UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **SANDRA TAYLOR RN,** | § | |
| **DIANA SEPEDA RN,** | § | |
| **NANCY FRIESEN RN,** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **3:07-CV-1931-M** |
| | § | |
| **LONE STAR HMA, LP** | § | |
| **d/b/a DALLAS REGIONAL MEDICAL** | § | |
| **CENTER,** | § | |
| | § | |
| **Defendant.** | § | |

## APPENDIX IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

The following Appendix is filed in support of Defendant Lone Star HMA, L.P. d/b/a

Dallas Regional Medical Center's Motion to Compel.

Respectfully submitted,


/s/ Mike Birrer
Mike Birrer
   State Bar No. 00783662
   mbirrer@ccsb.com
Rachel E. Mascorro
   State Bar No. 24060233
   rmascorro@ccsb.com
CARRINGTON, COLEMAN, SLOMAN
   & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone:  (214) 855-3000
Facsimile:  (214) 855-1333

*Attorneys for Defendant Lone Star HMA L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of July, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for Plaintiffs Sandra Taylor and Diana Sepeda, R.N., Elizabeth L. Higginbotham, Esq., 106 E. 6th Street, Suite 900, Austin, Texas 78701, and counsel for Plaintiff Nancy Friesen, Maria Wormington, Wormington Law Group, 207 East Lamar Street, McKinney, Texas 75069.


/s/ Mike Birrer
_____

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SANDRA TAYLOR, R.N. | § |
| DIANA SEPEDA, RN | § |
| NANCY FRIESEN, RN | § |
| | § |
| V. | § |
| | §   CIVIL ACTION NO.3:07-CV-1931-M |
| | § |
| LONE STAR HMA, LP, D/B/A | § |
| DALLAS REGIONAL MEDICAL CENTER | § |

**PLAINTIFFS' SANDRA TAYLOR, RN , DIANA SEPEDA RN
AND NANCY FRIESEN RN'S PRIVILEGE LOG**

| Doc. No. | Bates No. | Date | Doc. Type | Author | Recipients | Subject | Nature Of Privilege |
|---|---|---|---|---|---|---|---|
| 1 | 00259-00260 | 5/31/07 | E-Mail | Amber Jamil | D. Sepeda N. Friesen cc: E. Higginbotham | *Message from counsel to clients A. Jamil NNOC and S. Taylor | Attorney-client privilege; party communication |

*Message was sent May 31, 2007 to Sandra Taylor and to Amber Jamil who also

forwarded the message to Diana Sepeda and Nancy Friesen.

Respectfully submitted,

By:_____
      Elizabeth L. Higginbotham, RN, JD
      State Bar No. 00787694

HIGGINBOTHAM & ASSOCIATES LLC
The Littlefield Building

106 E. 6th Street, Suite 900
Austin, Texas 78701
(512) 322-5719 Phone
(512) 692-2752 Fax

Clay Dugas
Texas Bar No. 06173200
CLAY DUGAS & ASSOCIATES
805 Park
Beaumont, Texas 77701
(409) 813-1111 Phone
(409) 813-1396 Fax

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been forwarded via Electronic Transmission and certified mail on this 25th day of June, 2008 to Defendant's counsel of record:

Mike Birrer
Carrington, Coleman, Sloman & Blumenthal, LLP
901 Main Street, Suite 5500
Dallas, Texas 75202

_____
Elizabeth L. Higginbotham, RN, JD

# UNITED STATES DISTRICT COURT
## NOTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **SANDRA TAYLOR RN,** | § | |
| **DIANA SEPEDA RN,** | § | |
| **NANCY FRIESEN RN,** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **3:07-CV-1931-M** |
| | § | |
| **LONE STAR HMA, LP** | § | **[ECF]** |
| **d/b/a DALLAS REGIONAL MEDICAL** | § | |
| **CENTER,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT'S FIRST REQUEST FOR PRODUCTION
## TO PLAINTIFF NANCY FRIESEN RN

**TO:**   **Nancy Friesen RN, by and through her attorney of record, Elizabeth L. Higginbotham, 106 E. 6th Street, Suite 900, Austin, Texas 78701.**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Lone Star HMA, LLP ("Defendant") serves these requests for production upon Plaintiff Nancy Friesen RN and requests that she answer them separately and fully in writing and under oath within thirty (30) days after service hereof, in accordance with FED. R. CIV. P. 34. Responsive documents shall be produced at the offices of Carrington, Coleman, Sloman & Blumenthal, L.L.P., 901 Main Street, Suite 5500, Dallas, Texas 75202, at that time, or at a time and place mutually agreed upon by the parties. These requests shall be deemed to be continuing so as to require supplemental responses pursuant to FED. R. CIV. P. 26(e).

### I.   DEFINITIONS

As used in these requests, the following terms and phrases shall have the following definitions:

DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO
PLAINTIFF NANCY FRIESEN RN – Page 1

App. 3

1.      "You," "Your," and "Taylor" shall mean and include Nancy Friesen, her agents and other representatives.

2.      "Defendant" or shall mean and include Lone Star HMA, LLP, and any of its agents or other representatives.

3.      "Lawsuit" refers to this action styled *Sandra Taylor, et al., Plaintiffs, v. Lone Star HMA, LP d/b/a/ Dallas Regional Medical Center, Defendant*, Cause No. 307CV1931, pending in the United States District Court for the Northern District of Texas, Dallas division.

4.      "Document" shall mean and include documents and tangible things as defined by FED. R. CIV. P. 26 and 34.   This term shall also be defined to include all physically or electronically recorded information, written, transcribed, taped, filmed, and photographic matter, however produced or reproduced, of every type or description that is or has been in Plaintiff's possession, custody, or control, or of which Plaintiff has knowledge, including, but not limited to, every copy of each such document where such copy is not an identical copy of an original, or where such copy contains any marginal note or other commentary.

5.      "Possession, custody, or control" includes actual or constructive possession.  Any document or thing that is not in your immediate physical possession, but to which you have a superior right to compel production from a third person, or which is otherwise subject to your control, shall be obtained and produced as directed.

6.      "Concerning" means relating to, referring to, describing, evidencing, or constituting in any way, directly or indirectly, the item requested.

7.      "Interrogatory" or "Interrogatories" refers to interrogatories contained within Defendant's First Set of Interrogatories to Plaintiff Sandra Taylor.

**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO**
**PLAINTIFF NANCY FRIESEN RN – Page 2**

8.    "Person" shall be defined to include any natural person or business, legal or governmental entity or association.

9.    You should construe these discovery requests as follows: (a) the singular includes the plural and the plural includes the singular; (b) the masculine, feminine, or neuter pronoun includes the other genders; (c) the conjunctions "and" and "or" should be read either disjunctively or conjunctively to bring within the scope of the request all documents or information that might otherwise be construed to be outside its scope; (d) the words "any" and "all" shall include each and every; and (e) the present tense of a verb includes its past tense and vice versa.

## II.    INSTRUCTIONS

1.    All documents or things that respond, in whole or in part, to any portion of the requests below are to be produced in their entirety, including attachments and enclosures.

2.    You should produce one copy of each requested document.  A document that varies in any way from its original or from any other copy, including drafts or a document with handwritten notations or deletions, constitutes a separate document and must be produced, whether or not the original is within your custody, possession, or control.  Where an identical copy of a document cannot be produced for any reason (e.g., different color entries, faint writing, erasures, etc.), please produce the original.

3.    If Plaintiff contends that she is entitled to withhold any documents or things that would otherwise be responsive to these requests on the basis of any privilege or subject to protection as trial preparation materials, then with respect to such document or things please state the following: (i) type of document or thing (e.g., letter, memorandum, e-mail, telegram, telex, chart, photograph, sound reproduction, etc.); (ii) general subject matter; (iii) date of the document or thing; and (iv) author(s), addressee(s), and recipient(s).  *See* FED. R. CIV. P.

DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO
PLAINTIFF NANCY FRIESEN RN – Page 3

App. 5

26(b)(5).   Also state the basis upon which you contend you are entitled to withhold such document or thing.

4.      Unless otherwise specified in particular requests, the time period applicable to each of these requests is May 1, 2005 to present.

### III.      REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All documents concerning any communications between you and any other person, except your legal counsel, concerning this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 2:**

All invoices, bills, billing statements, timesheets or other documents concerning attorney's fees or expenses incurred in this Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 3:**

All documents concerning any communications between you and the California Nurses Association concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 4:**

All documents concerning any communications between you and the National Nurses Organizing Committee concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**


**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO**
**PLAINTIFF NANCY FRIESEN RN – Page 4**

**REQUEST FOR PRODUCTION NO. 5:**

All documents concerning any communications between you and any elected official concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 6:**

All documents concerning any communications between you and the California Nurses Association concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 7:**

All documents concerning any communications between you and the National Nurses Organizing Committee concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 8:**

All documents concerning any communications between you and any elected official concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 9:**

All documents referenced in your Initial Disclosures under the Federal Rules of Civil Procedure in this Lawsuit.

**RESPONSE:**


**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO**
**PLAINTIFF NANCY FRIESEN RN – Page 5**

**REQUEST FOR PRODUCTION NO. 10:**

All documents reviewed or referenced in preparing your responses (and any amended or supplemental responses) to Defendant's First Set of Interrogatories served on you in this Lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:**

All documents concerning the receipt of any money or income from June 1, 2007 to date.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:**

All documents concerning public forums in which you have discussed your termination from Defendant.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:**

All documents concerning any damages you are seeking to recover in the Lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:**

All emails that you have sent to anyone (except your attorney) concerning Defendant's termination of your employment.

**RESPONSE:**

**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO
PLAINTIFF NANCY FRIESEN RN – Page 6**

**REQUEST FOR PRODUCTION NO. 15:**

All documents reflecting that a third party has agreed to pay your attorneys' fees and/or costs in the Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 16:**

All documents concerning contacts that you have made with the media (television, newspapers, magazines, electronic bulletin boards, blogs, internet chat rooms, etc.) concerning your termination from Defendant or patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 17:**

Any diary or calendar that you maintained concerning your employment with Defendant.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 18:**

Your phone bills (home telephone and cell phone) for May 2007 and June 2007.

**RESPONSE:**

Respectfully submitted,

Mike Birrer
   State Bar No. 00783662
   mbirrer@ccsb.com
Rachel E. Mascorro
   State Bar No. 24060233
   rmascorro@ccsb.com
CARRINGTON, COLEMAN, SLOMAN
   & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone:  (214) 855-3000
Facsimile:  (214) 855-1333

*Attorneys for Defendant Lone Star HMA L.P.*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above cause in accordance with Rule 5, Federal Rules of Civil Procedure, on this 1st day of February, 2008.

UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SANDRA TAYLOR RN, | § | |
| DIANA SEPEDA RN, | § | |
| NANCY FRIESEN RN, | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | **CIVIL ACTION NO.** |
| v. | § | **3:07-CV-1931-M** |
| | § | |
| LONE STAR HMA, LP | § | **[ECF]** |
| d/b/a DALLAS REGIONAL MEDICAL | § | |
| CENTER, | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT'S FIRST REQUEST FOR PRODUCTION
## TO PLAINTIFF DIANA SEPEDA RN

TO:   **Diana Sepeda RN, by and through her attorney of record, Elizabeth L. Higginbotham, 106 E. 6th Street, Suite 900, Austin, Texas 78701.**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Lone Star HMA, LLP ("Defendant") serves these requests for production upon Plaintiff Diana Sepeda RN and requests that she answer them separately and fully in writing and under oath within thirty (30) days after service hereof, in accordance with FED. R. CIV. P. 34. Responsive documents shall be produced at the offices of Carrington, Coleman, Sloman & Blumenthal, L.L.P., 901 Main Street, Suite 5500, Dallas, Texas 75202, at that time, or at a time and place mutually agreed upon by the parties. These requests shall be deemed to be continuing so as to require supplemental responses pursuant to FED. R. CIV. P. 26(e).

### I.   DEFINITIONS

As used in these requests, the following terms and phrases shall have the following definitions:

**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO**
**PLAINTIFF DIANA SEPEDA RN – Page 1**

**App. 11**

1. "You," "Your," and "Taylor" shall mean and include Diana Sepeda, her agents and other representatives.

2. "Defendant" or shall mean and include Lone Star HMA, LLP, and any of its agents or other representatives.

3. "Lawsuit" refers to this action styled *Sandra Taylor, et al., Plaintiffs, v. Lone Star HMA, LP d/b/a/ Dallas Regional Medical Center, Defendant*, Cause No. 307CV1931, pending in the United States District Court for the Northern District of Texas, Dallas division.

4. "Document" shall mean and include documents and tangible things as defined by FED. R. CIV. P. 26 and 34. This term shall also be defined to include all physically or electronically recorded information, written, transcribed, taped, filmed, and photographic matter, however produced or reproduced, of every type or description that is or has been in Plaintiff's possession, custody, or control, or of which Plaintiff has knowledge, including, but not limited to, every copy of each such document where such copy is not an identical copy of an original, or where such copy contains any marginal note or other commentary.

5. "Possession, custody, or control" includes actual or constructive possession. Any document or thing that is not in your immediate physical possession, but to which you have a superior right to compel production from a third person, or which is otherwise subject to your control, shall be obtained and produced as directed.

6. "Concerning" means relating to, referring to, describing, evidencing, or constituting in any way, directly or indirectly, the item requested.

7. "Interrogatory" or "Interrogatories" refers to interrogatories contained within Defendant's First Set of Interrogatories to Plaintiff Sandra Taylor.

8.    "Person" shall be defined to include any natural person or business, legal or governmental entity or association.

9.    You should construe these discovery requests as follows: (a) the singular includes the plural and the plural includes the singular; (b) the masculine, feminine, or neuter pronoun includes the other genders; (c) the conjunctions "and" and "or" should be read either disjunctively or conjunctively to bring within the scope of the request all documents or information that might otherwise be construed to be outside its scope; (d) the words "any" and "all" shall include each and every; and (e) the present tense of a verb includes its past tense and vice versa.

## II.    INSTRUCTIONS

1.    All documents or things that respond, in whole or in part, to any portion of the requests below are to be produced in their entirety, including attachments and enclosures.

2.    You should produce one copy of each requested document.  A document that varies in any way from its original or from any other copy, including drafts or a document with handwritten notations or deletions, constitutes a separate document and must be produced, whether or not the original is within your custody, possession, or control.  Where an identical copy of a document cannot be produced for any reason (e.g., different color entries, faint writing, erasures, etc.), please produce the original.

3.    If Plaintiff contends that she is entitled to withhold any documents or things that would otherwise be responsive to these requests on the basis of any privilege or subject to protection as trial preparation materials, then with respect to such document or things please state the following: (i) type of document or thing (e.g., letter, memorandum, e-mail, telegram, telex, chart, photograph, sound reproduction, etc.); (ii) general subject matter; (iii) date of the document or thing; and (iv) author(s), addressee(s), and recipient(s).  *See* FED. R. CIV. P.

DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO
PLAINTIFF DIANA SEPEDA RN – Page 3

26(b)(5).  Also state the basis upon which you contend you are entitled to withhold such document or thing.

4.      Unless otherwise specified in particular requests, the time period applicable to each of these requests is May 1, 2005 to present.

## III.   REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All documents concerning any communications between you and any other person, except your legal counsel, concerning this Lawsuit, or your claims in this Lawsuit.

### RESPONSE:


### REQUEST FOR PRODUCTION NO. 2:

All invoices, bills, billing statements, timesheets or other documents concerning attorney's fees or expenses incurred in this Lawsuit.

### RESPONSE:


### REQUEST FOR PRODUCTION NO. 3:

All documents concerning any communications between you and the California Nurses Association concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

### RESPONSE:


### REQUEST FOR PRODUCTION NO. 4:

All documents concerning any communications between you and the National Nurses Organizing Committee concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

### RESPONSE:


**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO**
**PLAINTIFF DIANA SEPEDA RN – Page 4**

**REQUEST FOR PRODUCTION NO. 5:**

All documents concerning any communications between you and any elected official concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 6:**

All documents concerning any communications between you and the California Nurses Association concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 7:**

All documents concerning any communications between you and the National Nurses Organizing Committee concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 8:**

All documents concerning any communications between you and any elected official concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 9:**

All documents referenced in your Initial Disclosures under the Federal Rules of Civil Procedure in this Lawsuit.

**RESPONSE:**


**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO**
**PLAINTIFF DIANA SEPEDA RN – Page 5**

**REQUEST FOR PRODUCTION NO. 10:**

All documents reviewed or referenced in preparing your responses (and any amended or supplemental responses) to Defendant's First Set of Interrogatories served on you in this Lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:**

All documents concerning the receipt of any money or income from June 1, 2007 to date.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:**

All documents concerning public forums in which you have discussed your termination from Defendant.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:**

All documents concerning any damages you are seeking to recover in the Lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:**

All emails that you have sent to anyone (except your attorney) concerning Defendant's termination of your employment.

**RESPONSE:**

**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO PLAINTIFF DIANA SEPEDA RN – Page 6**

**REQUEST FOR PRODUCTION NO. 15:**

All documents reflecting that a third party has agreed to pay your attorneys' fees and/or costs in the Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 16:**

All documents concerning contacts that you have made with the media (television, newspapers, magazines, electronic bulletin boards, blogs, internet chat rooms, etc.) concerning your termination from Defendant or patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 17:**

Any diary or calendar that you maintained concerning your employment with Defendant.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 18:**

Your phone bills (home telephone and cell phone) for May 2007 and June 2007.

**RESPONSE:**


**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO**
**PLAINTIFF DIANA SEPEDA RN – Page 7**

Respectfully submitted,

Mike Birrer
   State Bar No. 00783662
   mbirrer@ccsb.com
Rachel E. Mascorro
   State Bar No. 24060233
   rmascorro@ccsb.com
CARRINGTON, COLEMAN, SLOMAN
   & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone:  (214) 855-3000
Facsimile:  (214) 855-1333

*Attorneys for Defendant Lone Star HMA L.P.*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above cause in accordance with Rule 5, Federal Rules of Civil Procedure, on this 1st day of February, 2008.

**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO
PLAINTIFF DIANA SEPEDA RN – Page 8**

UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SANDRA TAYLOR RN, | § | |
| DIANA SEPEDA RN, | § | |
| NANCY FRIESEN RN, | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **3:07-CV-1931-M** |
| | § | |
| LONE STAR HMA, LP | § | [ECF] |
| d/b/a DALLAS REGIONAL MEDICAL | § | |
| CENTER, | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO PLAINTIFF SANDRA TAYLOR RN

TO:    **Sandra Taylor RN, by and through her attorney of record, Elizabeth L. Higginbotham, 106 E. 6th Street, Suite 900, Austin, Texas 78701.**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Lone Star HMA, LLP ("Defendant") serves these requests for production upon Plaintiff Sandra Taylor and requests that she answer them separately and fully in writing and under oath within thirty (30) days after service hereof, in accordance with FED. R. CIV. P. 34. Responsive documents shall be produced at the offices of Carrington, Coleman, Sloman & Blumenthal, L.L.P., 901 Main Street, Suite 5500, Dallas, Texas 75202, at that time, or at a time and place mutually agreed upon by the parties. These requests shall be deemed to be continuing so as to require supplemental responses pursuant to FED. R. CIV. P. 26(e).

### I.    DEFINITIONS

As used in these requests, the following terms and phrases shall have the following definitions:

DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO
PLAINTIFF SANDRA TAYLOR RN – Page 1

1.     "You," "Your," and "Taylor" shall mean and include Sandra Taylor, her agents and other representatives.

2.     "Defendant" or shall mean and include Lone Star HMA, LLP, and any of its agents or other representatives.

3.     "Lawsuit" refers to this action styled *Sandra Taylor, et al., Plaintiffs, v. Lone Star HMA, LP d/b/a/ Dallas Regional Medical Center, Defendant*, Cause No. 307CV1931, pending in the United States District Court for the Northern District of Texas, Dallas division.

4.     "Document" shall mean and include documents and tangible things as defined by FED. R. CIV. P. 26 and 34.   This term shall also be defined to include all physically or electronically recorded information, written, transcribed, taped, filmed, and photographic matter, however produced or reproduced, of every type or description that is or has been in Plaintiff's possession, custody, or control, or of which Plaintiff has knowledge, including, but not limited to, every copy of each such document where such copy is not an identical copy of an original, or where such copy contains any marginal note or other commentary.

5.     "Possession, custody, or control" includes actual or constructive possession.  Any document or thing that is not in your immediate physical possession, but to which you have a superior right to compel production from a third person, or which is otherwise subject to your control, shall be obtained and produced as directed.

6.     "Concerning" means relating to, referring to, describing, evidencing, or constituting in any way, directly or indirectly, the item requested.

7.     "Interrogatory" or "Interrogatories" refers to interrogatories contained within Defendant's First Set of Interrogatories to Plaintiff Sandra Taylor.

**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO**
**PLAINTIFF SANDRA TAYLOR RN – Page 2**

8.     "Person" shall be defined to include any natural person or business, legal or governmental entity or association.

9.     You should construe these discovery requests as follows: (a) the singular includes the plural and the plural includes the singular; (b) the masculine, feminine, or neuter pronoun includes the other genders; (c) the conjunctions "and" and "or" should be read either disjunctively or conjunctively to bring within the scope of the request all documents or information that might otherwise be construed to be outside its scope; (d) the words "any" and "all" shall include each and every; and (e) the present tense of a verb includes its past tense and vice versa.

## II.     INSTRUCTIONS

1.     All documents or things that respond, in whole or in part, to any portion of the requests below are to be produced in their entirety, including attachments and enclosures.

2.     You should produce one copy of each requested document.  A document that varies in any way from its original or from any other copy, including drafts or a document with handwritten notations or deletions, constitutes a separate document and must be produced, whether or not the original is within your custody, possession, or control.  Where an identical copy of a document cannot be produced for any reason (e.g., different color entries, faint writing, erasures, etc.), please produce the original.

3.     If Plaintiff contends that she is entitled to withhold any documents or things that would otherwise be responsive to these requests on the basis of any privilege or subject to protection as trial preparation materials, then with respect to such document or things please state the following: (i) type of document or thing (e.g., letter, memorandum, e-mail, telegram, telex, chart, photograph, sound reproduction, etc.); (ii) general subject matter; (iii) date of the document or thing; and (iv) author(s), addressee(s), and recipient(s).  *See* FED. R. CIV. P.

DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO
PLAINTIFF SANDRA TAYLOR RN – Page 3

App. 21

26(b)(5).   Also state the basis upon which you contend you are entitled to withhold such document or thing.

4.      Unless otherwise specified in particular requests, the time period applicable to each of these requests is May 1, 2005 to present.

### III.      REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All documents concerning any communications between you and any other person, except your legal counsel, concerning this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 2:**

All invoices, bills, billing statements, timesheets or other documents concerning attorney's fees or expenses incurred in this Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 3:**

All documents concerning any communications between you and the California Nurses Association concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 4:**

All documents concerning any communications between you and the National Nurses Organizing Committee concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**


**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO
PLAINTIFF SANDRA TAYLOR RN – Page 4**

**REQUEST FOR PRODUCTION NO. 5:**

    All documents concerning any communications between you and any elected official concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 6:**

    All documents concerning any communications between you and the California Nurses Association concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 7:**

    All documents concerning any communications between you and the National Nurses Organizing Committee concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 8:**

    All documents concerning any communications between you and any elected official concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 9:**

    All documents referenced in your Initial Disclosures under the Federal Rules of Civil Procedure in this Lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10:**

      All documents reviewed or referenced in preparing your responses (and any amended or supplemental responses) to Defendant's First Set of Interrogatories served on you in this Lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:**

      All documents concerning the receipt of any money or income from June 1, 2007 to date.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:**

      All documents concerning public forums in which you have discussed your termination from Defendant.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:**

      All documents concerning any damages you are seeking to recover in the Lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:**

      All emails that you have sent to anyone (except your attorney) concerning Defendant's termination of your employment.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:**

All documents reflecting that a third party has agreed to pay your attorneys' fees and/or costs in the Lawsuit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 16:**

All documents concerning contacts that you have made with the media (television, newspapers, magazines, electronic bulletin boards, blogs, internet chat rooms, etc.) concerning your termination from Defendant or patient/nurse ratios on an intensive care unit.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 17:**

Any diary or calendar that you maintained concerning your employment with Defendant.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 18:**

Your phone bills (home telephone and cell phone) for May 2007 and June 2007.

**RESPONSE:**


**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO PLAINTIFF SANDRA TAYLOR RN – Page 7**

App. 25

Respectfully submitted,

Mike Birrer
   State Bar No. 00783662
   mbirrer@ccsb.com
Rachel E. Mascorro
   State Bar No. 24060233
   rmascorro@ccsb.com
CARRINGTON, COLEMAN, SLOMAN
   & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone:  (214) 855-3000
Facsimile:  (214) 855-1333

*Attorneys for Defendant Lone Star HMA L.P.*

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above cause in accordance with Rule 5, Federal Rules of Civil Procedure, on this 1st day of February, 2008.

**DEFENDANT'S FIRST REQUEST FOR PRODUCTION TO
PLAINTIFF SANDRA TAYLOR RN – Page 8**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| SANDRA TAYLOR, R.N. § | |
| DIANA SEPEDA, RN § | |
| NANCY FRIESEN, RN § | |
| § | |
| V. § | |
| § | **CIVIL ACTION NO.3:07-CV-1931-M** |
| § | |
| LONE STAR HMA, LP, D/B/A § | |
| DALLAS REGIONAL MEDICAL CENTER § | |

### PLAINTIFF NANCY FRIESEN'S
### RESPONSE TO DEFENDANT'S FIRST REQUEST FOR PRODUCTION

TO:    Lone Star HMA, LP d/b/a Dallas Regional Medical Center, by and through their attorney of
record, Mike Birrer, Carrington, Coleman, Sloman & Blumenthal, L.L.P., 901 Main Street,
Suite 5500, Dallas, Texas 75202.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, and without waiving her

objections hereto made and without agreeing to the admissibility in evidence of Defendant's Request

Plaintiff Nancy Friesen, RN ("Plaintiff") serves these responses to requests for production upon

Defendant Lone Star HMA, LLP ("Defendant"); in accordance with FED. R. *Civ.* P. 34.

### PLAINTIFF'S RESPONSES TO DEFENDANT'S
### FIRST REQEUST FOR PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION NO.1:

All documents concerning any communications between you and any other person,

except your legal counsel, concerning this Lawsuit, or your claims in this Lawsuit.

### RESPONSE:

*See* Bates numbered documents P-00074 through P-00078; P-00089 through P-00138.

PLAINTIFF NANCY FRIESEN'S RESPONSE TO
DEFENDANT'S FIRST REQUEST FOR PRODUCTION

**REQUEST FOR PRODUCTION NO.2**:

All invoices, bills, billing statements, timesheets or other documents concerning attorney's fees or expenses incurred in this Lawsuit.

**RESPONSE:**

*See* contract for attorney's fees with Ms. Higginbotham and Mr. Dugas. P-00086 through P-00088.  Billing records and timesheets will be supplemented.

**REQUEST FOR PRODUCTION NO.3:**

All documents concerning any communications between you and the California Nurses Association concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**

*See* P-00074 through P-00078; P-00089 through P-00138.

**REQUEST FOR PRODUCTION NO.4**:

All documents concerning any communications between you and the National Nurses Organizing Committee concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**

*See* P-00074 through P-00078; P-00089 through P-00138.

**REQUEST FOR PRODUCTION NO.5:**

All documents concerning any communications between you and any elected official concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**

*See* P-00021 through P-00023; P-00025, P-00026; P-00074 through P-00078; P-00097 through P-00099; P-00111 through P-00120.

**REQUEST FOR PRODUCTION NO.6**:

All documents concerning any communications between you and the California Nurses

Association concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**

*See* P-00074 through P-00078; P-00089 through P-00138.

**REQUEST FOR PRODUCTION NO.7**:

All documents concerning any communications between you and the National Nurses

Organizing Committee concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**

*See* P-00074 through P-00078; P-00089 through P-00138.

**REQUEST FOR PRODUCTION NO.8**:

All documents concerning any communications between you and any elected official

concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**

*See* P-00021 through P-00023; P-00025, P-00026; P-00074 through P-00078; P-00089 thrugh

P-00138.

**REQUEST FOR PRODUCTION NO.9**:

All documents referenced in your Initial Disclosures under the Federal Rules of Civil

Procedure in this Lawsuit.

PLAINTIFF NANCY FRIESEN'S RESPONSE TO
DEFENDANT'S FIRST REQUEST FOR PRODUCTION

**RESPONSE:**

     *See* Bates Numbered documents P 00001-00082and  P 00089-00143 and P 00144-00152

**REQUEST FOR PRODUCTION NO. 10:**

     All documents reviewed or referenced in preparing your responses (and any amended or supplemental responses) to Defendant's First Set of Interrogatories served on you in this Lawsuit.

**RESPONSE:**

     *See* Bates Numbered documents P-00001, P-00078 through P-00085, P-00086 through P-00143 and P-00144 through P-00152.

**REQUEST FOR PRODUCTION NO.11:**

     All documents concerning the receipt of any money or income from June 1, 2007 to date.

**RESPONSE:**

     *See* P-00144 through P-00152.

**REQUEST FOR PRODUCTION NO. 12:**

     All documents concerning public forums in which you have discussed your termination from Defendant.

**RESPONSE:**

     *See* P-00111; P-00074 through P-00078.

**REQUEST FOR PRODUCTION NO. 13:**

     All documents concerning any damages you are seeking to recover in the Lawsuit.

**RESPONSE:**

     *See* P-00144 through P-00152.  Plaintiff will supplement this response.

**REQUEST FOR PRODUCTION NO. 14:**

All emails that you have sent to anyone (except your attorney) concerning Defendant's termination of your employment.

**RESPONSE:**

Plaintiff objects to this Request as it is overly broad, not limited in time or scope and seeks information that is not relevant to this litigation. If Defendant will narrow its request to identify the person to whom the e-mail is directed, Plaintiff will make every effort to produce emails that are specifically requested.

**REQUEST FOR PRODUCTION NO. 15:**

All documents reflecting that a third party has agreed to pay your attorneys' fees and/or costs in the Lawsuit.

**RESPONSE:**

None.

**REQUEST FOR PRODUCTION NO. 16:**

All documents concerning contacts that you have made with the media (television, newspapers, magazines, electronic bulletin boards, blogs, internet chat rooms, etc.) concerning your termination from Defendant or patient/nurse ratios on an intensive care unit.

**RESPONSE:**

*See* P-00021 through P-00023; P-00025, P-00026, P-00097 though P-00099; P-00111 through P-00120; P-00074 through P-00078.

**REQUEST FOR PRODUCTION NO. 17:**

      Any diary or calendar that you maintained concerning your employment with Defendant.

**RESPONSE:**

      Plaintiff will supplement this response.

**REQUEST FOR PRODUCTION NO. 18:**

      Your phone bills (home telephone and cell phone) for May 2007 and June 2007.

**RESPONSE:**

      Plaintiff objects to this Request to the extent that it invades Plaintiff's privacy related to any calls made or received from her home or cell phone related to the receipt of medical advice, treatment by Plaintiff or a member of her household with access to her home and/or cellular telephone. Plaintiff objects to providing her home telephone records to the extent that Plaintiff is not the only person who utilizes the telephone and this Request invades the privacy interests of third parties who also use that account. Subject to and without waiving these objections, Plaintiff agrees to produce redacted cell phone records

                                Respectfully submitted,

                                  By: _____
                                      Elizabeth L. Higginbotham, RN, JD
                                      State Bar No. 00787694

                                HIGGINBOTHAM & ASSOCIATES LLC
                                The Littlefield Building
                                106 E. 6th Street, Suite 900
                                Austin, Texas 78701
                                (512) 322-5719 Phone
                                (512) 692-2752 Fax

Clay Dugas
Texas Bar No. 06173200
CLAY DUGAS & ASSOCIATES
805 Park
Beaumont, Texas 77701
(409) 813-1111  Phone
(409) 813-1396  Fax

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been forwarded via Electronic Transmission on this 4th day of March, 2008.to Defendant's counsel of record:

Mike Birrer
Carrington, Coleman, Sloman & Blumenthal, LLP
901 Main Street, Suite 5500
Dallas, Texas  75202

ELIZABETH L. HIGGINBOTHAM, RN, JD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **SANDRA TAYLOR, R.N.** | § | |
| **DIANA SEPEDA, RN** | § | |
| **NANCY FRIESEN, RN** | § | |
| | § | |
| **V.** | § | |
| | § | **CIVIL ACTION NO.3:07-CV-1931-M** |
| | § | |
| **LONE STAR HMA, LP, D/B/A** | § | |
| **DALLAS REGIONAL MEDICAL CENTER** | § | |

## PLAINTIFF DIANA SEPEDA'S
## RESPONSE TO DEFENDANT'S FIRST REQUEST FOR PRODUCTION

TO:    Lone Star HMA, LP d/b/a Dallas Regional Medical Center, by and through their attorney of record, Mike Birrer, Carrington, Coleman, Sloman & Blumenthal, L.L.P., 901 Main Street, Suite 5500, Dallas, Texas 75202.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, and without waiving her objections hereto made and without agreeing to the admissibility in evidence of Defendant's Request Plaintiff Diana Sepeda, RN ("Plaintiff") serves these responses to requests for production upon Defendant Lone Star HMA, LLP ("Defendant"); in accordance with FED. R. CIV. P. 34.

## PLAINTIFF'S RESPONSES TO DEFENDANT'S
## FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION NO.1:

All documents concerning any communications between you and any other person, except your legal counsel, concerning this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**

*See* Bates numbered documents P00007 through P-0009; P-00074 through P-00078; P-00089 through P-00138.

## REQUEST FOR PRODUCTION NO.2:

All invoices, bills, billing statements, timesheets or other documents concerning attorney's fees or expenses incurred in this Lawsuit.

**RESPONSE:**

*See* contract for attorney's fees with Ms. Higginbotham and Mr. Dugas (P-0083 through P-0085). Billing records and timesheets will be supplemented.

## REQUEST FOR PRODUCTION NO.3:

All documents concerning any communications between you and the California Nurses Association concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**

*See* P-00074 through P-00078; P-00089 through P-00138.

## REQUEST FOR PRODUCTION NO.4:

All documents concerning any communications between you and the National Nurses Organizing Committee concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**

*See* P-00074 through P-00078; P-00089 through P-00138.

PLAINTIFF DIANA SEPEDA'S RESPONSE TO
DEFENDANT'S FIRST REQUEST FOR PRODUCTION

**REQUEST FOR PRODUCTION NO.5**:

All documents concerning any communications between you and any elected official concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE**:

*See* P-00021 through P-00023; P-00025, P-00026; P-00074 through P-00078; P-00097 through P-00099; P-00111 through P-00120.

**REQUEST FOR PRODUCTION NO.6**:

All documents concerning any communications between you and the California Nurses Association concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE**:

*See* P-00074 through P-00078; P-00089 through P-00138.

**REQUEST FOR PRODUCTION NO.7**:

All documents concerning any communications between you and the National Nurses Organizing Committee concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE**:

*See* P-00074 through P-00078; P-00089 through P-00138.

**REQUEST FOR PRODUCTION NO.8**:

All documents concerning any communications between you and any elected official concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE**:

*See* P-00021 through P-00023; P-00025, P-00026; P-00074 through P-00078; P-00089 through P-00138.

**REQUEST FOR PRODUCTION NO.9:**

All documents referenced in your Initial Disclosures under the Federal Rules of Civil Procedure in this Lawsuit.

**RESPONSE:**

*See* Bates Numbered documents P-00001 through P-00082, P-00089 through P-00143 and P-00157.

**REQUEST FOR PRODUCTION NO. 10:**

All documents reviewed or referenced in preparing your responses (and any amended or supplemental responses) to Defendant's First Set of Interrogatories served on you in this Lawsuit.

**RESPONSE:**

*See* Bates Numbered documents P-00001 through P-00078 and P-00083 through P-00085; and P-00089 through P-00143 and P-00157.

**REQUEST FOR PRODUCTION NO.11:**

All documents concerning the receipt of any money or income from June 1, 2007 to date.

**RESPONSE:**

*See* P-00157.

**REQUEST FOR PRODUCTION NO. 12:**

All documents concerning public forums in which you have discussed your termination from Defendant.

**RESPONSE:**

*See* P-00111; P-00074 through P-00078 and P-00053.

**REQUEST FOR PRODUCTION NO. 13:**

All documents concerning any damages you are seeking to recover in the Lawsuit.

**RESPONSE:**

*See* P-00157.  Plaintiff will supplement this response.

**REQUEST FOR PRODUCTION NO. 14:**

All emails that you have sent to anyone (except your attorney) concerning Defendant's termination of your employment.

**RESPONSE:**

Plaintiff objects to this Request as it is overly broad, not limited in time or scope and seeks information that is not relevant to this litigation.  If Defendant will narrow its request to identify the person to whom the e-mail is directed, Plaintiff will make every effort to produce emails that are specifically requested.

**REQUEST FOR PRODUCTION NO. 15:**

All documents reflecting that a third party has agreed to pay your attorneys' fees and/or costs in the Lawsuit.

**RESPONSE:**

None.

**REQUEST FOR PRODUCTION NO. 16:**

All documents concerning contacts that you have made with the media (television, newspapers, magazines, electronic bulletin boards, blogs, internet chat rooms, etc.) concerning your termination from Defendant or patient/nurse ratios on an intensive care unit.

**RESPONSE:**

*See* P-00021 through P-00023; P-00025, P-00026; P-00053; P-00097 through P-00099; P-00111 through P-00120; P-00074 through P-00078.

**REQUEST FOR PRODUCTION NO. 17:**

Any diary or calendar that you maintained concerning your employment with Defendant.

**RESPONSE:**

Plaintiff will supplement this response.

**REQUEST FOR PRODUCTION NO. 18:**

Your phone bills (home telephone and cell phone) for May 2007 and June 2007.

**RESPONSE:**

Plaintiff objects to this Request to the extent that it invades Plaintiff's privacy related to any calls made or received from her home or cell phone related to the receipt of medical advice, treatment by Plaintiff or a member of her household with access to her home and/or cellular telephone. Plaintiff objects to providing her home telephone records to the extent that Plaintiff is not the only person who utilizes the telephone and this Request invades the privacy interests of third parties who also use that account. Subject to and without waiving these objections, Plaintiff agrees to produce redacted cell phone records

Respectfully submitted,

By: _____
    Elizabeth L. Higginbotham, RN, JD
    State Bar No. 00787694


HIGGINBOTHAM & ASSOCIATES LLC
The Littlefield Building
106 E. 6th Street, Suite 900
Austin, Texas  78701
(512) 322-5719 Phone
(512) 692-2752 Fax

Clay Dugas
Texas Bar No. 06173200
CLAY DUGAS & ASSOCIATES
805 Park
Beaumont, Texas 77701
(409) 813-1111  Phone
(409) 813-1396  Fax

ATTORNEYS FOR PLAINTIFF


## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been forwarded via Electronic Transmission on this 4th day of March, 2008.to Defendant's counsel of record:

Mike Birrer
Carrington, Coleman, Sloman & Blumenthal, LLP
901 Main Street, Suite 5500
Dallas, Texas  75202

                                 _____
                   ELIZABETH L. HIGGINBOTHAM, RN, JD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **SANDRA TAYLOR, R.N.** | § | |
| **DIANA SEPEDA, RN** | § | |
| **NANCY FRIESEN, RN** | § | |
| | § | |
| **V.** | § | |
| | § | **CIVIL ACTION NO.3:07-CV-1931-M** |
| | § | |
| **LONE STAR HMA, LP, D/B/A** | § | |
| **DALLAS REGIONAL MEDICAL CENTER** | § | |

### PLAINTIFF SANDRA TAYLOR'S
### RESPONSE TO DEFENDANT'S FIRST REQUEST FOR PRODUCTION

TO:   Lone Star HMA, LP d/b/a Dallas Regional Medical Center, by and through their attorney of record, Mike Birrer, Carrington, Coleman, Sloman & Blumenthal, L.L.P., 901 Main Street, Suite 5500, Dallas, Texas 75202.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, and without waiving her objections hereto made and without agreeing to the admissibility in evidence of Defendant's Request Plaintiff Sandra Taylor, RN ("Plaintiff") serves these responses to requests for production upon Defendant Lone Star HMA, LLP ("Defendant"); in accordance with FED. R. CIV. P. 34.

### PLAINTIFF'S RESPONSES TO DEFENDANT'S
### FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION NO.1:

All documents concerning any communications between you and any other person, except your legal counsel, concerning this Lawsuit, or your claims in this Lawsuit.

### RESPONSE:

*See* Bates numbered documents P00001 through P-0005; P-00074 through P-00078; P-00089 through P-00138.

PLAINTIFF SANDRA TAYLOR'S RESPONSE TO
DEFENDANT'S FIRST REQUEST FOR PRODUCTION

**REQUEST FOR PRODUCTION NO.2**:

All invoices, bills, billing statements, timesheets or other documents concerning attorney's fees or expenses incurred in this Lawsuit.

**RESPONSE:**

*See* contract for attorney's fees with Ms. Higginbotham and Mr. Dugas. P-0079 through P-0082. Billing records and timesheets will be supplemented.

**REQUEST FOR PRODUCTION NO.3:**

All documents concerning any communications between you and the California Nurses Association concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**

*See* P-00074 through P-00078; P-00089 through P-00138.

**REQUEST FOR PRODUCTION NO.4:**

All documents concerning any communications between you and the National Nurses Organizing Committee concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

**RESPONSE:**

*See* P-00074 through P-00078, P-00089 through P-00138.

**REQUEST FOR PRODUCTION NO.5:**

All documents concerning any communications between you and any elected official concerning Defendant, this Lawsuit, or your claims in this Lawsuit.

PLAINTIFF SANDRA TAYLOR'S RESPONSE TO
DEFENDANT'S FIRST REQUEST FOR PRODUCTION

**RESPONSE:**

  *See* P-00021 throough P-00023; P-00025, P-00026; P-00074 through P-00078; P-00097 through P-00099; P-00111 through P-00120

**REQUEST FOR PRODUCTION NO.6:**

  All documents concerning any communications between you and the California Nurses Association concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**

  *See* P-00074 through P-00078; P-00089 through P-00138.

**REQUEST FOR PRODUCTION NO.7:**

  All documents concerning any communications between you and the National Nurses Organizing Committee concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**

  *See* P-00074 through P-00078; P-00089 through P-00138.

**REQUEST FOR PRODUCTION NO.8:**

  All documents concerning any communications between you and any elected official concerning appropriate patient/nurse ratios on an intensive care unit.

**RESPONSE:**

  *See* P-00021 through P-00023; P-00025, P-00026; P-00074 through P-00078; P-00089 through P-000138.

**REQUEST FOR PRODUCTION NO.9:**

  All documents referenced in your Initial Disclosures under the Federal Rules of Civil Procedure in this Lawsuit.

PLAINTIFF SANDRA TAYLOR'S RESPONSE TO
DEFENDANT'S FIRST REQUEST FOR PRODUCTION

                   Page 3

**App. 43**

**RESPONSE:**

   *See* Bates Numbered documents P-00001 through P-00082, P-00089 through P-00143, and P-00153 through P-00156.

## REQUEST FOR PRODUCTION NO. 10:

   All documents reviewed or referenced in preparing your responses (and any amended or supplemental responses) to Defendant's First Set of Interrogatories served on you in this Lawsuit.

**RESPONSE:**

   *See* Bates Numbered documents P-00001 through P-00082, P-00089 through P-00143 and P-00153 through P-00156.

## REQUEST FOR PRODUCTION NO.11:

   All documents concerning the receipt of any money or income from June 1, 2007 to date.

**RESPONSE:**

   *See* P-00153 through P-00156.

## REQUEST FOR PRODUCTION NO. 12:

   All documents concerning public forums in which you have discussed your termination from Defendant.

**RESPONSE:**

   *See* P-00111; P-00074 through P-00078.

## REQUEST FOR PRODUCTION NO. 13:

   All documents concerning any damages you are seeking to recover in the Lawsuit.

**RESPONSE:**

*See* P-00153 through P-00156.  Plaintiff will supplement this response.

**REQUEST FOR PRODUCTION NO. 14:**

All emails that you have sent to anyone (except your attorney) concerning Defendant's termination of your employment.

**RESPONSE:**

Plaintiff objects to this Request as it is overly broad, not limited in time or scope and seeks information that is not relevant to this litigation.  If Defendant will narrow its request to identify the person to whom the e-mail is directed, Plaintiff will make every effort to produce emails that are specifically requested.

**REQUEST FOR PRODUCTION NO. 15:**

All documents reflecting that a third party has agreed to pay your attorneys' fees and/or costs in the Lawsuit.

**RESPONSE:**

None.

**REQUEST FOR PRODUCTION NO. 16:**

All documents concerning contacts that you have made with the media (television, newspapers, magazines, electronic bulletin boards, blogs, internet chat rooms, etc.) concerning your termination from Defendant or patient/nurse ratios on an intensive care unit.

**RESPONSE:**

*See* P-00021 through P-00023; P-00025, P-00026, P-00097 through P-00099; P0111 through P-00120; P-00074 through P-00078.

**REQUEST FOR PRODUCTION NO. 17:**

Any diary or calendar that you maintained concerning your employment with Defendant.

**RESPONSE:**

Plaintiff will supplement this response.

**REQUEST FOR PRODUCTION NO. 18:**

Your phone bills (home telephone and cell phone) for May 2007 and June 2007.

**RESPONSE:**

Plaintiff objects to this Request to the extent that it invades Plaintiff's privacy related to any calls made or received from her home or cell phone related to the receipt of medical advice, treatment by Plaintiff or a member of her household with access to her home and/or cellular telephone. Plaintiff objects to providing her home telephone records to the extent that Plaintiff is not the only person who utilizes the telephone and this Request invades the privacy interests of third parties who also use that account. Subject to and without waiving these objections, Plaintiff agrees to produce redacted cell phone records

Respectfully submitted,

By: _____
     Elizabeth L. Higginbotham, RN, JD
     State Bar No. 00787694

PLAINTIFF SANDRA TAYLOR'S RESPONSE TO
DEFENDANT'S FIRST REQUEST FOR PRODUCTION

Page 6

App. 46

HIGGINBOTHAM & ASSOCIATES LLC
The Littlefield Building
106 E. 6th Street, Suite 900
Austin, Texas 78701
(512) 322-5719 Phone
(512) 692-2752 Fax

Clay Dugas
Texas Bar No. 06173200
CLAY DUGAS & ASSOCIATES
805 Park
Beaumont, Texas 77701
(409) 813-1111 Phone
(409) 813-1396 Fax

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been forwarded via Electronic Transmission on this 4th day of March, 2008.to Defendant's counsel of record:

Mike Birrer
Carrington, Coleman, Sloman & Blumenthal, LLP
901 Main Street, Suite 5500
Dallas, Texas 75202

ELIZABETH L. HIGGINBOTHAM, RN, JD

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                     DALLAS DIVISION

3
     SANDRA TAYLOR, RN,                )
4    DIANA SEPEDA, RN,                 )
     NANCY FRIESEN, RN,                )
5                                      )
              Plaintiffs,              ) CIVIL ACTION
6                                      ) NO.
     vs.                               ) 3:07-CV-1931-M
7                                      )
     LONE STAR HMA, LP d/b/a DALLAS    )
8    REGIONAL MEDICAL CENTER,          )
                                       )
9             Defendant.               )

10

11   ************************************************************

12                 ORAL DEPOSITION OF

13              **NANCY L. FRIESEN**

14                 May 16, 2008

15   ************************************************************

16                     COPY

17

18            ORAL DEPOSITION of **NANCY L. FRIESEN**,

19   taken at the instance of the Defendant, on the 16th of

20   May, 2008, in the above styled and numbered cause at

21   the offices of Art Brender, 600 Eighth Avenue,

22   Fort Worth, Texas, before Jeff L. Foster, a Certified

23   Shorthand Reporter in and for the State of Texas,

24   pursuant to the Federal Rules of Civil Procedure and

25   the provisions stated on the record.

1                    A P P E A R A N C E S

2

3

APPEARING FOR THE PLAINTIFF:

4
     Ms. Elizabeth L. Higginbotham
5    HIGGINBOTHAM & ASSOCIATES
     The Littlefield Building
6    106 East 6th Street, Suite 900
     Austin, Texas 78701
7
     -and-
8
     Mr. Clay Dugas
9    CLAY DUGAS & ASSOCIATES
     805 Park
10   Beaumont, Texas 77701

11

12  APPEARING FOR THE DEFENDANT:

13   Mr. Mike Birrer
     Ms. Rachel E. Mascorro
14   CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL
     901 Main Street, Suite 5500
15   Dallas, Texas 75202

16

ALSO APPEARING

17
     Ms. Sandra Taylor
18   Ms. Diana Sepeda

19

20

21

22

23

24

25

Nancy Friesen

30 (Pages 114 to 117)

---

**Page 114**

1 the schedule on the nightshift for May 24?
2    A.  No.  But if there was 15 patients, what would
3 there be, six or seven?
4    Q.  How many -- does the charge nurse take ICU
5 patients?
6    A.  Sometimes.
7    Q.  Was Ms. Welpton assigned patients on the night
8 of May 24 when you showed up and looked at the
9 whiteboard?
10    A.  I don't remember if she had some.  She always
11 tried to have it -- work it so she had none.  You can
12 have three, but she didn't want to have any.  So she
13 may have had one that night.
14    Q.  I thought it was your testimony that you can't
15 have three.
16    A.  I know.  That's right.  She might say, "You
17 triple, but I don't want to have any patients, because
18 I'm the charge nurse."  Do you understand what I'm
19 saying?
20    Q.  No.  So --
21    A.  Let me try again.
22        MR. DUGAS:  Let him go ahead and ask his
23 question.
24    Q.  (BY MR. BIRRER)  So is it okay for -- is it
25 okay for a charge nurse on ICU to take three ICU

---

**Page 115**

1 patients?
2    A.  No.
3    Q.  How many beds are there on ICU?
4    A.  There are 13.
5    Q.  And the charge nurse -- even if a charge nurse
6 gets a transfer order, let's say a transfer order to
7 PCU, the charge nurse doesn't have the ability to
8 transfer the patient unless there's an open bed on PCU,
9 correct?
10    A.  Correct.
11    Q.  Okay.  And if -- is there ever an occasion
12 when a charge nurse gets a transfer order to move a
13 patient from ICU to PCU and there's a bed available on
14 PCU, but the charge nurse properly refuses the
15 transfer?
16    A.  Yes.
17    Q.  And have you seen that happen on occasion?
18    A.  Yes.
19    Q.  And was that -- are you trying to claim that
20 that was -- that that was happening on May 24?
21        MR. DUGAS:  Objection, form.
22    A.  No.
23    Q.  (BY MR. BIRRER)  Do you know if there were --
24 you indicated that there was one -- one patient that
25 you had heard that could have been transferred on the

---

**Page 116**

1 night of May 24, correct?
2    A.  Yes.
3    Q.  And do you know why that patient -- personal
4 knowledge.  Do you know why that patient had not been
5 transferred?
6        MR. DUGAS:  Objection, form.
7    A.  No.
8    Q.  (BY MR. BIRRER)  Pardon?
9    A.  No.
10    Q.  Okay.  Between May 24 and the date on which
11 you met with human resources, which I believe was June
12 1st -- between May 24 and June 1st, did you send
13 e-mails to anyone concerning the circumstances of
14 May 24?
15    A.  Yes.
16    Q.  Who did you send e-mails to?
17    A.  To each other.
18    Q.  When you say "each other," who are you --
19    A.  Diana and Amber Jamil.
20    Q.  Did you send e-mails to Sandra?
21    A.  Yeah.
22    Q.  About the events of May 24?
23    A.  Yes.
24    Q.  And that would have happened between June 1
25 and May 24?

---

**Page 117**

1    A.  It would have.
2    Q.  So you mentioned Diana, Amber Jamil, Sandra.
3 Anyone else?
4    A.  No, not that I recall.
5    Q.  And did you retain copies of those e-mails?
6    A.  Of course not.
7    Q.  And even if you don't have paper copies on
8 your computer, are they stored anywhere?
9    A.  Not that I'm aware of.
10    Q.  And you would have sent those on the AT&T
11 account we talked about earlier?
12    A.  No doubt.
13    Q.  Is that yes?
14    A.  Yes.
15    Q.  And did anyone during that time period send
16 you e-mails about the events that happened on May 24
17 that we've been discussing?
18    A.  Yes.  The same people.
19    Q.  Diana, Amber Jamil and Sandra?
20    A.  Of course, yes.
21    Q.  And I apologize.  You may have identified her
22 earlier, but who is Amber Jamil?
23    A.  She was working with the NNOC.
24    Q.  What is her position with the NNOC?
25    A.  She would be an organizer.

---

Nancy Friesen

Page 118

1    Q.   And what is the NNOC?
2    A.   National Nurses Organizing Committee.
3    Q.   And what does that organization do?
4    A.   That organization helps nurses to accomplish
5  things collectively.
6    Q.   Is it -- is it a union organization?
7    A.   No, not really.
8    Q.   Okay.  The California Nurses Association is a
9  union organization, correct?
10   A.   The California Nurses Association is a
11 registry for the California nurses and, yes, the
12 California nurses are organized and they do have a
13 union.
14   Q.   And is that union the California Nurses
15 Association?
16   A.   If that's the registry body and the union --
17 yeah, I would say so.
18        MR. DUGAS:  Well, don't guess.  You don't
19 have to.
20        THE WITNESS:  No?  Okay.  I don't know.
21        MR. DUGAS:  This is testimony.
22        THE WITNESS:  I don't know.  I don't know
23 how it's organized --
24        MR. DUGAS:  That's your answer.
25        THE WITNESS:  -- in California.

Page 119

1        MR. DUGAS:  That's your answer.
2    Q.   (BY MR. BIRRER)  Well, Amber Jamil, is she
3  located in California?
4    A.   No.
5    Q.   Where does she live?
6    A.   She's in New York.
7    Q.   What city in New York?
8    A.   New York City, I believe.
9    Q.   And had you met Amber Jamil prior to May 24?
10   A.   Yes.
11   Q.   Where did you meet her for the first time?
12   A.   In Austin.
13   Q.   Approximately when?
14   A.   Oh, November, December.
15   Q.   Of '06?
16   A.   Uh-huh.
17   Q.   Is that yes?
18   A.   Yes.
19   Q.   And was that when you were lobbying to get the
20 patient ratio --
21   A.   Yes.
22   Q.   -- law for --
23   A.   Yes.
24   Q.   -- excuse me -- for ICUs?
25   A.   Yes.

Page 120

1    Q.   And that's the one we talked about earlier
2  that didn't pass the Texas legislature?
3    A.   Yes.
4        MR. DUGAS:  Objection, form.
5    Q.   (BY MR. BIRRER)  Did you meet anyone else from
6  the NNOC during that Austin trip?
7    A.   Sure.
8    Q.   Who?
9    A.   Lots of people.
10   Q.   Can you recall any of them?
11   A.   People from all over the state.
12   Q.   And I just want to know if there are any names
13 that you can recall.
14   A.   Ed Bruno.
15   Q.   Anyone else?
16   A.   Hedy Dumpel.
17   Q.   Could you say the first name?
18   A.   It's Hedy.  H-E-D-Y, I believe, her name is
19 spelled.
20   Q.   Dumpel?
21   A.   Uh-huh.
22   Q.   Could you spell that?
23   A.   D-U-M-P-L-E (sic) perhaps.
24   Q.   Okay.
25   A.   I'm not sure.

Page 121

1    Q.   And can you name anyone else that you met
2  during that trip from the NNOC?
3    A.   Not specifically.
4    Q.   Where does Mr. Bruno live?
5    A.   I think he lives in Florida.
6    Q.   And where does Ms. Dumpel live?
7    A.   In California.
8    Q.   And are they members of the NNOC or the CNA?
9    A.   NNOC.
10   Q.   And do you have their e-mail addresses also?
11   A.   No.
12   Q.   How did you get Amber Jamil's e-mail address?
13   A.   She gave it to me.
14   Q.   And had you e-mailed her prior to May 24?
15   A.   Possibly.
16   Q.   You just don't recall?
17   A.   Don't recall.
18   Q.   Had you ever e-mailed Diana prior to May 24?
19   A.   No.
20   Q.   And had you ever e-mailed Sandra prior to May
21 24?
22   A.   No.
23   Q.   How did you have Diana's e-mail address?
24   A.   She gave it to me.
25   Q.   When?

Nancy Friesen

32  (Pages 122 to 125)

| Page 122 |
| --- |

1   A.  After May 24.
2   Q.  And how did you have Sandra's e-mail?
3   A.  The same.
4   Q.  Pardon?
5   A.  The same.
6   Q.  She gave it to you after May 24?
7   A.  Yes.
8   Q.  And did you have a business card from
9   Ms. Jamil?
10   A.  I'm not sure.  I likely did.  Don't have it
11   now.
12   Q.  Is that where the e-mail address was located?
13   A.  It may have been.
14   Q.  You just don't recall?
15   A.  I don't recall.
16   Q.  And when you e-mailed Amber Jamil, what did
17   that e-mail say?  The first one.
18   A.  It would be telling her what happened.
19   Q.  What happened on May 24?
20   A.  Uh-huh.
21   Q.  Is that yes?
22   A.  Yes.
23   Q.  And on how many occasions did you e-mail Amber
24   Jamil?
25   A.  I don't know.

| Page 123 |
| --- |

1   Q.  Was it more than one?
2   A.  Yes.
3   Q.  Was it more than four?
4   A.  I don't know.
5   Q.  Did you get a response e-mail from Ms. Jamil?
6   A.  Yes.
7   Q.  And how many response e-mails did you get?
8   A.  I don't know.
9   Q.  Was it more than four?
10   A.  I don't know.
11   Q.  You don't have any idea?
12   A.  No.
13   Q.  Did you print those e-mails off?
14   A.  No.
15   Q.  Do you have those recorded anywhere —
16   A.  No.
17   Q.  — pardon — anywhere on your computer?
18   A.  No.
19   Q.  Do you still have the same computer that you
20   used to send those e-mails?
21   A.  Yes.
22   Q.  And just to make sure I have everyone, so
23   between — the e-mails that you had sent or received
24   between May 24 and June 1st concerning the events of
25   May 24, that was Diana, Amber Jamil and Sandra.  Is

| Page 124 |
| --- |

1   there anyone else?
2   A.  Possibly Richard Stephens.
3   Q.  Who is he?
4   A.  He's also with the NNOC.
5   Q.  And where is located?
6   A.  He was in Fort Worth.
7   Q.  Fort Worth, Texas?
8   A.  Uh-huh.
9   Q.  Is that yes?
10   A.  Yes.
11   Q.  Do you recall receiving a response e-mail from
12   Mr. Stephens?
13   A.  No.
14   Q.  He could have.  You just don't remember one
15   way or the other?
16   A.  He likely would have telephoned.
17   Q.  Pardon?
18   A.  He likely would have telephoned.
19   Q.  And when did you meet Mr. Stephens?
20   A.  Oh, I think in April of '07.
21   Q.  And what was the occasion for you to meet with
22   Mr. Stephens?
23   A.  He was working with the NNOC.
24   Q.  And why were you meeting with the NNOC in
25   April of '07?

| Page 125 |
| --- |

1   A.  Just an information meeting about our house
2   bill.
3   Q.  And where did that meeting take place?
4   A.  Dallas area.
5   Q.  Was it at a hotel or somewhere else?
6   A.  A restaurant.
7   Q.  A restaurant.  Were Diana and Sandra there?
8   A.  I'm not sure.
9   Q.  Were Diana and Sandra with you on the trip to
10   Austin in November or December of '06?
11   A.  No.
12   Q.  Did you go with — how did you get down to
13   Austin?  Just drive?
14   A.  Drive.
15   Q.  Did you carpool with anyone down there?
16   A.  I don't recall.
17   Q.  Okay.  And so you indicated that between May
18   24 and June 1st you sent an e-mail to Diana about the
19   events of May 24, correct?
20   A.  Yes.
21   Q.  What did you say in that e-mail?
22   A.  I don't remember.
23   Q.  Do you remember anything about that e-mail?
24   A.  No, I don't remember.
25   Q.  Do you remember anything about any of the

Nancy Friesen

38 (Pages 146 to 149)

Page 146

1    A.   Just two days.
2    Q.   Pardon?
3    A.   Two days.
4    Q.   You stayed over two nights?
5    A.   The day coming, stay over one night, and I
6 believe we went home the next day.
7    Q.   And did you meet Mr. Moore?
8    A.   Yes, I did.
9    Q.   And was this at the screening?
10   A.   Yes.
11   Q.   And did you give any public comments at that
12 screening?
13   A.   No.
14   Q.   And the NNOC, did they sponsor the screening?
15   A.   I think it was the CNA.
16   Q.   CNA. And how did you find out — how did you
17 get invited to this?
18   A.   The NNOC would have invited us.
19   Q.   Who — who contacted you?
20   A.   Richard Stephens, I think.
21   Q.   And was he there as well?
22   A.   Yes.
23   Q.   And there's a picture it looks like of a — of
24 a protest. Do you see that on the first page of the
25 exhibit?

Page 147

1    A.   Uh-huh.
2    Q.   Is that yes?
3    A.   Yes.
4    Q.   And the article itself says that the three
5 nurses and about two dozen supporters were at the
6 rally. Is that —
7    A.   Yes.
8    Q.   — your recollection?
9    A.   How many nurses did it say?
10   Q.   It said "the three nurses" —
11   A.   Yes. Yes. Okay.
12   Q.   — "and about two dozen supporters"?
13   A.   Yes.
14   Q.   Is that accurate?
15   A.   That's about accurate.
16   Q.   And — and where did that rally take place?
17   A.   Behind the hospital on the street.
18   Q.   And it says there were children present. Do
19 you recall children being present?
20   A.   Absolutely.
21   Q.   Whose children were they?
22   A.   Mine.
23   Q.   How many children were there?
24   A.   Three.
25   Q.   Other than your three children, were any other

Page 148

1 children present?
2    A.   No, I don't think — believe.
3    Q.   And what are the ages of those children?
4    A.   Nine, 10 and 13.
5    Q.   That was their age at the time?
6    A.   Well, no, subtract a year.
7    Q.   So eight, nine and 12?
8    A.   Eight, nine and 12.
9    Q.   And are these your adopted children?
10   A.   Yes.
11   Q.   Any other children present?
12   A.   I don't believe.
13   Q.   Were they in school at that time or was school
14 over with?
15   A.   School — school was out.
16   Q.   And there's reference in this newspaper
17 article that the NNOC had been knocking on doors
18 circulating a petition. Do you see that?
19   A.   We had been doing that.
20   Q.   Who is "we"?
21   A.   We nurses.
22   Q.   The three of you?
23   A.   The three of us and some others that came to
24 help.
25   Q.   And who were those others?

Page 149

1    A.   I don't know their names, who came. Mainly it
2 was us three and my children.
3    Q.   And where did you — were you walking around
4 in the Mesquite neighborhoods?
5    A.   Yes.
6    Q.   Anywhere else?
7    A.   No.
8    Q.   Do you know Clair Jordan?
9    A.   No.
10   Q.   Are you familiar with the Texas Nurses
11 Association?
12   A.   Yes.
13   Q.   How are you familiar with them?
14   A.   Because — how am I familiar with them?
15 Because they're supposed to be our professional —
16 nursing professional organization in Texas.
17   Q.   Are you a member of that organization?
18   A.   No.
19   Q.   Pardon?
20   A.   No.
21   Q.   Do you know Rosemary Luquire?
22   A.   No.
23   Q.   Was Baylor one of the hospitals you applied?
24   A.   Yes.
25   Q.   I'm going to hand you what's been marked

1    COUNTY OF DALLAS    )

2    STATE OF TEXAS      )

3              I, Jeff L. Foster, certified shorthand

4    reporter in and for the State of Texas, do hereby

5    certify that the facts as stated by me in the caption

6    hereto are true; that there came before me the

7    aforementioned named person, who was by me duly sworn

8    to testify the truth concerning the matters in

9    controversy in this cause; and that the examination was

10   reduced to writing by computer transcription under my

11   supervision; that the deposition is a true record of

12   the testimony given by the witness.

13             I further certify that I am neither

14   attorney or counsel for, nor related to or employed by,

15   any of the parties to the action in which this

16   deposition is taken, and further that I am not a

17   relative or employee of any attorney or counsel

18   employed by the parties hereto, or financially

19   interested in the action.

20             Given under my hand and seal of office on

21   this, the 27th day of May, A.D., 2008.

22   _____

23   Jeff L. Foster, CSR 5434
     Expiration Date:  12/31/2008
     Firm Registration No. 209
24   5220 Renaissance Tower
     Dallas, Texas 75270
25   (214) 855-5300

DIANA S. SEPEDA                                    1

```
  1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
  2                        DALLAS DIVISION

  3
       SANDRA TAYLOR, RN,              )
  4    DIANA SEPEDA, RN,               )
       NANCY FRIESEN, RN,              )
  5                                    )
                   Plaintiffs,         )   CIVIL ACTION
  6                                    )   NO.
       vs.                             )   3:07-CV-1931-M
  7                                    )
       LONE STAR HMA, LP d/b/a DALLAS  )
  8    REGIONAL MEDICAL CENTER,        )
                                       )
  9                Defendant.          )

 10
 11  *****************************************************
 12                    ORAL DEPOSITION OF
 13                    DIANA S. SEPEDA
 14                     June 16, 2008
 15  *****************************************************
 16                        COPY
 17
 18            ORAL DEPOSITION of DIANA S. SEPEDA, taken
 19  at the instance of the Defendant, on the 16th of June,
 20  2008, in the above styled and numbered cause at the
 21  offices of Art Brender, 600 Eighth Avenue,
 22  Fort Worth, Texas, before Jeff L. Foster, a Certified
 23  Shorthand Reporter in and for the State of Texas,
 24  pursuant to the Federal Rules of Civil Procedure and
 25  the provisions stated on the record.
```

214-855-5300            UARS            800-445-7718

1               A P P E A R A N C E S

2

APPEARING FOR THE PLAINTIFF:

3

    Ms. Elizabeth L. Higginbotham
4   HIGGINBOTHAM & ASSOCIATES
    The Littlefield Building
5   106 East 6th Street, Suite 900
    Austin, Texas 78701

6

7

APPEARING FOR THE DEFENDANT:

8

    Mr. Mike Birrer
9   Ms. Rachel E. Mascorro
    CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL
10  901 Main Street, Suite 5500
    Dallas, Texas 75202

11

12  ALSO APPEARING

13      Ms. Sandra Taylor
        Ms. Bridget Defelice

14

15

16

17

18

19

20

21

22

23

24

25

Diana Sepeda

Page 110

1    A.  Correct.
2    Q.  And on how many occasions did you speak with
3  Nancy Friesen by phone on the night of May 24th?
4    A.  I don't remember.  You have my phone log right
5  there.
6    Q.  Why did you call Nancy Friesen?
7    A.  Because I was in shock that we were terminated
8  or we were sent home.
9    Q.  And tell me what — what the two of you talked
10  about during that telephone call.
11    A.  I don't recall.  I just know that I was
12  shocked that — I do remember that, that I was very
13  shocked that we were sent home.
14    Q.  And so other than remembering you were shocked
15  that you were sent home, you don't remember anything
16  else you discussed with Ms. Friesen?
17    A.  That I recall, no.
18    Q.  Did you take any notes of that conversation?
19    A.  No, sir.
20    Q.  You also called Sandra Taylor that night,
21  correct?
22    A.  Correct.
23    Q.  And on how many occasions did you call Sandra
24  Taylor on the night of May 24?
25    A.  I don't recall.

Page 111

1    Q.  It was a number of times, right?
2    A.  I don't recall.
3    Q.  Well, what did you and Ms. Taylor discuss
4  during those telephone conversations on the night of
5  May 24th?
6    A.  The same situation, that I was very shocked
7  that we were sent home.
8    Q.  And other than you speaking with Ms. Taylor
9  about the fact that you were shocked that you were sent
10  home, do you recall anything else that was discussed
11  during those conversations?
12    A.  No, sir.
13    Q.  When is the first time you contacted the NNOC
14  after you were sent home?
15    A.  I think the next day, from — from the phone
16  logs, Amber.  I contacted her the next day, but she was
17  on voicemail, so she never contacted me back.  She
18  never called me back that day.
19    Q.  So — and let me just make sure I have this
20  right.  So you left — you clocked out on May 24 and
21  went home, and the first time you spoke with anyone at
22  NNOC was the following day, May 25th, correct?
23    A.  Correct.
24    Q.  And you called and left a voicemail message
25  with Amber Jamil?

Page 112

1    A.  Correct.
2    Q.  Did Ms. Jamil call you back on that day?
3    A.  I don't recall.
4    Q.  Do you recall when you first spoke with
5  Ms. Jamil?
6    A.  No, I don't.
7    Q.  Were you in contact with Ms. Jamil — well,
8  strike that.
9        Your telephone records indicate that you
10  had telephoned Ms. Jamil on May 20th of 2007.  Do you
11  recall what that conversation was about?
12    A.  I don't.
13    Q.  In this May time frame, were — was NNOC
14  organizing another push to get the legislation passed
15  that they wanted passed in the Texas legislature?
16    A.  I don't recall.
17    Q.  Well, you've already testified that on June
18  4th, 2007 you were at an NNOC meeting, correct?
19    A.  Yes.
20    Q.  Was that meeting scheduled before May 24th?
21    A.  I don't recall.
22    Q.  How did you get invited to that meeting?
23    A.  I was — I don't remember.  I really don't.  I
24  don't remember.
25    Q.  And after May 24th, were you flown to

Page 113

1  California for a special showing of — of a Michael
2  Moore documentary?
3    A.  I think — when?
4    Q.  I said after May 24 of 2000 —
5    A.  Yes.
6    Q.  Excuse me.  Let me restate the date.  After
7  May 24 of 2007, were you flown to California for a
8  special showing of the Michael Moore documentary?
9    A.  Yes, I was.
10    Q.  And that was paid for by the NNOC?
11    A.  Correct.
12    Q.  And did you meet Mr. Moore?
13    A.  No, I did not.
14    Q.  And on this trip you went, Sandra Taylor went
15  and Nancy Friesen went, correct?
16    A.  I don't know if Nancy went, but I know Sandra
17  and I did.
18    Q.  You don't remember seeing Ms. Friesen at this
19  event?
20    A.  I don't.
21    Q.  Who invited you to the event?
22    A.  Richard Stephens.
23    Q.  And he's in Fort Worth?
24    A.  I don't know where he's at now.  He's an
25  organizer for the Dallas area.

Diana Sepeda

## Page 114

1   Q.  Did he tell you why he was inviting you?
2   A.  We were going to go meet Michael Moore and see
3  him speak on issues of healthcare.
4   Q.  And was this event in Sacramento?
5   A.  Yes.
6   Q.  Did you give any media interviews during this
7  event?
8   A.  No, sir, that I recall.
9   Q.  So at least on — so on June 4, 2007 — you
10  talked about a meeting that you had with the NNOC
11  group, correct?
12   A.  On June 4th?
13   Q.  Yes.
14   A.  Yes.
15   Q.  And in that meeting — it's your contention
16  that meeting didn't have anything specifically to do
17  with the defendant hospital, correct?
18   A.  Correct.
19   Q.  And so it would be fair to say that in the
20  June 4, 2007 time frame, the NNOC was actively planning
21  to reintroduce the legislation that had not passed the
22  Texas assembly concerning patient/nurse ratios; is that
23  correct?
24       MS. HIGGINBOTHAM:  Form.
25   A.  Well, we were discussing issues on patient

## Page 115

1  safety and whistleblower protection and so forth.
2   Q.  (BY MR. BIRRER)  And one of the issues you
3  were discussing — the NNOC was discussing is
4  patient/nurse ratios, correct?
5   A.  Safe nurse/patient ratios.
6   Q.  So that was one of the issues, correct?
7   A.  That was one of the issues.
8   Q.  And that was happening in the May 2007 time
9  frame also, correct?
10   A.  May 2007?  Correct.
11   Q.  And were you disappointed that the Texas
12  legislature had not passed the NNOC bill?
13   A.  Well, I think that — not as much
14  disappointed, because it did help us with one of the
15  newer things that the TNA did, which notified and made
16  aware of the nursing associations that we did need to
17  change some laws.  And they actually did change the
18  Safe Harbor law into we could claim Safe Harbor at any
19  time during the shift and we could report it to
20  anybody.
21   Q.  And that happened when?
22   A.  I don't remember.
23   Q.  And so you were involved in working on
24  changing the Safe Harbor in Texas?
25   A.  I was involved in doing patient advocacy.

## Page 116

1   Q.  And did that include changing the Safe Harbor
2  rules in Texas?
3   A.  Not at that point.  Just the whistleblower
4  protection and so forth.
5   Q.  Why were you calling Amber Jamil on May 24th?
6  Or excuse me, May 25th.
7   A.  I don't remember.
8   Q.  What did you say in the message you left with
9  her?
10   A.  I don't remember.
11   Q.  Did it involve the circumstances surrounding
12  your departure on May 24th from the hospital?
13   A.  You know, I don't remember.
14   Q.  Did you send any e-mails on the night of
15  May 24th?
16   A.  No, I did not.
17   Q.  Did you — have you ever sent e-mails to the
18  NNOC about your — about the events of May 24th?
19   A.  No, I have not.
20   Q.  Did you send any e-mails to Sandra Taylor on
21  May 24th?
22   A.  No, I did not.
23   Q.  Did you send any e-mails on May 24th?
24   A.  No, I did not.
25   Q.  Okay.  Have you ever sent any e-mails

## Page 117

1  concerning the circumstances of May 24th?  Setting
2  aside your attorney in this case.
3   A.  Just on my blog.  Just from the termination.
4   Q.  And the blog is what we talked about earlier,
5  correct?
6   A.  Yes.  Correct.
7   Q.  But setting that aside, I'm talking about
8  e-mails.  Have you ever sent anyone — setting aside
9  your attorney, have you ever sent anyone an e-mail in
10  which you discussed the events of May 24th?
11   A.  No, I did not.
12   Q.  You keep mentioning — when we talk about the
13  legislation, you keep mentioning about whistleblower.
14  What — what specifically are you trying to get the
15  legislation to say?
16   A.  That we are — when a nurse reports an unsafe
17  condition such as real high acuity staffing or an
18  unsafe environment, that we are protected from
19  retaliation from any of the hospitals when we do
20  complain about the unsafe assignment and the high
21  acuity and so forth.
22   Q.  And you had talked earlier about, you know,
23  conversations at Medical Center of Mesquite where you
24  had raised issues about staffing with Linda Iserman.
25   A.  Correct.

e32b691a-e387-4b8c-a4e0-e5f3bb6670be

Diana Sepeda

Page 162

1    A.   Yes, sir.
2    Q.   And you've been advocating that now, correct?
3    A.   Correct.
4    Q.   And you were advocating that before May 24th,
5    correct?
6    A.   Correct.
7    Q.   Have you had conversations with anyone in
8    which you've said we should publicize the circumstances
9    surrounding our termination of the three plaintiffs in
10   this lawsuit in order to help potentially pass that
11   legislation?
12   A.   Publicize as far as —
13   Q.   Any way.
14   A.   We've spoken to the union hall regarding the
15   law that we want to pass for patient safety.  That's
16   one of them.  Basically that's all I can recall.
17   Q.   Did you say "union hall"?
18   A.   Yes, it's called union hall, but that's where
19   all the AF-CIOs and —
20   Q.   And so what you've discussed in the union hall
21   is publicizing the current situation in order to help
22   try to pass the legislation; is that correct?
23   A.   Correct.
24   Q.   And including publicizing this lawsuit; is
25   that correct?

Page 163

1    A.   No, not the lawsuit.
2    Q.   Well, publicizing, I guess, just the events of
3    May 24th; is that correct?
4    A.   No, just publicizing that we need to pass the
5    legislative (sic) of the patient safety ratio.
6    Q.   Right.  And what I'm asking you, though, is
7    you've — you've been in the media about your
8    termination on May 24th, correct?
9    A.   Correct.
10   Q.   And have you ever had a conversation with
11   anyone in which you said it might — in order to help
12   pass the legislation, it might be helpful to publicize
13   the circumstances surrounding our termination?
14   A.   No.
15   Q.   You've never had that conversation with
16   anybody.
17   A.   No, just the NNOC to get it moving to pass our
18   law.  So, no.
19   Q.   Okay.  But have you had that conversation with
20   the NNOC, I guess, that maybe we should publicize the
21   circumstances surrounding our termination?
22   A.   No.
23   Q.   And has anyone at the NNOC ever made that
24   recommendation to you?
25   A.   No.

Page 164

1    Q.   And where — you said "union hall."  Where is
2    the union hall?
3    A.   Somewhere downtown.  I want to say
4    Grand Prairie, but don't hold me to it.
5    Q.   Okay.  And is that the NNOC union hall?
6    A.   No, it's the AF-CIO and so forth, yeah.
7    Q.   And have you been to meetings at that union
8    hall?
9    A.   Not recently.
10   Q.   When is the last time you were at a meeting
11   there?
12   A.   I cannot recall.  And it was not the meeting.
13   It was just the meeting again for — for public
14   awareness of we're trying to pass this bill.
15   Q.   Have you ever had conversations in that union
16   hall concerning the circumstances surrounding your
17   termination?
18   A.   No.
19   Q.   Did you report — based on the circumstances
20   of May 24th, did you report anyone at the hospital to
21   the Board of Nurse Examiners?
22   A.   No.
23        (Deposition Exhibit 19 marked.)
24   Q.   (BY MR. BIRRER)  I'm going to show you what
25   has been marked Deposition Exhibit 19.  Have you seen

Page 165

1    that document before?
2    A.   Yes.
3    Q.   What is it?
4    A.   This petition for the — for reinstatement of
5    our jobs.
6    Q.   Did you help get the signatures on that?
7    A.   Yes, I did.
8    Q.   And how did you get the signatures on
9    Deposition Exhibit 19?
10   A.   We walked around the neighborhood.
11   Q.   Who is "we"?
12   A.   Sandra and I.
13   Q.   Was Nancy Friesen with you?
14   A.   Yes, she was.
15   Q.   What neighborhood?
16   A.   Around the Mesquite area, the Galloway area
17   Q.   And did you knock on people's doors?
18   A.   Yes, we did.
19   Q.   Who gave you this petition to carry around?
20   A.   The NNOC.
21   Q.   Are they the ones that drafted it?
22   A.   Yes, sir.
23   Q.   And when you went around with this petition,
24   you were still an employee of the — of the hospital?
25   A.   What date is that?

e32b691a-e387-4b8c-a4e0-e5f3bb6670be

Diana Sepeda

Page 166

1    Q.   May 30, 2007?
2    A.   Yes, we were.  Because we didn't get
3    terminated until July.
4    Q.   Until when?
5    A.   Until June.  I'm sorry.
6    Q.   And this Concerned Citizens Panel, do you see
7    that?
8    A.   Yes, sir.
9    Q.   Who picked who would·be on the Concerned
10   Citizens Panel?
11   A.   The NNOC.
12   Q.   William McElvaney, do you know him?
13   A.   No, sir.
14   Q.   Gene Lantz, do you know him?
15   A.   Yes, sir.
16   Q.   How do you know Gene Lantz?
17   A.   He's a radio talk show host.
18   Q.   Here in Dallas?
19   A.   Yes, sir.
20   Q.   What channel?
21   A.   I don't recall.
22   Q.   Have you ever been on his show?
23   A.   No, sir.
24   Q.   Have you ever been on a radio call-in show?
25   A.   No, sir.

Page 167

1    Q.   Jeff Dillon.  Do you know Jeff Dillon?
2    A.   No, sir.
3    Q.   How did Jeff Dillon find out about this?
4    A.   I don't know.
5    Q.   And do you know how Gene Lantz signed his name
6    to this?
7    A.   I don't know.
8    Q.   Who handed you this letter, which is the first
9    page of Deposition Exhibit 19?
10   A.   Richard Stephens.
11   Q.   And so he gave you the letter in addition to
12   the blank spreadsheet where you could have people sign
13   up?
14   A.   Yes, sir.
15        (Deposition Exhibit 20 marked.)
16   Q.   (BY MR. BIRRER) I'm going to show you what's
17   been marked Deposition Exhibit 20.  Have you seen
18   Deposition exhibit 20 before?
19   A.   Yes, sir.
20   Q.   What is it?
21   A.   It is a letter from Chris Loyd in human
22   resources?
23   Q.   And did you attend a meeting at human
24   resources on June 1st?
25   A.   Yes, sir.

Page 168

1    Q.   And did you — and you attended that meeting?
2    A.   Yes, sir.
3    Q.   Tell me what happened at that meeting.  Let me
4    break it down a little bit more.  So on June 1st you
5    did attend a meeting in human resources, correct?
6    A.   Yes, sir.
7    Q.   And when you arrived, Chris Loyd and April
8    Collier were in the room, correct?
9    A.   That I remember, yes.
10   Q.   And did you come with some other people to
11   that meeting?
12   A.   Yes, sir.
13   Q.   Who did you come with?
14   A.   I came with Amber Jamil and Richard Stephens.
15   Q.   Anyone else?
16   A.   Sandra and Nancy.  Katherine, that I can
17   remember.  That's pretty much all the —
18   Q.   And why were Amber and Richard there?
19   A.   For support.
20   Q.   Just moral support?
21   A.   Support, yes.
22   Q.   And I guess the same with Katherine; is that
23   right?
24   A.   Yes, they're all nurses who met Katherine.
25   Q.   Other than Sandra and Nancy, were there any

Page 169

1    nurses from defendant hospital that were with you?
2    A.   Toward the end Chidi, C-H-I-D-I, was there,
3    but towards the end.
4    Q.   And so where did the meeting take place?  In
5    the human resource director's office; is that correct?
6    A.   Yes.
7    Q.   How long did the meeting last?
8    A.   I don't recall.
9    Q.   And what do you recall happening during the
10   meeting?
11   A.   I remember telling him that — I think we have
12   documentation.  He has — he sent me — I don't
13   remember.  I proceeded to inform him that my rights
14   were violated, because I did advocate for my patients,
15   and he said he didn't want to hear that.  He just
16   wanted to hear what happened that night.
17   Q.   Of May 24th?
18   A.   May 24th, 2007.
19   Q.   So how did you respond?
20   A.   I told him, "Well, this is what I'm giving
21   you."
22   Q.   And what is "this"?
23   A.   The —
24   Q.   Is that the document we looked at earlier?
25   A.   Yes, the one I had written out.

e32b691a-e387-4b8c-a4e0-e5f3bb6670be

Diana Sepeda

44 (Pages 170 to 173)

Page 170

1      MS. HIGGINBOTHAM:  Number 15.
2      Q.  (BY MR. BIRRER)  Deposition Exhibit 15, I
3  believe?
4      MR. BIRRER:  Could we go off the record
5  for a second?
6      MS. HIGGINBOTHAM:  You bet.
7      (Discussion off the record.)
8      Q.  (BY MR. BIRRER)  And so you handed to Chris
9  Loyd a copy of Deposition Exhibit 15; is that correct?
10     A.  Correct.
11     Q.  And did you hand him a copy of Deposition
12  Exhibit 19?
13     A.  Yes, sir.
14     Q.  Did you give him anything else?
15     A.  That I can recall, no.
16     Q.  And other than what you've already testified
17  to, do you recall anything else that you said to
18  Mr. Loyd or Ms. Collier during that meeting?
19     A.  That I can recall, no.  Well, other than my
20  testimony and —
21     Q.  When you say "testimony," what are you talking
22  about?
23     A.  I'm sorry, this one.
24     Q.  Deposition Exhibit 15?
25     A.  Deposition Exhibit 15, yes.

Page 171

1      Q.  Okay.
2      A.  And I informed him that my rights were
3  violated, that I wish that we could work this out here
4  in the office and not — since he had violated my civil
5  rights that we wouldn't go before — a public court
6  appearance to settle the situation.
7      Q.  That's what you told him at the meeting?
8      A.  Yes.  And he told me that all he wanted to
9  hear about was this.
10     Q.  And when you say "this," you're talking about
11  May 24th?
12     A.  Yes.
13     Q.  So he was — so what he was telling you is,
14  "I'm just trying to collect facts on what happened on
15  May 24th," correct?
16     A.  Correct.
17     Q.  Did Ms. Collier say anything during the
18  meeting?
19     A.  No, sir.
20     Q.  Did you know her?
21     A.  No, sir.
22     Q.  How did the meeting end?
23     A.  I thanked him for his time and I left.
24     Q.  And did you sort of have a mini-rally
25  downstairs after the meeting was over?

Page 172

1      A.  I don't recall.
2      Q.  Were you and the other group you were with,
3  did you guys start chanting slogans or something in the
4  parking lot afterwards?
5      A.  I don't recall.
6      Q.  How did the NNOC even know about the meeting
7  that was going to take place on June 1st?
8      A.  May 20 what?
9      Q.  Well, there's a meeting on June 1st —
10     A.  Right.
11     Q.  — that you had with Chris Loyd, correct?
12     A.  Correct.
13     Q.  And you brought with you some NNOC folks to
14  that meeting, correct?
15     A.  Correct.
16     Q.  How did they even know you were supposed to
17  meet with Chris Loyd on May — excuse me, on June 1st?
18     A.  I'm assuming Amber told Richard, and I don't
19  know who called her.  I don't know if it was — I don't
20  remember calling her.
21     Q.  And so we've already talked about how you
22  found out your employment was terminated, correct?
23     A.  Correct.
24     Q.  Did you have a conversation with anybody else
25  other than that one phone conversation in which

Page 173

1  somebody told you your employment was terminated?
2      A.  No.
3      Q.  Do you know Stephanie Tibone?
4      A.  No, I don't recall knowing her.  No.
5      Q.  Have you ever met her?
6      A.  (Witness shakes head.)
7      Q.  Do you know who she is at all?
8      A.  I don't think so, no.
9      Q.  Okay.
10     MR. BIRRER:  If we could take a quick
11  break, we might be about done.
12     (Recess taken.)
13     Q.  (BY MR. BIRRER)  Okay.  I just want to get the
14  timeline straight.  So it looks like you were at the
15  hospital on May 24th for about 30 or so minutes.
16  Actually, exactly 30 minutes.  And when we were going
17  through the sequence of events earlier, it seemed like
18  everything was happening pretty quickly.  Was there any
19  dead time in there when you were just waiting around
20  for something to happen?  Does that make sense — my
21  question make sense?
22     A.  When I was waiting for P.J. to call back, I
23  was waiting at the desk.
24     Q.  Okay.  And after P.J. called back and you had
25  the conversation with P.J., is that when you — and

e32b691a-e387-4b8c-a4e0-e5f3bb6670be

1  COUNTY OF DALLAS    )

2  STATE OF TEXAS      )

3         I, Jeff L. Foster, certified shorthand

4  reporter in and for the State of Texas, do hereby

5  certify that the facts as stated by me in the caption

6  hereto are true; that there came before me the

7  aforementioned named person, who was by me duly sworn

8  to testify the truth concerning the matters in

9  controversy in this cause; and that the examination was

10 reduced to writing by computer transcription under my

11 supervision; that the deposition is a true record of

12 the testimony given by the witness.

13        I further certify that I am neither

14 attorney or counsel for, nor related to or employed by,

15 any of the parties to the action in which this

16 deposition is taken, and further that I am not a

17 relative or employee of any attorney or counsel

18 employed by the parties hereto, or financially

19 interested in the action.

20        Given under my hand and seal of office on

21 this, the 25th day of June, A.D., 2008.

22 _____

23 Jeff L. Foster, CSR 5434
   Expiration Date:  12/31/2008
24 Firm Registration No. 209
   5220 Renaissance Tower
   Dallas, Texas 75270
25 (214) 855-5300

SANDRA R. TAYLOR                                                    1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION

 3
    SANDRA TAYLOR, RN,                    )
 4  DIANA SEPEDA, RN,                     )
    NANCY FRIESEN, RN,                    )
 5                                        )
            Plaintiffs,                   ) CIVIL ACTION
 6                                        ) NO.
    vs.                                   ) 3:07-CV-1931-M
 7                                        )
    LONE STAR HMA, LP d/b/a DALLAS        )
 8  REGIONAL MEDICAL CENTER,              )
                                          )
 9          Defendant.                    )

10

11  ************************************************************

12                ORAL DEPOSITION OF

13                SANDRA R. TAYLOR

14                  June 17, 2008

15  ************************************************************

16

17

18          ORAL DEPOSITION of SANDRA R. TAYLOR,

19  taken at the instance of the Defendant, on the 17th of

20  June, 2008, in the above styled and numbered cause at

21  the offices of Art Brender, 600 Eighth Avenue,

22  Fort Worth, Texas, before Jeff L. Foster, a Certified

23  Shorthand Reporter in and for the State of Texas,

24  pursuant to the Federal Rules of Civil Procedure and

25  the provisions stated on the record.
```

214-855-5300          UARS          800-445-7718

1                    A P P E A R A N C E S

2


3

APPEARING FOR THE PLAINTIFF:
4
        Ms. Elizabeth L. Higginbotham
5       HIGGINBOTHAM & ASSOCIATES
        The Littlefield Building
6       106 East 6th Street, Suite 900
        Austin, Texas 78701
7
        -and-
8
        Mr. Clay Dugas
9       CLAY DUGAS & ASSOCIATES
        805 Park
10      Beaumont, Texas 77701

11


12  APPEARING FOR THE DEFENDANT:

13      Mr. Mike Birrer
        Ms. Rachel E. Mascorro
14      CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL
        901 Main Street, Suite 5500
15      Dallas, Texas 75202

16


17  ALSO APPEARING

18      Ms. Diana Sepeda
        Mr. Tom Jacob
19

20

21

22

23

24

25

Sandra Taylor

Page 82

1   Q.  When all of this was happening?
2   A.  When all of this was happening.
3   Q.  And even though you can't remember exactly
4  where she was, do you remember seeing Nancy Friesen?
5   A.  Yes, I remember seeing Nancy there.
6   Q.  At the time you were calling Linda?
7   A.  Oh, no, no.  I don't remember seeing Nancy
8  when I was talking to Linda.
9   Q.  Okay.  And so you hand the phone to Diana to
10  speak with Linda Iserman, correct?
11   A.  Yes.
12   Q.  And what did Diana — what did you hear Diana
13  say?
14   A.  I didn't hear Diana say anything, because I
15  left and went to the other phone to call the
16  supervisor.  And at this time it was P.J., because I
17  was going to try to talk to the supervisor and see if
18  we could work this out.
19   Q.  Okay.
20   A.  That's why I hung around to see if we could
21  work this out.  Because the last thing I wanted to
22  happen is to be terminated and I wanted to be able to
23  work that shift.
24       And so I called P.J., and as soon as I
25  got on the phone and started telling P.J. what was — I

Page 83

1  didn't even get it out of my mouth what was going on.
2  She said, "You clock out and you go home now."  So I
3  waited — waited to see if they were going to try to
4  work it out or what they were going to do.  And by that
5  time they had talked to Diana and Nancy.  And so we all
6  just left at the same time.
7   Q.  Did — did — when you were speaking with
8  P.J., did you give the phone to Diana after you
9  finished with P.J.?
10   A.  No, I think Diana called P.J.
11   Q.  Okay.  And did you hear what Diana said to
12  P.J.?
13   A.  I don't remember.  The only thing — I don't
14  know what P.J. said, but I remember Diana saying
15  something about as a professional — I don't know
16  exactly what it was, but she said — when she got off
17  the phone, she said, "P.J. said that I was not
18  professional."
19   Q.  Okay.  And then — and then did — after Diana
20  hung up with P.J., did you, Diana and Nancy then clock
21  out and go home?
22   A.  Yes.  I went to my locker and picked up some
23  items and then we went outside ICU and clocked out.
24   Q.  And then did you just drive home?
25   A.  We — we talked about what we were going to do

Page 84

1  next.
2   Q.  Who's "we"?
3   A.  Diana, Nancy and I.  And I said we need to go
4  and talk to — we need go talk to the D.O.N. the next
5  morning, and so —
6   Q.  Where did that — were you talking in the
7  parking lot?
8   A.  I can't remember if we were at the parking lot
9  or we were right outside the ICU.  I can't remember
10  where we were when we discussed it.
11   Q.  And so other than going to talk to the
12  director of nursing, did you guys discuss any other
13  plan of action?
14   A.  Yes, we did.
15   Q.  What did you discuss?
16   A.  Well, we needed to find out exactly what we
17  were going to do.  And so I called Amber, Amber Jamil.
18   Q.  With the NNOC?
19   A.  With the NNOC.
20   Q.  So you called her that night?
21   A.  I called her that night.
22   Q.  And did you reach her?
23   A.  At first I didn't.  And she called me back.
24   Q.  That night on May 24th?
25   A.  Yes.

Page 85

1   Q.  And tell me about your conversation with
2  Amber Jamil.
3   A.  I don't remember exactly what was going on,
4  but I told her that we had planned to try to go to the
5  director of nursing and try to work this out.  And she
6  said that that — that that was a good thing, try to
7  work it out with — with the director of nursing.
8   Q.  Anything else that Amber told you?
9   A.  Nothing that night.
10   Q.  Let's stop right here for a second.
11   A.  Okay.
12   Q.  And I'm going to ask you some follow-up
13  questions.  So at the time that you were speaking with
14  Linda and P.J. and Barbara about your — your patient
15  assignment that night, the only information you had on
16  two patients is what came from the whiteboard, correct?
17   A.  Yes.
18   Q.  And then on the third patient, the only
19  information you had is what was on the whiteboard and
20  the conversation you had with Jeanette in the hallway.
21   A.  That's correct.
22   Q.  Did you have any other information beyond what
23  we've just recounted concerning those —
24   A.  I had no other information.
25   Q.  — concerning those three patients?

9d564f6a-822b-42cf-9ab4-b64175ceaad6

App. 65

Sandra Taylor

25 (Pages 94 to 97)

Page 94

1    Q. And that's what Chidi told you she said?
2    A. That's what Chidi told me that he said to
3 Rick.
4    Q. And Chidi is a man?
5    A. Chidi is a man, yes.
6    Q. So you spoke with Chidi —
7    A. Chidi worked the dayshift.
8    Q. Day ICU nurse.
9    A. Yes. He used to work with us sometimes on
10 nights, but he was a day ICU nurse.
11   Q. And to your knowledge, did Chidi have any of
12 the patients that were going to be assigned to you?
13   A. I don't know if he had any of them or not.
14   Q. And what did you say to Chidi during the call?
15   A. I don't recall exactly what — the entire
16 conversation. But he just told me — I don't know if
17 he — I don't know if he also — there was several
18 people that told us that it was a setup by
19 administration, Barbara and the administration. But I
20 don't know if Chidi said that that night or not. I
21 think the only thing Chidi said was that he asked Rick
22 not to do it.
23   Q. Not to make the assignment?
24   A. Not to make that assignment.
25   Q. And that would have been, I guess, before you

Page 95

1 showed up?
2    A. That was before I showed up. That's correct.
3    Q. And was it your turn to take a triple
4 according to the triple log?
5    A. I'm assuming that it was. I don't know.
6    Q. And on the night of May 24th, did you send any
7 e-mails when you got home?
8    A. No, I did not.
9    Q. Did you send any e-mails that you recall on
10 May 25th?
11   A. No, I did not.
12   Q. Have you sent anyone any e-mails concerning
13 the circumstances surrounding your termination?
14   A. No, I have not. I don't recall ever sending
15 any e-mails period.
16   Q. Do you not use e-mail?
17   A. I do not. I do not. We're computer
18 illiterate.
19       MS. SEPEDA: We are.
20       THE WITNESS: Off the record.
21   Q. (BY MR. BIRRER) All right. So on — and so
22 you telephoned Liz Higginbotham on May 25th; is that
23 correct?
24   A. Yes, I did.
25   Q. And was that for the purpose of obtaining

Page 96

1 legal representation?
2    A. No, for legal counsel.
3    Q. Legal counsel.
4    A. Yes.
5    Q. Okay. Did you — how did you get Liz's
6 telephone number?
7    A. I met Liz in Austin and it was at an NNOC
8 meeting.
9    Q. And was it an NNOC rally?
10   A. I can't remember whether it was a rally or
11 not.
12   Q. On how many occasions had you met Liz prior to
13 May 24th 2007?
14   A. I can't remember that either.
15   Q. Was it more than once?
16   A. Probably more than once. But the reason why I
17 contacted Liz now for legal counsel is because we went
18 back to that hospital that morning and we attempted to
19 talk to Mr. Morse, Tom Morse, who's the chief nursing
20 officer.
21   Q. Who's "we"?
22   A. Diana, Nancy and myself. And I think Lisa
23 Berry and Sharon Bush accompanied us.
24   Q. Who were they?
25   A. They were nurses from the nightshift.

Page 97

1    Q. ICU shift?
2    A. ICU.
3    Q. Had they been there on May 24th?
4    A. They were there that night. And when we
5 reached Mr. Morse's office, his secretary already knew
6 who we were. She said, "Are you the nightshift nurses
7 from ICU?" We said, "Yes." She said, "Mr. Morse says
8 that he's not going to speak with you and to go to
9 human resources."
10   Q. And did — and so anything else that happened
11 at that —
12   A. No, we went to human resources. And when we
13 reached human resources, the secretary said — we told
14 her that we needed to talk to — what's his name?
15   Q. Is it Chris Loyd?
16   A. Chris Loyd. And she said that he was not in
17 the office and he said that we could go home and that
18 he would contact us.
19   Q. And did Chris Loyd contact you?
20   A. I think he did.
21   Q. Did he set up a meeting?
22   A. Yes, he did. And I can't think of what the
23 time frame was. But during that interim, that's when
24 we went outside and — and I said, "Well, I guess we
25 better try to contact someone and talk to them about

Sandra Taylor

Page 102

1    A.  Yes, I did.
2    Q.  If you'd let me finish my question.  Did you
3  go to a meeting at the defendant hospital on June 1st?
4    A.  Yes, I did.
5    Q.  And Chris Loyd was at that meeting?
6    A.  Yes, he was.
7    Q.  Was April Collier at that meeting also?
8    A.  Yes, she was.  I'm assuming that's her name.
9    Q.  Had you met April Collier before?
10   A.  No, I have not and had not.
11       (Deposition Exhibit 22 marked.)
12   Q.  (BY MR. BIRRER) I'm going to hand you what's
13 been marked Deposition Exhibit 22.  Could you identify
14 that document?
15   A.  Yeah, this is a document that I — that I
16 gave — typed up the next day and took to Chris Loyd.
17   Q.  So you typed — you created Exhibit 22 on May
18 25th?
19   A.  Yes, I did.
20   Q.  And are you the one that typed this document
21 up?
22   A.  My sister did.
23   Q.  What's the name of your sister?
24   A.  Bridget Ellison.
25   Q.  And where does Bridget —

Page 103

1    A.  Or Bridget Ellison Carroll.  I'm sorry.
2    Q.  That's all right.  Where does she live?
3    A.  She lives in Mesquite.
4    Q.  And did you write it out in longhand and give
5  to her?
6    A.  No, I sat there and — and I read it and she
7  typed it up.  I mean, I told her what happened, and as
8  I talked to her she wrote — typed it up.
9    Q.  And were there any drafts or was this the only
10 draft?
11   A.  This is it.
12   Q.  Did you show anybody that document before you
13 gave it to Chris Loyd other than your sister?
14   A.  No.
15   Q.  What is nuclear medicine?
16   A.  It's — it's an intensive scan.
17   Q.  And, I mean, can you be any more descriptive
18 than that?
19   A.  Yes, it's — it is an invasive scanner that
20 looks for conditions that — or some diagnosis, a bleed
21 or something that doesn't show up on the regular
22 CAT scan.
23   Q.  And do they have that type of scan at the
24 Medical Center of Mesquite?
25   A.  I think they do, like the MRI scan, yes.

Page 104

1    Q.  Okay.
2    A.  I'm sure they do.
3    Q.  Have you ever taken a patient to nuclear
4  medicine?
5    A.  No.  I think nuclear medicine — or the MRI is
6  only open during the dayshift.  The CT scanner is open,
7  I think, during the nightshift.  I can't remember
8  whether nuclear medicine is open during the nights or
9  not.
10   Q.  You just can't remember?
11   A.  I can't remember.
12   Q.  But sitting here today you can't recall ever
13 taking a patient to nuclear medicine?
14   A.  Not to nuclear medicine.  I have taken several
15 to CT scan.
16   Q.  Okay.  And did you review Deposition Exhibit
17 22 before you gave it to human resources?
18   A.  Yes, I did.
19   Q.  Was this your attempt to be as — as full and
20 complete and accurate as possible?
21   A.  This was my attempt to be as accurate as I
22 possibly could, yes.
23   Q.  And you gave this to human resources on May
24 25th?
25   A.  I can't remember whether I give this to — I

Page 105

1  turned this — I didn't see him the next day.  So I
2  don't know if I give this to him on May 25th or I gave
3  this to him when we went in on the date that he had
4  requested us come in, I think, which was June 1st.
5    Q.  Okay.
6    A.  I can't remember.
7    Q.  Earlier you had testified that you spoke with
8  Amber Jamil on the night of May 24th, correct?
9    A.  Yes.
10   Q.  When is the next time you spoke with Amber
11 Jamil?
12   A.  I think I spoke with Amber the next day also,
13 but I can't remember whether I spoke with her or not.
14   Q.  And what — what — regardless of the day,
15 what was your next conversation that you can recall
16 with Amber Jamil?
17   A.  I think the next conversation was — I think I
18 talked to her the next day and I think the conversation
19 was we couldn't get any feedback.  We went to see the
20 director of nursing.  He would not see us.  We went to
21 human resources and we — human resources wouldn't
22 speak with us also.
23   Q.  And what did Amber Jamil say?
24   A.  I can't remember exactly what Amber told me.
25 But we — I can't remember now.

9d564f6a-822b-42cf-9ab4-b64175ceaad6

App. 67

Sandra Taylor

Page 106

1   Q.  Did Amber suggest that you send — that you
2   carry around a petition in Mesquite?
3       A.  That — well, we — we were the ones, I think,
4   that suggested that we carry those petitions around to
5   Mesquite, to the residents of Mesquite.
6       Q.  Who made the suggestion?
7       A.  I can't remember. I can't remember now who
8   made the suggestion — exactly who made the suggestion.
9       Q.  And the person who drafted the petition, was
10  that the NNOC?
11      A.  I don't remember. Now, exactly who drafted
12  it, I know my sister — I was talking to Diana
13  yesterday about that, and I know my sister drafted one,
14  because we took one to — I gave one to my friend who
15  took it to the golf course and had all of his golfing
16  buddies to sign it. And we had like two pages of
17  those.
18          So I don't know if the original one was
19  one that Amber gave us or if it was the one that my
20  sister drafted.
21      Q.  And did Amber — did the NNOC know that you
22  were taking a petition around Mesquite?
23      A.  Yes, they did.
24      Q.  Did they encourage you in doing that?
25      A.  Yes.

Page 107

1       Q.  And you did meet with Chris Loyd on June 1st;
2   is that correct?
3       A.  I think it was June 1st, that's correct.
4       Q.  And tell me about that meeting.
5       A.  That meeting, we brought in extra nurses from
6   outside the hospital, because we wanted to see if he'd
7   allow us to have someone present with us. And he said
8   no.
9       Q.  How many extra nurses did you bring?
10      A.  I don't remember exactly how many extra nurses
11  that came in there with us.
12      Q.  Was it as many as six extra people?
13      A.  I think it was at least six.
14      Q.  Was it more than six?
15      A.  I don't know if it was more than six or not.
16      Q.  And so Mr. Loyd told you that he didn't want
17  to meet with all of you at the same time; is that
18  correct?
19      A.  It was not the intention for us to meet with
20  him all at one time. But then he had already set up
21  times — different times for Nancy, Diana and myself on
22  that morning.
23      Q.  Okay.
24      A.  And the thing is that we wanted to bring one
25  person in there with us so we could have a witness as

Page 108

1   to what occurred when we were in there with him. And
2   he refused.
3       Q.  But you brought — and so you brought six
4   witnesses, though.
5       A.  Yes, we did.
6       Q.  Okay. And you wanted all — every one to sit
7   in the room at the same time?
8       A.  No, we did not.
9       Q.  Did you identify to Mr. Loyd one specific
10  person that you wanted in the room with you?
11      A.  We asked him could we have anyone in there
12  with us and he said no. So it was not identified, one
13  person. We asked him. He could choose if — if —
14  which one of the nurses that he would like to — that
15  he will allow to come in with us and he refused to have
16  anyone to come in with us.
17      Q.  Why did you — if you just wanted one witness,
18  why did you bring six nurses with you?
19      A.  As support, moral support.
20      Q.  And did the NNOC suggest that you bring six
21  nurses with you?
22      A.  I can't remember who suggested that we bring
23  six nurses with us. I know that we had representation
24  from NNOC. Amber was there and Richard Stephenson
25  (sic) was there.

Page 109

1       Q.  Actually — they were two of the nurses you're
2   talking about?
3       A.  They're not nurses, no. They came with us.
4       Q.  Okay. So they were two of the people —
5       A.  That showed up at the — at human resources.
6       Q.  Okay.
7       A.  Yes.
8       Q.  Okay. And so you did meet with Mr. Loyd; —
9       A.  Yes.
10      Q.  — is that correct?
11      A.  Yes.
12      Q.  And April Collier was in the room, correct?
13      A.  Yes.
14      Q.  And what — tell me about that meeting with
15  human resources.
16      A.  I tried to present my petition from the
17  neighborhood.
18      Q.  Hold on one second.
19      A.  Okay.
20      Q.  And is that Exhibit 19?
21      A.  That's it.
22      Q.  Okay. And then — so you tried to present the
23  petition and what happened?
24      A.  He refused to receive it. He told me that he
25  did not want this petition. He wanted nothing to do

9d564f6a-822b-42cf-9ab4-b64175ceaad6

Sandra Taylor

## Page 134

1    A.   No, she did not.
2    Q.   Did you ask her to send you a copy of the
3   policy?
4    A.   No, I did not.
5    Q.   Did she explain why she thought you were set
6   up?
7    A.   No, she really didn't go into it.
8    Q.   Did you ask her?
9    A.   No, I didn't.
10    Q.   Do you remember anything else regarding the
11   conversation with Sharon Bush?
12    A.   Yes. She also told me that -- that -- that
13   the compliance officers had gotten in touch with Lisa
14   Berry and they asked Lisa Berry had -- did she have any
15   knowledge of Barbara Welpton stating anything about
16   Debra being in the emergency room. And she said that
17   Lisa told her that they didn't actually word it to her,
18   that Barbara asked her or something to that effect.
19        And said that -- and so Lisa told the
20   compliance officers that, no, she didn't know anything
21   about that, because she said that if she got Barbara in
22   trouble, that there would be other nurses that would be
23   involved and she didn't want to do that.
24    Q.   And -- and it's your testimony that Sharon
25   Bush said that Lisa Berry told her that?

## Page 135

1    A.   That's correct.
2    Q.   And so just to make sure I understand what's
3   going on, Sharon Bush was telling you what she had
4   heard that Lisa Berry said to the compliance officers?
5    A.   She was telling me what Lisa Berry had told
6   her that she told the compliance officer.
7    Q.   Okay. Do you recall anything else that was
8   said during that telephone conversation with Sharon
9   Bush?
10    A.   No, other than she wanted -- she said that if
11   we needed anything, to just contact her.
12    Q.   And have you contacted her since then?
13    A.   No, I have not.
14    Q.   Did Sharon provide you with any information
15   about what happened on the night of May 24th?
16    A.   No, she did not.
17    Q.   Did you ask her?
18    A.   No, I did not.
19    Q.   And can you recall any other post May 24th
20   communication with Sharon Bush?
21    A.   No. There's -- oh, yes, I do. On the -- on
22   May 25th, the day right after when we went to
23   Tom Morse's office to meet with him, Sharon showed up
24   that morning -- we were in the lobby -- to go with us.
25   And I can't remember whether she -- it was Sharon and

## Page 136

1   Lisa that showed up to go over with us. And I can't
2   remember if they actually went in the office with us or
3   not. I think they did.
4    Q.   And did you have any conversation with Sharon
5   on that morning concerning what happened the night of
6   May 24th?
7    A.   No, not really. No.
8    Q.   Okay. And then if you look at pages six and
9   seven, there's a listing of NNOC members. Do you see
10   that?
11    A.   Yes, I do.
12    Q.   Starting with Amber Jamil?
13    A.   Uh-huh. Yes.
14    Q.   Have you spoken with each of these individuals
15   since May 24th?
16    A.   I've spoken with Amber. I've spoken with
17   Richard. I don't know who David Johnston is. Joe
18   Schuman, I've spoken with Joe, I think. I've
19   definitely spoken with Ed Bruno and Heidi Dumpel. Or
20   Hedy.
21    Q.   And prior to May 24th, had you spoken with
22   Amber Jamil?
23    A.   Oh, yes, I've spoken with Amber quite a bit.
24    Q.   Prior to May 24th?
25    A.   Yes.

## Page 137

1    Q.   Just approximately on how many occasions?
2    A.   I can't tell you exactly how many occasions.
3   Well, maybe six. I contacted her actually. And it was
4   after I wrote that letter.
5    Q.   The letter of August -- excuse me.
6    A.   In August, yes.
7    Q.   Of 2006?
8    A.   Yes.
9    Q.   Okay. And that was your first contact with
10   Amber Jamil?
11    A.   That's correct.
12    Q.   And how did you get Amber Jamil's name?
13    A.   Because I have a California license and I used
14   to get a lot of correspondence from them about
15   organizing. And so I contacted the NNOC and they said
16   that they actually had someone -- a representative in
17   our area and they gave me her name.
18    Q.   And who is that?
19    A.   And I contacted her.
20    Q.   Is it a her?
21    A.   It was -- yeah, it was Amber. Amber was the
22   organizer for the Dallas area at that time.
23    Q.   I understand.
24    A.   And I contacted her and spoke with her.
25    Q.   And your initial contact, that was concerning

Sandra Taylor

36 (Pages 138 to 141)

## Page 138

1 the August 2006 letter that we already talked about?
2    A. It was after that. It was after I got no
3 response back from that letter, then I — and we kept
4 having all of these incidents, I contacted Amber.
5    Q. When you say "all of these incidents," any
6 incident other than the one that is the ones that are
7 reflected in your August 2006 letter?
8    A. No, it's those incidents. Basically unsafe
9 staffing.
10    Q. And so did Amber Jamil take any action with
11 regard to your August 2006 letter?
12    A. No, she did not.
13    Q. Did she instruct you on any further action you
14 should take with regard —
15    A. No.
16    Q. If you'd let me finish. — with regard to
17 your August 2006 letter?
18    A. No, she did not. I don't think Amber knew
19 anything about that letter that I wrote.
20    Q. But that was why you called her?
21    A. I called her after the letter was written,
22 because we were not getting any support from the
23 hospital, from management.
24    Q. Okay. And did you speak to Richard Stephens
25 prior to May 24th of 2006?

## Page 139

1    A. I can't recall when I actually met Richard.
2 He came in to cover the Dallas-Fort Worth area and
3 Amber left. So I can't remember exactly when the first
4 contact was made with Richard Stephens.
5    Q. So when you first had contact with Amber, was
6 she living in the Metroplex area?
7    A. No. I think she was actually living in either
8 Washington, D.C. or New York.
9    Q. Okay.
10    A. But she was just flying in.
11    Q. And — and Joe Schuman, had you spoken with
12 Joe Schuman prior to May 24, 2006?
13    A. I don't recall when I met Joe Schuman. I
14 don't think I met Joe Schuman prior to that.
15    Q. Ed Bruno. Did you speak or meet Ed Bruno
16 prior to May 24th, 2006?
17    A. Yes, I did.
18    Q. And tell me about that.
19    A. I met him in Austin, and it was months before,
20 several months before. And I can't remember the first
21 time.
22    Q. Was that during the November —
23    A. It might have been.
24    Q. — rally in Austin?
25    A. Might have been.

## Page 140

1    Q. Okay. Do — other than that occasion, do you
2 recall any other contact with Ed Bruno prior to May 24?
3    A. No.
4    Q. Hedy —
5    A. Hedy Dumpel.
6    Q. Hedy Dumpel. Did you speak with Hedy Dumpel
7 prior to May 24th, 2006?
8    A. I did.
9    Q. On how many occasions?
10    A. That was at the same time that I met Ed Bruno.
11    Q. And actually I think I said May 24, 2006. I
12 meant to say May 24, 2007.
13    A. Yes.
14    Q. You have spoken with Hedy Dumpel prior to May
15 24th, 2007?
16    A. Yes.
17    Q. And just to make sure the record is clear, on
18 Ed Bruno, you spoke with Ed Bruno prior to May 24,
19 2007.
20    A. That's correct.
21    Q. And that was the Austin event.
22    A. That is correct.
23    Q. And then that would have probably been in
24 November of 2006, correct?
25    A. That's correct.

## Page 141

1    Q. And then just to make sure the record was
2 clear on Richard Stephens, had you met with him prior
3 to May 24th, 2007?
4    A. I cannot remember when I first met Richard.
5    Q. Okay. And then on Joe Schuman, do you recall
6 if you met with Joe Schuman prior to May 24th, 2007?
7    A. Yes, I think Joe — I think we met Joe at the
8 same time we met Ed Bruno and Hedy Dumpel.
9    Q. And that — that meeting would have been in
10 Austin in approximately November of 2006.
11    A. Yes.
12    Q. And this meeting in November of 2006 in
13 Austin, what was that about?
14    A. It was an educational seminar and it was a
15 protest at the Capitol. We were trying to make sure
16 that we got that bill passed for safe nursing/patient
17 ratios, whistleblower protection and advocacy for
18 patients.
19    Q. And if that bill had passed, would it have
20 been mandated that there be a two patient to one nurse
21 ratio in ICU?
22    A. That's correct.
23       MR. DUGAS: Objection, form.
24    Q. (BY MR. BIRRER) And do you recall
25 approximately how many nurses were present at that

9d564f6a-822b-42cf-9ab4-b64175ceaad6

App. 70

Sandra Taylor

Page 142

1  rally?
2     A.  No, I don't.
3     Q.  And did you march in front of the state
4  Capitol?
5     A.  Around the state Capitol.
6     Q.  Was there a march anywhere else?
7     A.  No, not that I recall.
8     Q.  Was there a rally at the end of the march?
9     A.  I think there was a rally prior to.
10    Q.  And do you remember how many nurses were at
11 this?
12    A.  No, I do not.
13    Q.  Or how many people were at this?
14    A.  No, I do not.
15    Q.  And you attended this with Diana Sepeda; is
16 that correct?
17    A.  That's correct.
18    Q.  Was Nancy Friesen there also?
19    A.  I can't remember whether Nancy was there or
20 not.
21    Q.  How did you get to Austin?
22    A.  Diana and I worked the night before and we
23 drove down.
24    Q.  And had you attended any educational seminars
25 or events with the NNOC prior to this rally?

Page 143

1     A.  I don't think so.
2     Q.  Did you attend any events with the NNOC
3  between the time of this rally and May 24th of 2006?
4     A.  Yes.
5     Q.  Or excuse me, May 24th of 2007?
6     A.  That's correct.
7     Q.  And list those for me.
8     A.  I can't — I can't recall exactly when those
9  educational meetings were.
10    Q.  Where did — where did they take place?
11    A.  I think one was here in Dallas, one was in
12 San Antonio, and I think one was in Austin.  And that's
13 all I can recall.
14    Q.  And you actually attended those meetings in
15 person?
16    A.  Yes, I did.
17    Q.  And did Diana go with you to all three of
18 those?
19    A.  I can't remember.
20    Q.  Did Nancy Friesen go with you to any of those
21 three meetings?
22    A.  I can't remember if Nancy went or not.
23    Q.  And then I think I initially asked you if
24 Diana went with you to all of those three meetings, but
25 were there any of them that you recall Diana being

Page 144

1  present at?
2     A.  I don't remember.
3     Q.  And what was the meeting in Dallas about?
4     A.  Education.
5     Q.  What type of education?
6     A.  On laws.
7     Q.  What laws?
8     A.  Of patient advocacy, laws that affect nurses.
9     Q.  Did you get any written materials at those
10 events?
11    A.  I can't remember.  If we did, they're in
12 your — the packet that we gave you.
13    Q.  Okay.  Was Liz Higginbotham at the Dallas
14 meeting?
15    A.  I don't think so.
16    Q.  Was — did you meet Liz Higginbotham at the
17 Austin rally?
18    A.  I think it was at the Austin rally that I met
19 Liz.
20    Q.  And what was the San Antonio event?
21    A.  I can't remember.  I think it was an
22 educational meeting also, but I cannot remember exactly
23 what happened at San Antonio.
24    Q.  And so were these — you mentioned Dallas, San
25 Antonio and Austin.  Were these all three educational

Page 145

1  events?
2     A.  That's correct.
3     Q.  Was it the same agenda on — on all three
4  meetings?
5     A.  Yes.
6     Q.  And were you attending those meetings as a
7  representative of NNOC?
8     A.  No, I was not.
9     Q.  And just explain with me, if you could — if
10 you had already attended one of these educational
11 meetings in Dallas and sat through the presentation,
12 why did you go to the San Antonio meeting?
13    A.  Because I wanted to continue to get updates
14 on — it was prior to the bill, and so I wanted to get
15 updates on what was going on with — with that bill,
16 where it was located and what we needed to do —
17    Q.  Okay.
18    A.  — to try to get that bill passed.
19    Q.  And so at all three meetings there would have
20 been updates given, correct?
21    A.  Most of it was updates.
22    Q.  And — and did those meetings happen after the
23 Austin rally or before the Austin rally?
24    A.  Those were after the Austin rally.
25    Q.  And other than attending those three meetings,

9d564f6a-822b-42cf-9ab4-b64175ceaad6

Sandra Taylor

38 (Pages 146 to 149)

Page 146

1  did you do — attend any other NNOC events between the
2  Austin rally and May 24 of 2007?
3      A.  You mean after?
4      Q.  No, between.
5      A.  No, I can't remember if there were any other
6  meetings or not.
7      Q.  Okay.  And the Austin meeting, that was also
8  an educational meeting?
9      A.  Yes.
10     Q.  And they gave you an update on the legislation
11 that was pending before the Texas assembly?
12     A.  That's correct.
13     Q.  Do you recall anything else that happened at
14 the Austin meeting?
15     A.  No.
16     Q.  On page seven, if you look at the italics
17 underneath the NNOC, it indicates that, "Plaintiffs
18 have spoken with the NNOC personnel on multiple
19 occasions regarding their suspension and termination
20 from DRMC."  Do you see that?
21     A.  Yes, I do.
22     Q.  Which one of the people listed from the NNOC
23 have you spoken with concerning your suspension and
24 termination?
25     A.  For sure all of them except probably David

Page 147

1  Johnston.  I don't know who David Johnston is.  But all
2  the other ones we've spoken with about our termination.
3      Q.  And when did you speak with Amber Jamil about
4  your termination?
5      A.  I spoke with Amber Jamil the night — oh,
6  after terminating?  I don't know exactly when.  You'd
7  have to look at the phone records to see exactly when I
8  spoke to her after the termination.  We probably called
9  her — I probably called her the date that I found out,
10 which would be June 4th.
11     Q.  On Richard Stephens, prior to your
12 termination, but after May 24, did you speak with
13 Richard Stephens?
14     A.  Yes, I have.
15     Q.  So I'm talking about between May 24 and June
16 4th, did you speak with Richard Stephens?
17     A.  Between — restate that.
18     Q.  Sure.  May 24, 2007, that's the day in
19 question, correct?
20     A.  Yes.
21     Q.  And then I believe you've testified earlier
22 that May — excuse me, that June 4, 2007 is when you
23 were notified that you were being terminated, correct?
24     A.  That's correct.
25     Q.  And so I was wondering in between those two

Page 148

1  dates did you speak with Richard Stephens?
2      A.  Yes.
3      Q.  On how many occasions?
4      A.  I can't remember exactly how many occasions.
5      Q.  And tell me about the conversations you can
6  recall with Richard Stephens.
7      A.  I don't remember exactly what we discussed,
8  but he was — he was aware of what was going on up
9  until termination.  He was the one who went with us to
10 the office that day to speak with human resources.
11     Q.  On June 1st?
12     A.  Yes.
13     Q.  Did Richard Stephens also — to your
14 knowledge, did he walk around with the petition?
15     A.  No, Richard didn't walk around with it.  He
16 was out there when we went to — to do the petitions,
17 but he didn't do the petitions.  Diana and I went to
18 get those petitions signed, and I think Nancy went and
19 got some signed also.
20     Q.  To your knowledge, did any NNOC staff person
21 help carry those petitions around town?
22     A.  No.
23     Q.  And do you know where Richard Stephens lived
24 around this time period?
25     A.  I don't — I'm not sure.  He either lived in

Page 149

1  Fort Worth or Arlington, I think.
2      Q.  And is he a registered nurse?
3      A.  No, he's not.
4      Q.  Is he a member of NNOC?
5      A.  He was.
6      Q.  Is he no longer a member of NNOC?
7      A.  I don't think he is.
8      Q.  Do you recall anything else that Richard
9  Stephens and you spoke about between May 24 and June 4
10 of 2007?
11     A.  Nothing other than going to human resources
12 and he was aware that we were terminated.
13     Q.  But do you recall anything that you spoke with
14 him about?
15     A.  No.
16     Q.  Okay.  Have you spoken with Richard Stephens
17 since May — excuse me, June 4 of 2007?
18     A.  That's correct.
19     Q.  You have spoken with him after?
20     A.  Yes.
21     Q.  And — and on how many occasions?
22     A.  I don't know.
23     Q.  And why — what was the nature of the
24 conversation between you and Richard Stephens?
25     A.  Well, we — to continue to push for the bill

9d564f6a-822b-42cf-9ab4-b64175ceaad6

Sandra Taylor

Page 150

1  to be passed in 2009.
2  Q.  So the legislation that you rallied for in
3  November of 2006 is going to be represented to the
4  Texas legislature for review in 2009?
5  A.  You mean the legislation that was supposed to
6  be passed in 2007.
7  Q.  Okay.  Well, you went to a rally in November
8  of 2006, correct?
9  A.  Yes, but it was to be — it was presented to
10  the legislation for 2007.
11  Q.  Okay.
12  A.  So it wasn't passed, and so we want to
13  continue to push for it to be passed in 2009.
14  Q.  And are you actively trying to get the NNOC
15  legislation passed in 2009?
16  A.  That's correct.
17  Q.  And what efforts have you made in the last six
18  months to make that happen?
19  A.  Well, really not a whole lot.  I don't know —
20  because I'm not really that active right now.  And
21  since we had been out of town, we really haven't been
22  that active.  So I don't know exactly what all, you
23  know, the NNOC is doing, but I'm not really actively
24  involved at this point.
25  Q.  Do you plan on getting more involved as it

Page 151

1  gets closer to 2009?
2  A.  I hope to, yes.
3  Q.  Joe Schuman.  Did you speak with Joe Schuman
4  between May 24 of 2007 and June 4 of 2007?
5  A.  I don't remember when I talked to Joe Schuman.
6  I don't think I talked to Joe Schuman between that
7  time.
8  Q.  When is the last time you recall speaking with
9  Joe Schuman?
10  A.  I don't.  I can't recall the last time I
11  talked to him.
12  Q.  Would it have been after your termination?
13  A.  It might have been after termination.
14  Q.  Can you recall any conversation you've had
15  with Joe Schuman?
16  A.  No, no personal — no.  I can't recall any
17  personal conversation I've had with Joe Schuman.
18  Q.  And when you say "personal conversation," I
19  mean, that includes issues concerning your work at
20  defendant hospital?
21  A.  That's correct.
22  Q.  Ed Bruno.  Do you recall any conversations
23  with Ed Bruno between May 24, 2007 and June 4, 2007?
24  A.  No.
25  Q.  Have you spoken with Ed Bruno since June 4,

Page 152

1  2007?
2  A.  Yes, I have.
3  Q.  On how many occasions?
4  A.  I don't recall exactly how many occasions.
5  Q.  Could you approximate?
6  A.  No, I can't.  Maybe four or five, I guess.
7  Q.  Okay.  And when is — tell me about the first
8  conversation you can recall after June 4, 2007 with
9  Ed Bruno.
10  A.  I can't really tell you that.  He's aware that
11  we have been terminated, and that's basically all that
12  I can recall —
13  Q.  Was Ed — sorry.  I didn't mean to cut you
14  off.  Pardon.
15  A.  That's okay.
16  Q.  What is Ed Bruno's position with the NNOC?
17  A.  I don't know what Ed's position is.
18  Q.  What is Joe Schuman's position with the NNOC?
19  A.  I don't know what Joe's position is either.
20  Q.  And was it a telephone conversation with
21  Ed Bruno?
22  A.  No.
23  Q.  It was face to face?
24  A.  Yes.
25  Q.  Where did that take place?

Page 153

1  A.  Probably it was at one of these — probably
2  was at one of the educational seminars.
3  Q.  Those would have happened after June 4 of
4  2007?
5  A.  I think there's been one after that.
6  Q.  And where was that?
7  A.  I can't remember.
8  Q.  Do you recall approximately when it was?
9  A.  I can't.
10  Q.  Do you recall if it was in 2007 or 2008?
11  A.  It was probably 2007.
12  Q.  Did Mr. Bruno speak at that event?
13  A.  Yes.
14  Q.  Do you recall what he spoke about?
15  A.  No, I do not.
16  Q.  Did you speak at that event?
17  A.  No, I haven't spoken at any events, —
18  Q.  At any of —
19  A.  — that I remember.
20  Q.  Okay.  Any NNOC event?
21  A.  No, not that I can recall.
22  Q.  Hedy —
23  A.  Hedy Dumpel.
24  Q.  Hedy Dumpel?
25  A.  Uh-huh.

Sandra Taylor

Page 154

1    Q.  Did you speak with Hedy Dumpel between May 24,
2  2007 and June 4, 2007?
3    A.  No.  No, I didn't.
4    Q.  Did you speak with Hedy Dumpel after June 4 of
5  2007?
6    A.  Yes.
7    Q.  On how many occasions?
8    A.  I can't remember that.
9    Q.  What were your conversations with Ms. Dumpel?
10    A.  Basically the same thing, about, you know, we
11  have been terminated.
12    Q.  Did Ms. Dumpel give you any advice?
13    A.  I can't remember whether Hedy gave us any
14  advice or not.
15    Q.  After your termination, did anyone at the NNOC
16  give you advice on what to do?
17    A.  We conferred with Amber about what we should
18  do.
19    Q.  And what did Amber tell you?
20    A.  It was about the same time that we had talked
21  to Liz, so —
22    Q.  Without — I don't want you to go into your
23  conversations with Liz at that time, but just focusing
24  on Ms. Dumpel, what did Ms. Dumpel tell you?
25    A.  Oh, I can't — Ms. Dumpel didn't really give

Page 155

1  us that much information, and I can't remember exactly
2  what Hedy told us.
3    Q.  Okay.
4    A.  So —
5    Q.  And then between May 24, 2007 and June 1 of
6  2007, did you get advice from the NNOC?
7    A.  From Amber.
8    Q.  Anyone else?
9    A.  No.
10    Q.  And what was the advice that Amber gave you?
11    A.  Well, we — we discussed going to human
12  resources, going to the D.O.N., and what we needed to
13  do after that.  Because after we went over there that
14  morning, we got no response from the D.O.N. or human
15  resources.  And so those are the things that — that we
16  discussed between that night of the event, which was on
17  the 24th, and June 1st.
18    Q.  Okay.
19    A.  So —
20    Q.  Between June 1st, which is when you met with
21  human resources —
22    A.  Uh-huh.
23    Q.  Well, actually let me back up.  So it's your
24  testimony — was Ms. Dumpel present in Mesquite on June
25  1st?

Page 156

1    A.  No, Ms. Dumpel was not present.
2    Q.  Did you have any conversations with Ms. Dumpel
3  between your meeting with human resources on June 1st
4  and June 4th?
5    A.  No, we did not.
6    Q.  And what is Ms. Dumpel's position?
7    A.  I don't know exactly what her position is with
8  NNOC.
9    Q.  All right.  Moving down to Denita Yates.
10    A.  Yes.
11    Q.  Denita Yates, has she ever worked for the
12  defendant hospital?
13    A.  No, not that I — not to my knowledge.
14    Q.  And has Carolyn Ballard ever worked for the
15  defendant hospital?
16    A.  Yes, she has.
17    Q.  In what position?
18    A.  She was one of the night supervisors.
19    Q.  House supervisors?
20    A.  Yes.
21    Q.  And was she employed at defendant hospital in
22  May of 2007?
23    A.  Yes, she was.
24    Q.  As a house supervisor?
25    A.  Yes.

Page 157

1    Q.  And do you know where Ms. Ballard works now?
2    A.  No, I do not.
3    Q.  And do you know how it came to pass that
4  Carolyn Ballard was speaking with Denita Yates?
5    A.  Denita told me that she was working through
6  the agency at a hospital, I think, that Carolyn Ballard
7  worked at part-time.  And she said that she asked
8  her — because she knew she had worked over at
9  Mesquite.  She asked her to — what happened to those
10  nurses over at Mesquite.  And Carolyn told her she
11  couldn't talk to her right then, but she'd tell her
12  later.  And later she told her that that was
13  going to happen to those nurses.  The hospital set them
14  up so they could get rid of them or something to that
15  effect.
16    Q.  And — and so it's your testimony that Denita
17  told you that Carolyn told her this information; is
18  that correct?
19    A.  That's correct.
20    Q.  Okay.  And has Carolyn Ballard ever said
21  anything to you about the circumstances regarding your
22  termination from — from the defendant hospital?
23    A.  No, she has not.
24    Q.  And to your knowledge, was Carolyn Ballard on
25  duty on the day or night of May 24th?

9d564f6a-822b-42cf-9ab4-b64175ceaad6

**App. 74**

Sandra Taylor

48 (Pages 186 to 189)

Page 186

1  is that correct?
2     A.  Yes.
3     Q.  Did you do anything in the Mesquite area to
4  try to get publicity for that rally prior to the rally?
5     A.  We went to get petitions.  We continued to get
6  our petitions signed.
7     Q.  And that could have been happening immediately
8  before the June 15th event?
9     A.  That could have been.
10    Q.  And was it just the three of you that were
11 going around trying to get petitions signed or other
12 people?
13    A.  I don't remember.  I think it was – Diana and
14 I went out together, and I think her family was – was
15 with us.  And I can't remember who else showed up at
16 that Block Walk.
17    Q.  But that would have been immediately prior to
18 the June rally?
19    A.  Yes.
20    Q.  And was – was the NNOC the one that organized
21 the Block Walk?
22    A.  I think so.
23    Q.  On the night of May 24, after you left the
24 hospital, did you call anyone at the hospital to make
25 sure that all the patients had been covered?

Page 187

1     A.  I called back to talk with – I called back
2  and I think I talked to Peggy Allen and also spoke to
3  Linda Iserman.
4     Q.  On the night of –
5     A.  On the night of the event, on the 24th.
6     Q.  And when did you call Peggy Allen?
7     A.  I don't know exactly what the time frame was.
8     Q.  Was she on duty at the hospital?
9     A.  Yes, she was.
10    Q.  Did you actually get through to her?
11    A.  Yes, I did.
12    Q.  And tell me about that conversation.
13    A.  She just told me that she was scheduled to
14 work PCU and that they pulled her over there to work.
15 And she told me that Linda Iserman was there and I
16 asked her, "Could I speak to Linda?"  And I spoke to
17 Linda.  And I can't remember what else Peggy – I can't
18 remember right now what else Peggy and I discussed.
19    Q.  Okay.  And tell me about the call with
20 Linda Iserman.
21    A.  I tried to talk to Linda about the situation
22 that had occurred, and Linda told me she was not going
23 to talk to me about that right now.  And she just hung
24 up the phone.
25    Q.  And did she say "good-bye" or did she just

Page 188

1  hang-up?
2     A.  I can't remember.
3     Q.  Okay.
4     A.  I think she just hung up, so –
5     Q.  And did you speak with anyone else at the
6  hospital on the night of May 24th?
7     A.  I talked to Chidi, I think, that night.  Chidi
8  Onyi.
9     Q.  But Chidi was at home, correct?
10    A.  I can't remember whether Chidi was at home or
11 not.  But I remember speaking to him.
12    Q.  Right.
13    A.  So –
14    Q.  But Chidi was a day ICU nurse, correct?
15    A.  Yes.  Yes.
16    Q.  And so if Peggy was supposed to be on PCU, how
17 did you know to call her?
18    A.  No, I called the unit, and I asked – I can't
19 remember who answered the phone.  I think Dorothy, the
20 secretary on days, was there and I asked her who was
21 there and she told me.  And I said, "Let me speak to
22 Peggy."  She said Peggy was over there or something to
23 that effect.  And I said, "Let me speak to Peggy."
24    Q.  And so I take it you know Peggy?
25    A.  Yes, I do.

Page 189

1     Q.  And how do you know Peggy?
2     A.  When I first worked there through – well,
3  Peggy was one of the nurses that worked day shift over
4  there.
5     Q.  On PCU, though, right?
6     A.  She worked PCU and ICU.  She worked the pool
7  and she worked both units.
8     Q.  And do you know Peggy in any other way than
9  that?
10    A.  No, I do not.
11    Q.  Did you know how many nurses were on the
12 schedule for the nightshift – ICU nightshift on May
13 24th?
14    A.  I do not know that.
15    Q.  When you left on May 24, did you know that
16 Diana Sepeda was also going to clock out and go home?
17    A.  Yes.
18    Q.  And when you left on May 24, did you know that
19 Nancy Friesen was also going to clock out and go home?
20    A.  Yes.
21    Q.  Did that cause you any concern about the
22 safety of the ICU patients?
23    A.  The reason why I stayed around is because the
24 whole thing was causing me concern about the safety of
25 the patients.  So, yeah, I stayed around and waited to

9d564f6a-822b-42cf-9ab4-b64175ceaad6

App. 75

SANDRA  R.  TAYLOR                    197

1    COUNTY OF DALLAS    )

2    STATE OF TEXAS      )

3               I, Jeff L. Foster, certified shorthand

4    reporter in and for the State of Texas, do hereby

5    certify that the facts as stated by me in the caption

6    hereto are true; that there came before me the

7    aforementioned named person, who was by me duly sworn

8    to testify the truth concerning the matters in

9    controversy in this cause; and that the examination was

10   reduced to writing by computer transcription under my

11   supervision; that the deposition is a true record of

12   the testimony given by the witness.

13              I further certify that I am neither

14   attorney or counsel for, nor related to or employed by,

15   any of the parties to the action in which this

16   deposition is taken, and further that I am not a

17   relative or employee of any attorney or counsel

18   employed by the parties hereto, or financially

19   interested in the action.

20              Given under my hand and seal of office on

21   this, the 25th day of June, A.D., 2008.

22                          _____
                            Jeff L. Foster, CSR 5434
23                          Expiration Date:  12/31/2008
                            Firm Registration No. 209
24                          5220 Renaissance Tower
                            Dallas, Texas 75270
25                          (214) 855-5300

214-855-5300            UARS            800-445-7718