# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| **SANDRA TAYLOR RN,** | § | |
| **DIANA SEPEDA RN,** | § | |
| **NANCY FRIESEN RN,** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **3:07-CV-1931-M** |
| | § | |
| **LONE STAR HMA, LP** | § | |
| **d/b/a DALLAS REGIONAL MEDICAL** | § | |
| **CENTER,** | § | |
| | § | |
| **Defendant.** | § | |

## BRIEF IN SUPPORT OF MOTION FOR
## SUMMARY JUDGMENT

Mike Birrer
  State Bar No. 00783662
  mbirrer@ccsb.com
Rachel E. Mascorro
  State Bar No. 24060233
  rmascorro@ccsb.com
CARRINGTON, COLEMAN, SLOMAN
  & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone:  (214) 855-3000
Facsimile:  (214) 855-1333

***Attorneys for Defendant Lone Star HMA L.P.***

## TABLE OF CONTENTS

I.      BACKGROUND FACTS ................................................................................1

II.      SUMMARY ..............................................................................................16

III.      DISCUSSION ...........................................................................................17

     A.      Plaintiffs Cannot Maintain A Claim Under THSC § 161.134(a)..........17

         1.      Plaintiffs Cannot Show They Each Made A Report Of A Violation Of Law. ...............................................................................18

         2.      Plaintiffs Also Cannot Show Any So-Called Report Was Made In Good Faith. .................................................................................18

         3.      Plaintiffs Cannot Show Any So-Called Report Of A Violation Of Law Caused Their Terminations.............................................20

     B.      Plaintiffs Cannot Maintain an Action Under TOC § 301.413. .............22

         1.      Plaintiffs Did Not Make A Report Under The Subchapter.......................22

         2.      Plaintiffs Cannot Show Defendant's Legitimate Reason For Termination Is Pretextual.................................................................25

     C.      TOC § 301.352 Precludes Plaintiffs' Claims Under TOC § 301.413 and THSC § 161.134. .......................................................................25

         1.      The Remedial Structure of TOC § 301.352(a) Does Not Provide a Cause of Action.............................................................................26

         2.      Plaintiffs Cannot Plead Whistleblower Claims to Circumvent TOC § 301.352.............................................................................29

     D.      Plaintiff Cannot Establish Defamation. ................................................30

         1.      Plaintiffs Cannot Establish Any Actionable Defamatory Statements (Elements 1 and 2). ......................................................................31

         2.      Plaintiffs Cannot Establish Special Damages. ...........................32

         3.      The Qualified Privilege Covers Any Information Defendant Provided To Group One.................................................................32

## TABLE OF AUTHORITIES

**CASES**

*Austin v. Healthtrust, Inc.*,
    967 S.W.2d 400 (Tex. 1998).................................................................................27

*Austin v. Inet Techs., Inc.*,
    118 S.W.3d 491 (Tex. App.—Dallas 2003, no pet.).........................................31, 33

*Barron v. Cook Children's Health Care Sys.*,
    218 S.W.3d 806 (Tex. App.—Fort Worth 2007, no pet.).....................................17

*Brown v. De la Cruz*,
    156 S.W.3d 560 (Tex. 2004)................................................................................28

*Brown v. Petrolite Corp.*,
    965 F.2d 38 (5th Cir. 1992) ................................................................................30

*Cain v. Hearst Corp.*,
    878 S.W.2d 577 (Tex. 1994)...............................................................................30

*City of Waco v. Lopez*,
    No. 06-0089, 2008 WL 2702182 (Tex. July 11, 2008)...................................29-30

*Dixon v. Sw. Bell Tel. Co.*,
    607 S.W.2d 240 (Tex. 1980)...............................................................................32

*Ed Rachal Foundation v. D'Unger*,
    207 S.W.3d 330 (Tex. 2006)..........................................................................18, 26

*Fox v. Parker*,
    98 S.W.3d 713 (Tex. App.—Waco 2003, pet. denied).........................................32

*Kelly v. Diocese of Corpus Christi*,
    832 S.W.2d 88 (Tex. App.—Corpus Christi 1992, writ dism'd w.o.j.)............30, 32

*Lassetter v. Strategic Materials, Inc.*,
    192 F. Supp. 2d 698 (N.D. Tex. 2002) (Lynn, J.), *aff'd*, 72 F. App'x 106 (5th Cir.
    2003) ..................................................................................................................22

*Leatherman v. Rangel*,
    986 S.W.2d 759 (Tex. App.—Texarkana 1999, pet. denied) ..................... 30, 32-33

*Musser v. Smith Protective Servs., Inc.*,
    723 S.W.2d 653 (Tex. 1987)...............................................................................31

*Patrick v. McGowan*,
    104 S.W.3d 219 (Tex. App.—Texarkana 2003, no pet.) ........................................33

*Peshak v. Greer*,
    13 S.W.3d 421 (Tex. App.—Corpus Christi 2000, no pet.) ................................32

*Randall's Food Mkts., Inc. v. Johnson*,
    891 S.W.2d 640 (Tex. 1995).................................................................................30

*Subaru of Am., Inc. v. David McDavid Nissan, Inc.*,
    84 S.W.3d 212 (Tex. 2002)...........................................................................22, 27

*Tomhave v. Oaks Psychiatric Hosp.*,
    82 S.W.3d 381 (Tex. App.—Austin 2002, pet. denied), *overruled on other grounds by*
    *Binur v. Jacobo*, 135 S.W.3d 646 (Tex. 2004) ...............................................20, 25

*Transam. Mortgage Advisors, Inc. v. Lewis*,
    444 U.S. 11 (1979)...............................................................................................28

*Wal-Mart Stores, Inc. v. Lane*,
    31 S.W.3d 282 (Tex. App.—Corpus Christi 2000, pet. denied).............................30

STATUTES

79th Leg., R.S., ch. 113, § 7, 2005 Tex. Gen. Laws 210 (amended 2007) (current version
    at TEX. OCC. CODE ANN. § 301.352 (Vernon Supp. 2008)) ...........................*Passim*

79th Leg., R.S. ch., 113 § 116, 2005 Tex. Gen. Laws 213 (amended 2007) (current
    versioin at TEX. OCC. CODE ANN. § 303.005 (Vernon Supp. 2008))..................8, 28

TAC § 217.11(1)(T)................................................................................... 26-27

TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (Vernon 2005).....................................30

TEX. HEALTH & SAFETY CODE ANN. § 161.134 (Vernon 2001).........................*Passim*

TEX. OCC. CODE ANN. § 301.401(a) (Vernon 2004)......................................22, 24

TEX. OCC. CODE ANN. § 301.401(a)(4) (Vernon 2004) ...............................................27

TEX. OCC. CODE ANN. § 301.402(d) (Vernon 2004)......................................22

TEX. OCC. CODE ANN. § 301.413..............................................................*Passim*

TEX. OCC. CODE ANN. § 301.413(b) (Vernon 2004)...................................*Passim*

TEX. OCC. CODE ANN. § 303.005(b) (Vernon Supp. 2008)......................................8, 28

## Rules

22 Texas Admin. Code 217.11(1)(T) (2004) (Bd. of Nurse Examiners, Standards of
Nursing Practice) (amended 2007) ..............................................................................26

22 Tex. Admin. Code § 217.20 (2004) (Tex. Bd. of Nursing, Safe Harbor Peer Review
for Nurses) (amended 2008) ......................................................................................8

25 Tex. Admin. Code § 133.43(b) (2007) (Tex. Dep't of State Health Services,
Discrimination or Retaliation Standards).................................................... 17-18, 22

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SANDRA TAYLOR RN, | § | |
| DIANA SEPEDA RN, | § | |
| NANCY FRIESEN RN, | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 3:07-CV-1931-M |
| | § | |
| LONE STAR HMA, LP | § | |
| d/b/a DALLAS REGIONAL MEDICAL | § | |
| CENTER, | § | |
| | § | |
| **Defendant.** | § | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE COURT:

Defendant files this Brief in Support of Motion for Summary Judgment and respectfully would show as follows:

### I.      BACKGROUND FACTS

#### Cast of Characters

1.      Dallas Regional Medical Center (the "Hospital") is located in Mesquite, Texas. The Hospital has a number of different medical units, including but not limited to the following:

(i) Intensive Care Unit ("ICU") -- This is the Hospital's critical care unit.

(ii) Progressive Care Unit ("PCU") -- This is known as a step-down unit from ICU.  Patients often are transferred from ICU to PCU as their conditions improve.

(iii) Medical Surgical Unit ("Med-Surg") -- This is the Hospital unit where non-critical patients are placed.

Iserman Decl. ¶ 3/App. 0306.

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT – Page 1**

2.      Sandra Taylor, Diana Sepeda and Nancy Friesen (collectively, "Plaintiffs") were nurse employees who worked on the ICU nightshift.  Iserman Decl. ¶ 2/App. 0305.  All three were on the schedule for May 24, 2007, and all three refused to accept their patient assignments on that date.  Friesen Dep. 71:18-20; 78:18-14/App. 0022; 0025; Sepeda Dep. 29:9-11; 40:9-10/App. 0063; 0072; Taylor Dep. 62:10-12; 74:17-20/App. 0138; 0145.  They were placed on an investigative suspension, and, on or about June 4, 2007, their employment was terminated.  Iserman Dep. 76:23-25; 78:6-17/App. 0212-13.

3.      Linda Iserman is the Director of ICU, and as such, had direct supervisory responsibility over Plaintiffs.  Iserman Dep. 7:15-18/App. 0192; Iserman Decl. ¶ 2/App. 0305.  Consequently, Iserman is responsible for evaluating the performance of ICU nurses.  Taylor Dep. 59:8-11/App. 0137.  Iserman made the decision to terminate Plaintiffs' employment.  Iserman Dep. 79:19-21/App. 0214.

4.      Rick Lijauco is an ICU Charge Nurse on the dayshift.  Lijauco Decl. ¶ 2/App. 0316.  As Charge Nurse, he is responsible for making patient/nurse assignments for the oncoming nightshift.  Lijauco Decl. ¶ 3/App. 0316.  Further, as Charge Nurse, he is considered a resource person for any ICU nurse on duty.  Lijauco Dep. 6:6-11/App. 0233; Welpton Dep. 10:17-25/App. 0269.  Based on staffing requirements, the Charge Nurse may also take patient assignments.  Lijauco Dep. 7:4-9/App. 0234.  Lijauco made the patient/nurse assignments for the ICU nightshift on May 24, 2007.  Lijauco Dep. 19:4-7/App. 0237.

5.      Barbara Welpton is an ICU Charge Nurse, and she was on duty for the nightshift on May 24, 2007.  Welpton Dep. 5:4; 23:14-15/App. 0268; 0271.  Welpton's Charge Nurse duties are the same as those reflected above, except she would make the initial assignments for the oncoming ICU dayshift.  *See* Welpton Dep. 22:14 to 23:13/App. 0270-71.

6.      P.J. Kersey was the House Supervisor for the nightshift on May 24, 2007.  Kersey Dep. 7:6-7; 9:23 to 10:2; 14:21-25/App. 0295-98.  As House Supervisor, Kersey was responsible for nurse staffing throughout the Hospital during her shifts.  Kersey Dep. 9:4-7/App. 0296; Sepeda Dep. 44:16-23/App. 0075.  For instance, if one unit required additional staffing, Kersey's job duties required that she assist in finding additional staffing, which might include transferring a nurse from one unit to another, calling in overtime nurses, and other such activities.  Kersey Dep. 10:5-19; 20:13-18/ App. 0297; 0299.  Because unit directors typically were not on-site during the nightshift, the House Supervisor was the go-to supervisor during that shift.  Kersey Dep. 9:7-9/App. 0296; Taylor Dep. 40:10-23/App. 0127.  After Plaintiffs left on May 24, Kersey led the effort to find extra staff for ICU.  Kersey Dep. 35:23 to 37:10/App. 0300-302.

7.      Chris Loyd is the Director of Human Resources for Defendant.  Loyd Decl. ¶ 2/App. 0316.  Loyd assisted in conducting the investigation into the events of May 24, 2007, including individual interviews with each Plaintiff on June 1, 2007.  Iserman Dep. 183:4-22/App. 0221; Loyd Decl. ¶ 6/App. 0317.

8.      The National Nurses Organizing Committee ("NNOC") is a nurse advocacy group, and Plaintiffs were involved with the organization.  Friesen Dep. 118:1-5/App. 0041; Taylor Dep. 150: 12-16/App. 0165; Sepeda Dep. 71:6-7/App. 0088A.  The NNOC actively supported a proposed state law that would have prohibited any ICU from assigning more than two patients to one nurse regardless of acuity level.  *See* Friesen Dep. 55:14-19/App. 0010.  However, the proposed legislation never made it out of committee.  Friesen Dep. 55:22-24; 161:2-9/App. 0010; 0050B.  It is anticipated that the legislation will be reintroduced in 2009.  Taylor Dep. 150:2-16/App. 0165.  If enacted, hospitals would be prohibited from making 3:1 patient-to-nurse assignments in the ICU.  Taylor Dep. 141:15-22/App. 0164.

### ICU Operations

9.      The ICU has two shifts.  The dayshift is from 7:00 a.m. to 7:00 p.m., and the nightshift is from 7:00 p.m. to 7:00 a.m.  Iserman Decl. ¶ 4/App. 0306.

10.     The ICU has fourteen beds and each bed is assigned a number from one to fifteen. There is no bed thirteen.  Lijauco Dep. 32:1-6/App. 0242.

11.     The ICU typically maintains a 2:1 patient to nurse ratio.  Lijauco Decl. ¶ 7/App. 0323.  On occasion, there is an ICU patient whose condition is sufficiently critical that the patient will be assigned his own nurse, which is a 1:1 patient to nurse ratio.  Lijauco Decl. ¶ 5/App. 0323.  Further, based on staffing requirements, the ICU may "triple" a nurse, which means a 3:1 patient to nurse ratio.  Iserman Dep. 41:19-20/App. 0198; Lijauco Dep. 10:24 to 11:11/App. 0235-36; Sepeda Dep. 123:9-16/App. 0105.  If a nurse is asked to handle three patients on ICU, the Charge Nurse endeavors to provide the nurse with lower acuity patients. Lijauco Decl. ¶ 9/App. 0323-24; Friesen Dep. 65:20-23/App. 0017.

12.     In order to have an orderly system for assigning triples, the ICU maintained a "Triple Log" on which a nurse's name and date were recorded whenever an ICU nurse took three patients on ICU or transferred to another unit (*e.g.*, PCU) on which she would have three or more patients.  Iserman Dep. 35:17-24/App. 0195.  Pursuant to the Triple Log, ICU staff nurses took turns taking any triples.  *Id.*; Taylor Dep. 50:10-19/App. 0128.

13.     After an ICU nurse clocks in, she typically goes to a whiteboard by the ICU desk on which the prior Charge Nurse has written patient/nurse assignments.  Taylor Dep. 53:5-12/App. 0131.  In making assignments, the Charge Nurse considers, among other things, the acuity level of the patients and the abilities of the oncoming nurses.  Lijauco Decl. ¶¶ 6, 9/App. 0323-24.

14.     The whiteboard contains the following information for every patient:  (i) bed number, (ii) corresponding patient's first name, (iii) day ICU nurse assigned to the patient, and (iv) night ICU nurse to be assigned to the patient.  Taylor Dep. 53:18 to 54:2/App. 0131-32.  If applicable, the whiteboard has a symbol indicating whether a specific patient is on a ventilator, a balloon pump, or is a "fresh" open-heart patient.  Taylor Dep. 54:3-6/App. 0132.

15.     Prior to May 24, 2007, on two occasions, Sepeda or Taylor was assigned a triple, but told the Charge Nurse she would not accept the assignment.  Taylor Dep. 57:4-13/App. 0135.

16.     Welpton heard of the incidents regarding refusal to triple.  Welpton Dep. 129:4-10/App. 0290.  Welpton asked Iserman if she could send a nurse home who refused a triple.  Iserman Dep. 33:1-4/App. 0193.  Iserman responded that, as Charge Nurse, Welpton had authority to make that decision.  *Id.*

### Events of May 24, 2007

17.     Toward the end of the dayshift on May 24, 2007, there were seven ICU nurses (including the Charge Nurse) available and on the schedule for the nightshift, and there were fourteen patients.  Lijauco Decl. ¶ 12/App. 0324; Lijauco Dep. 19:4-14/App. 0237.  Accordingly, the unit could have had a 2:1 ratio.  But Lijauco believed the patient in Bed 5 required 1:1 nursing care.  Lijauco Decl. ¶ 12/App. 0324.  This left six nurses for thirteen patients.  *Id.*

18.     Lijauco and Iserman wanted to add another nurse to the May 24 nightshift so that Bed 5 would have a 1:1 with six ICU staff nurses who would have 2:1 assignments, and the Charge Nurse who would have one patient.  Lijauco Decl. ¶ 13/App. 0324; Iserman Decl. ¶5/App. 0306.  Lijauco and Iserman telephoned other nurses, but they had not received a firm

commitment from another nurse at the time it was necessary to make assignments.[1]   Lijauco

Dep. 27:2 to 29:2/App. 0238-40.

19.     When making patient/nurse assignments, Lijauco first determined that Lisa Berry

would care for Bed 5 in a 1:1 assignment.   Lijauco Dep. 31:18-19/App. 0241; Lijauco Decl.

¶ 14/App. 0324.   There remained six ICU nurses for thirteen patients.   Lijauco Decl. ¶ 14/App.

0324.   This meant one ICU staff nurse would have a triple.   *Id.*   The Charge Nurse is not

expected to triple.   Iserman Dep. 204:18 to 205:22/App. 0223-24.

20.     Lijauco consulted the Triple Log to determine who would triple, and it was

Taylor's turn.   Lijauco Decl. ¶ 14/App. 0324; Lijauco Dep. 57:23 to 58:2/App. 0249-50.   Lijauco

reviewed the existing patients to determine if there was an acceptable three-patient assignment

for Taylor.   Lijauco Decl. ¶ 15/App. 0324.   Lijauco assigned Beds 11, 14, and 15 to Taylor

because they were near each other, and all three patients were stable with relatively lower acuity.

Lijauco Decl. ¶ 16/App. 0324-25.   Bed 11 was a patient with pneumonia who was scheduled for

an evaluation to allow the patient to transfer to a long-term care facility (nursing home), and Bed

14 had orders stating the patient could be transferred to PCU.[2]   *Id.*   Bed 15 had a stable patient

with anemia who was restrained but had been relatively sedate.   *Id.*   Based on these patients'

acuity levels, Lijauco believed Taylor had the skills to handle this triple assignment.   Lijauco

Decl. ¶ 17/App. 0325.

### Sandra Taylor

21.     Taylor clocked in to the ICU at 6:38 p.m.   Taylor Dep. 62:13-16 & Exh. 3/App.

0138; 0183.   Before Taylor looked at her assignment, she gave a message to Jeannette Wright

---

[1]   Lijauco knew that Tita Luyen, an off-duty ICU nurse, had indicated an interest in overtime.   Lijauco Dep. 27:12-25.   On May 24, he left Luyen a voicemail message, but she was at the movies.   Lijauco Dep. 27:16-25.

[2]   PCU was full, and so the patient in Bed 14 remained in ICU during the entire May 24 night shift.

(day ICU Nurse).  Taylor Dep. 62:23 to 63:14; 64:2-24/App. 0138-40.  Wright mentioned she had been very busy because one of her two patients had to get medical scans (which requires an ICU nurse to accompany the patient to the scanner).  Taylor Dep. 67:1-5/App. 0142.  That was the totality of the information Taylor knew regarding Wright's patients.  Taylor never observed Wright's patients, did not know their medical conditions, and did not know if the one patient mentioned by Wright had any additional scans scheduled.  Taylor Dep. 66:23 to 67:5; 78:14-21; 85:12 to 86:7; 93:2-3/App. 0141-42; 0149; 0155-56.  ("[Wright] didn't tell me the condition or anything, the patient's diagnosis or doctors, anything like that.").  In fact, the patient Wright mentioned to Taylor did not have any further scans scheduled, and thus, the reason Wright claimed to be busy was not applicable to the nightshift.  Iserman Decl. ¶ 11/App. 0308.

22.     Leaving Wright, Taylor went to the whiteboard.  Taylor Dep. 68:16-22/App. 0143.  Taylor had been assigned Wright's two patients and one additional patient.  Taylor Dep. 72:9-23/App. 0144.  Taylor refused the triple assignment without knowing the underlying conditions of the patients assigned to her.  Taylor Dep. 87:16-18/App. 0157.

23.     Taylor did not know the acuity level of the patient whom Wright described as "very busy."  *Compare* Taylor Dep. 191:3-14/App. 0170 (describing steps to assess acuity), *with* Taylor Dep. 191:21 to 193:5/App. 0170-72 (Taylor did not take these steps on May 24).  Taylor did not know the acuity levels of the other two patients.  *See* Taylor Dep. 77:14-20; 87:16-18/App. 0148; 0157.

24.     Taylor claims that she called the dayshift House Supervisor (Paulette) and said, "The assignment that I have, I cannot take this assignment the way it is."  Taylor Dep. 74: 17-20/App. 0145.  The House Supervisor told Taylor to work it out with the Charge Nurse.  Taylor Dep. 74:24-25/App. 0145.

25.     Taylor claims that she told Lijauco (dayshift Charge Nurse), "I am not refusing an assignment, but I cannot take this assignment."  Taylor Dep. 75:23 to 76:2/App. 0146-47. Lijauco asked Taylor to invoke Safe Harbor.  Taylor Dep. 76:9-15/App. 0147.

26.     "Safe Harbor" is provided for under the Nursing Practice Act ("NPA").  *See* 79th Leg., R.S., ch. 113 § 116, 2005 Tex. Gen. Laws 213 (amended 2007) (current version at TEX. OCC. CODE ANN. § 303.005(b) (Vernon Supp. 2008)); *see also* 22 Tex. Admin. Code § 217.20 (2004) (Tex. Bd. of Nursing, Safe Harbor Peer Review for Nurses) (amended 2008).  If a nurse believes she is being asked to perform an action that would be reportable to the Board of Nurse Examiners ("BNE" or "Board"), she can invoke Safe Harbor.  *Id*.  Under the Safe Harbor process, a nurse and management initially discuss the situation and if a resolution cannot be reached, the nurse completes a form invoking Safe Harbor and the hospital's Peer Review Committee reviews the issue.  *Id*.

27.     Taylor refused to invoke Safe Harbor and told Lijauco that she wanted to speak with Linda Iserman (ICU Nurse Manager).  Taylor Dep. 76:9-15/App. 0147.  While waiting for Iserman to return the call, Taylor asked Barbara Welpton (night ICU Charge Nurse) to help Lijauco with staffing.  Taylor Dep. 76:9-21/App. 0147.  Welpton responded that Iserman had told her that she could send home a nurse refusing a three-patient assignment, but told Taylor to call Iserman and the House Supervisor.  Welpton Dep. 50:22 to 51:2/App. 0281-82.

28.     Taylor claims that Iserman told her to file Safe Harbor or go home.  Taylor 80:25 to 81:7/App. 0150-51.  After a brief conversation with the House Supervisor, Taylor went home. Taylor Dep. 82:24 to 83:6/App. 0152-53.

## Diana Sepeda

29.     On May 24, 2007, Diana Sepeda clocked in at 6:43 p.m.  Sepeda Dep. 30:12 & Exh. 3/App. 0064; 0182.   Sepeda went to the whiteboard and saw she had a two-patient assignment.  Sepeda Dep. 31:6-11; 34:10-16/App. 0065; 0067.

30.     Sepeda left the whiteboard and spoke with Jessie Wallace, a dayshift ICU nurse who had been assigned one of her two patients.  Sepeda Dep. 36:1-6/App. 0068.  Sepeda claims the conversation did not amount to taking "report" on this patient.  Sepeda Dep. 78:9-12/App. 0091.   When a nurse takes report, the oncoming nurse and the outgoing nurse discuss the patient's diagnosis, conditions, capabilities, and medical drips.  Sepeda Dep. 33:1-7/App. 0066. According to Sepeda, Wallace briefly stated that the patient had gone into V-Tach and V-Fib during the day, which Ms. Sepeda describes as lethal arrhythmias.  Sepeda Dep. 36:12-19/App. 0068.

31.     Sepeda heard a commotion at the ICU desk and told Wallace that she was going to see what was going on.  Sepeda Dep. 37:13-16/App. 0069.  As Sepeda approached the desk, she saw Welpton in front of the whiteboard with a magic marker in her hand, and she claims she overheard her say everyone was going to have to take three patients.  Sepeda Dep. 38:19 to 39:8; 39:24 to 40:3/App. 0070-72.

32.     Sepeda told Welpton she could not take three patients, and Sepeda contends that Welpton responded that every nurse who did not accept three patients could clock out and go home.  Sepeda Dep. 40:9-10; 42:1-3/App. 0072-73.  Sepeda replied, "Well, why don't I take the charge nurse position and you take my patients?"  Sepeda Dep. 42:4-6/App. 0073.  Welpton was the permanent Charge Nurse, not Sepeda, and refused the offer.  Welpton Dep. 77:24 to 78:2/App. 0284-85.  In any event, Sepeda was not looking for a solution for the entire ICU (which would be the Charge Nurse's duty).  Sepeda Dep. 44:24 to 45:5/App. 0075-76.

33.     Sepeda admits that Welpton never made an actual three-patient assignment to her. Sepeda Dep. 47:23 to 48:5/App. 0077-78.  Sepeda acknowledges that Welpton was still trying to figure out how she was going to staff the unit when she went up to Welpton.  Sepeda Dep. 48:6-16/App. 0078.

34.     Sepeda knew Taylor was speaking with Iserman and asked Taylor to let her speak with Iserman when Taylor finished the conversation.  Sepeda Dep. 48:17 to 49:4/App. 0078-79. According to Plaintiffs' Complaint, Sepeda told Iserman that "she could not safely take three patients . . . because the acuity and location of the patients."  Petition ¶ 10.

35.     Contrary to the Complaint, Sepeda concedes that she did not know which three patients might be assigned to her when she was speaking with Iserman.  Sepeda Dep. 52:2-19/App. 0081.  Sepeda obviously knew nothing about the mystery third patient (who had not been assigned), knew nothing about her second patient (Sepeda Dep. 128:25 to 129:2/App. 0107-08), and knew so little about her first patient that she refused to agree that she had taken report on that patient (Sepeda Dep. 78:9-25; 81:1-7/App. 0091-92).  Sepeda further admits that no one told her that she would have to keep Wallace's "V-Tach" patient if she were assigned three patients.  Sepeda Dep. 52:20 to 53:6/App. 0081-82.

36.     As Taylor and Sepeda prepared to leave ICU, they paged P.J. Kersey, the House Supervisor.  Sepeda Dep. 57:1-6/App. 0083.  When Kersey called back, Sepeda told her that as a "professional courtesy," she was letting her know she was clocking out to which Kersey responded that Sepeda was not being professional.  Kersey Dep. 44:7-13/App. 0303.

37.     When Sepeda was asked whether she would have been willing to accept the two patients who were actually assigned to her on the whiteboard when she clocked out, Sepeda

responded, "I cannot answer that because I don't know the acuity level of what I was going to be given."  Sepeda Dep. 77:12-16/App. 0090.

### Nancy Friesen

38.     On May 24, 2007, Friesen was late and clocked in at 7:04 p.m.  Friesen Dep. 79:6-19 & Exh. 3/App. 0026; 0181.  Sepeda told Friesen that she was going to be tripled.  *See* E-mail from Friesen to Jamil (hereinafter referred to as Friesen e-mail)/App. 0328.  An e-mail excerpt from Friesen explains the remainder of the conversations leading to her clocking out and going home:

> Diana said, "Well if Sandra goes home, then we both will be tripled and I can't take three patients either []"  Well Neither [sic] can I, I said.  The charge nurse, Barbara Welpton said, "[W]ell call Linda, her number is over there on the desk. So I called Linda and told her I wasn't able to be tripled either. . . .  I then said to Linda that under the circumstances, that I would need to go home too.  She said, O.K. and hung up.

39.     When asked why her patient assignment would be unsafe, Friesen responded "mathematics."   Friesen Dep. 90:7-14/App. 0032.   Friesen would refuse any three-patient assignment.  Friesen Dep. 54:7-10/App. 0009.  But Friesen admits that no one assigned her three specific patients on May 24, 2007.  Friesen Dep. 87:19-24/App. 0031.

40.     Friesen further admits that, on May 24, she did not take report on any of her patients.  Friesen Dep. 91:11-20/App. 0033.  Except for comments by Sepeda about the "V-Tach" patient and Taylor about the "very busy" patient, Friesen admits that she did not talk to a single nurse about the condition of any particular patient on the ICU floor.  Friesen Dep. 91:21-24; 132:15-25/App. 0033; 0044.  So, Friesen knew nothing about the two patients actually assigned to her when she told Iserman she was refusing her assignment.  Friesen Dep. 168:14-23/App. 0053.

41.     Friesen recalls that Safe Harbor was mentioned.   Friesen Dep. 108:3-12/App. 0038.

42.     Rather than give Welpton the opportunity to determine re-assignments, Friesen joined Sepeda and Taylor in leaving ICU.   Friesen Dep. 86:19-23/App. 0030.   Taylor, Sepeda, and Friesen all three clocked out at 7:13 p.m.   Sepeda Dep. 62:10-15 & Exh. 3/App. 0086; 0181-83.

## Acuity Levels

43.     A nurse must understand patient acuity to determine whether a nurse is capable of handling an assignment.  *See* Sepeda Dep. 74:8-16; 147:11-14/App. 0089; 0112.   "Acuity" is a nursing term used to denote how sick the patient is.   Taylor Dep. 190:17-24/App. 0169; Friesen Dep. 65:6-14/App. 0017.   A patient with higher acuity requires more nursing care than a patient with lower acuity.   By way of example, a patient waiting to transfer from ICU to PCU would have a lower acuity than a regular ICU patient.   Taylor Dep. 193:9-12/App. 0172.   The transfer of an ICU patient to a department or facility requiring less care is referred to as a "step-down." *See* Sepeda Dep. 130:9 to 132:8/App. 0109-111.   A patient being transferred to a "step-down" unit would have lower acuity.   Taylor Dep. 193:9-12/App. 0172.

44.     As shown above, Plaintiffs did not know the acuity of their patients before clocking out.   Indeed, Sepeda and Friesen clocked out based on the anticipation of a triple assignment, not an actual triple assignment.   Iserman Dep. 42:12-22/App. 0199.

## Investigation of Plaintiffs

45.     After speaking with Taylor, Sepeda, and Friesen, Iserman took a shower, put on a new uniform, and returned to the Hospital.   Iserman Dep. 34:8-16/App. 0194.   Iserman had two reasons for returning -- (i) determine whether the ICU patients had appropriate nurse staffing,

and (ii) investigate the circumstances surrounding Plaintiffs' departures. Iserman Dep. 39:23 to 41:4/App. 0196-98.

46.     Upon arriving at the ICU, Iserman was notified that Kersey (House Supervisor) had obtained additional nursing staff and concluded that the ICU patients were being cared for properly. Iserman Dep. 43:8-14; 44:2-8/App. 0200-201.

47.     Iserman then investigated the circumstances surrounding Plaintiffs' departures. Iserman Dep. 39:19 to 41:6; 68:10 to 76:21/App. 0196-198; 0204-12.

48.     In order to assess the acuity levels of the patients, Iserman reviewed the nursing notes on all fourteen ICU patients. Iserman Dep. 40:6-41:4/App. 0197-98.

49.     Iserman then spoke with Welpton and the nightshift ICU nurses to determine what they had heard or observed. Iserman Dep. 68:10-70:24/App. 0204-06.

50.     On May 25, Iserman spoke with the dayshift ICU nurses (including Rick Lijauco) who had been present on May 24. Iserman Dep. 68:10 to 70:24/App. 0204-06. Iserman telephoned dayshift ICU nurses who were present on May 24, but who were not at the Hospital on May 25. Iserman Dep. 70:19-24/App. 0206. Iserman also received an e-mail from P.J. Kersey describing her contact with Plaintiffs on May 24. Iserman Decl. ¶ 10 & Exh. 1/App. 0307; 0311.

51.     Based on Iserman's investigation, she determined the acuity levels of the three patients who had been assigned to Taylor and concluded that the assignment was reasonable and within Taylor's abilities. Iserman Decl. ¶ 11/App. 0307-08. Iserman discovered that Taylor did not know her patients' acuity levels when she refused her assignment. Iserman Dep. 41:11-13/App. 0198. Iserman also discovered that Sepeda and Friesen had left before they were actually given a specific three-patient assignment. Iserman Dep. 43:2-7/App. 0200. Iserman

also concluded that Friesen knew nothing about her patients beyond the whiteboard, and concluded that Sepeda did not take report on her patients and only knew that one patient had V-Tach earlier in the dayshift.  Iserman Decl. ¶ 18/App. 0309.

52.     Iserman spoke with Loyd (HR Director) and Tom Mars (Chief Nursing Officer) about the incident.  Iserman Dep. 73:18-24/App. 0209.   Loyd told Iserman that he would interview the three nurses to obtain their sides of the events.  Iserman Dep. 183:4-6/App. 0221.

53.     Iserman was out of town from May 26 to June 3, and returned to work on June 4. Iserman Dep. 76:14-21/App. 0212.

54.     On June 1, 2007, Chris Loyd (HR director) and April Collier (PCU Director) conducted individual interviews with each of the Plaintiffs to determine their version of events. *See* Loyd Decl. Exh. A/App. 0318-21.

55.     Loyd gave Iserman copies of the notes from the individual meeting with Plaintiffs.[3]  Iserman Decl. ¶ 16/App. 0309.  As reflected in these notes, Ms. Friesen repeatedly stated that a 3:1 ratio is unsafe.  When asked why she walked out on May 24, Friesen stated, "It was not my idea to walk out.  It had to be.  I had to do it.  To prove our point."  Friesen further explained, "No it was not a disservice to the nurses or patients.  It had to be done.  We had to take [our] stand."  Friesen Dep. Exh. 10/App. 0184-85; *see also* Friesen Dep. 153:3-22/App. 0048.

56.     Nothing in the interview notes called into doubt the information Iserman collected on May 24 and May 25.  Iserman Decl. ¶ 17/App. 0309.  Based on Iserman's investigation, she concluded that Taylor clocked out on May 24 based on a refusal to accept three patients without analyzing the acuity levels of the three assigned patients.  Iserman Dep. 79:4-21/App. 0214.

---

[3]  Plaintiffs had given Loyd typewritten statements, but Iserman did not receive or review these.  Iserman Dep. 138:16-19/App. 0217.

Iserman concluded that Sepeda and Friesen clocked out on May 24 without actually being assigned triples.  Iserman Dep. 43:2-7/App. 0200.

57.     Iserman further concluded that Plaintiffs likely would reject future three-patient assignments on the ICU.   Iserman Dep. 149:5-23; 150:1-10/App. 0219-20.   In reaching this conclusion, Iserman noted that Plaintiffs had all refused assignments without even beginning the report process on a single patient.  Iserman Decl. ¶ 13/App. 0308.  Rather, Iserman noted that Taylor and Friesen clocked out without knowing their patients' medical conditions, and Sepeda clocked out without beginning report on a single patient and without receiving an actual three-patient assignment.  Iserman Decl. ¶ 18/App. 0309.  Iserman believed the interview notes also supported her conclusion.  Iserman Decl. ¶ 17/App. 0309.

58.     Iserman believed that Plaintiffs' conduct constituted gross misconduct.  Iserman Dep. 79:19 to 80:4/App. 0214-15; Iserman Decl. ¶ 19/App. 0309.  Further, Iserman believed the conduct was untenable because Iserman expected ICU nurses to have the skills and ability to handle a triple assignment when the patients have appropriate acuity levels.  Iserman Dep. 189:2-17/App. 0222.  Iserman thought that it would be extremely detrimental to the ICU if Plaintiffs received special treatment -- allowing them to refuse triples without analyzing acuity -- which would increase the workload of the other ICU nurses.  Iserman Decl. ¶ 19/App. 0310.

59.     As a result of the above, Iserman terminated Plaintiffs' employment.  *Id.*

### Plaintiffs' Causes of Action

60.     Plaintiffs contend that Defendant retaliated against them as a result of Plaintiffs' refusal of alleged unsafe assignments.   Petition ¶ 16; *see also* Plaintiffs' First Supplemental Response to Interrogatory No. 1 ("Plaintiffs believe that if they had not refused the unsafe assignments on May 24, 2007, they would not have been terminated. . . .").  More specifically,

Plaintiffs' Petition contends that Defendant violated Texas Health and Safety Code § 161.134(a) and the Texas Occupations Code § 301.413.  *See* Petition ¶ 15.

61.     Plaintiffs also contend that information that Defendant supplied to Group One regarding their termination constitutes defamation.

## II.     SUMMARY

Plaintiffs claim that, "but for" their refusal to engage in reportable conduct (i.e., their alleged refusal to accept unsafe assignments), they would not have been terminated.  Plaintiffs conclude that this supports wrongful termination claims under two *whistleblower* statutes: (i) Texas Occupations Code § 301.413(b) and (ii) Texas Health and Safety Code § 161.134(a). Therein lies a critical flaw in Plaintiffs' claims:  an alleged refusal to act does not equal the report of an unlawful act.

There is a specific (unpleaded) Texas statute — Texas Occupations Code § 301.352 — that prohibits termination of a nurse who refuses to engage in an act that is reportable to the BNE.  The applicable version of TOC § 301.352, however, does not provide for a private cause of action.  Further, under Texas law, Plaintiffs cannot proceed under whistleblower statutes (such as 161.134 and 301.413) when a more specific statute (such as 301.352) has more restrictive procedural terms.

In addition, Plaintiffs cannot maintain a claim under TOC § 301.413(b) because it is limited to retaliatory conduct against "a person who reports, without malice, *under this subchapter*." TEX. OCC. CODE ANN. § 301.413(b) (Vernon 2004) (emphasis added).  Plaintiffs did not "report under this subchapter" and thus cannot maintain a claim.  Likewise, Plaintiffs cannot maintain a claim under THSC § 161.134 because it is limited to retaliatory termination for making a report of a violation of law.  Plaintiffs did not report a violation of law and thus

cannot maintain a claim.  In addition, THSC § 161.134 requires that the report be made in good faith which includes reasonableness, and Plaintiffs cannot meet that burden.

Plaintiffs also cannot show the legitimate, non-retaliatory reason for their terminations was false or pretext for retaliation under either pleaded statute.

Finally, Plaintiffs have no evidence that Defendant provided any defamatory information to Group One, and any communications between Defendant and Group One are protected under the qualified privilege.  Accordingly, Plaintiffs' defamation claims fail.

## III.   DISCUSSION

### A.   Plaintiffs Cannot Maintain A Claim Under THSC § 161.134(a).

THSC § 161.134(a) provides in pertinent part, "A hospital . . . may not . . . terminate . . . an employee for reporting to the employee's supervisor . . . a violation of law . . .."[4]  THSC § 161.134(a) (Vernon 2004).   Accordingly, to prove retaliatory discharge under THSC § 161.134(a), each Plaintiff must establish the following elements:  (1) she was an employee of the hospital; (2) she reported a violation of law; (3) the report was made to her supervisor; (4) her report was made in good faith; and (5) she was terminated as a result of the report.  *Barron v. Cook Children's Health Care Sys.*, 218 S.W.3d 806, 810 (Tex. App.—Fort Worth 2007, no pet.).[5]  As shown below, Plaintiffs cannot establish the second, fourth or fifth elements, and thus summary judgment is proper.

---

[4] Plaintiffs also cite 25 Texas Administrative Code Section 133.43, "Discrimination or Retaliation Standards," which is merely an interpretation of THSC § 161.134(a).  It provides:  "[A] hospital may not suspend or terminate the employment of, discipline, or otherwise discriminate against an employee for reporting in good faith to the employee's supervisor [or] an administrator of the hospital, . . . a violation of the Act or this chapter."  25 Tex. Admin. Code § 133.43(b) (2007) (Tex. Dep't of State Health Services, Discrimination or Retaliation Standards).

[5] The *Barron* court collapses the adverse employment action and causation elements into one element.  *See Barron*, 218 S.W.3d at 810 n.3 ("There is, however, a rebuttable presumption for the fifth element if the complained-of action occurred within sixty days of her report.").  This brief, however, will discuss these two elements separately.

1.     **Plaintiffs Cannot Show They Each Made A Report Of A Violation Of Law.**

Each Plaintiff claims that she was offered a patient assignment that she deemed unsafe and that she allegedly told the hospital she would not take an unsafe assignment.  A refusal to act is not the same as a report of a violation of law.  *See Ed Rachal Foundation v. D'Unger*, 207 S.W.3d 330, 332 (Tex. 2006) (under Texas common law, an employee cannot be terminated for refusal to engage in criminal conduct; however, reporting criminal conduct is not the same as refusal to engage in criminal conduct and will not support a common law wrongful termination claim).

For example, a lawyer who tells a client — "I cannot take this case because it's outside my area of expertise" — has not reported an ethical violation.  Likewise, a guest who tells a bartender — "I'm not driving because I've had too much to drink" — has not reported a violation of Dram Shop law.  In the present case, Plaintiffs refused to accept a patient assignment allegedly because the assignment would be unsafe.  There was no report that anyone violated any law.  Accordingly, Plaintiffs cannot maintain a claim under THSC § 161.134.

2.     **Plaintiffs Also Cannot Show Any So-Called Report Was Made In Good Faith.**

With regard to THSC § 161.134(a), the Texas Administrative Code explains, "A report is not made in good faith if there is not a reasonable factual or legal basis for making the report." 25 Tex. Admin. Code § 133.43(b) (2007) (Dep't of State Health Services, Discrimination or Retaliation Standards).  In the present case, Plaintiffs concede that it is necessary to analyze and understand their patients' acuity levels in order to determine whether a specific assignment is unsafe.  The undisputed evidence shows that none of the Plaintiffs engaged in this task and there was no reasonable factual basis supporting their refusals.

**Taylor** – When Taylor refused her three patient assignment, she admits she knew absolutely nothing about two of her patients.  The only information she knew about the third patient was that a dayshift nurse mentioned in the hallway that the patient had been "very busy" because the patient had had medical scans during the dayshift.  Taylor never observed this patient, did not know his medical condition, and did not know if the patient had any medical scans scheduled for the nightshift. Taylor Dep. 66:23 to 67:5; 78:14-21; 85:12 to 86:7; 93:2-3/App. 0141-42; 0149; 0155-56; 0159.  If Taylor had bothered to investigate, she would have learned this patient did not have any further medical scans scheduled for the nightshift, which was the sole reason the dayshift nurse indicated he was a "busy" patient.   Thus, the only piece of information that Taylor knew about one patient was inapplicable to the nightshift.  Thus, Taylor cannot show she had a reasonable factual basis for refusing her assignment.

**Sepeda** – Sepeda was given a two-patient assignment, but she anticipated eventually receiving a three patient assignment based on comments by Barbara Welpton (Charge Nurse). Sepeda Dep. 47:23 to 48:5/App. 0077-78.  When asked whether she would have accepted the two patient assignment, Sepeda responded, "I cannot answer that because I don't know the acuity level of what I was going to be given."  Sepeda Dep. 77:12-16/App. 0090.  Sepeda acknowledges that Welpton was still trying to determine how to re-staff the unit when Sepeda refused her potential three patient assignment.  Sepeda Dep.  48:6-16/App. 0078.  Sepeda concedes that she did not know which three patients might be assigned to her when she told Linda Iserman (ICU Nurse Manager) that she was refusing her assignment.  Sepeda Dep. 52:2 to 53:6/App. 0081-82. Thus, Sepeda cannot show she had a reasonable factual basis for refusing her assignment.

**Friesen** – On May 24, 2007, Friesen knew nothing about the two patients actually assigned to her when she told Iserman she was refusing her assignment.  Friesen Dep. 168:14-

23/App. 0053.  Friesen admits that no one assigned her three specific patients on May 24, 2007.

Friesen Dep. 87:19-24/App. 0031.   Thus, Friesen cannot show she had a reasonable factual basis

for refusing her assignment.

Based on the above, summary judgment is appropriate on Plaintiffs' claims under THSC

§ 161.134 because, under the undisputed facts, any alleged report was not made in good faith.

   **3.     Plaintiffs Cannot Show Any So-Called Report Of A Violation Of Law Caused Their Terminations.**

If Plaintiffs were to establish the first four elements, a rebuttable presumption of

causation exists if the termination occurred within sixty days of the report.  TEX. HEALTH &

SAFETY CODE ANN. § 161.134(f) (Vernon 2001).  The burden of proof, however, is never shifted

to Defendant.  *Tomhave v. Oaks Psychiatric Hosp.*, 82 S.W.3d 381, 385 (Tex. App.—Austin

2002, pet. denied), *overruled on other grounds by Binur v. Jacobo*, 135 S.W.3d 646 (Tex. 2004).

Instead, once Defendant produces evidence indicating a legitimate, non-retaliatory reason, the

presumption disappears, and Plaintiffs must establish that their terminations would not have

occurred but for their reports.  *Id.*

Defendant terminated Plaintiffs' employment within sixty days of their decisions to

refuse their patient assignments.  As indicated above, this does not constitute a report of a

violation of law, but for purposes of this section, Defendant will assume Plaintiffs can somehow

show that they made the requisite reports within sixty days of termination.  As shown below,

Defendant did not terminate Plaintiffs' employment based on any reports.

After the refusals, Iserman conducted an investigation which included speaking with the

ICU nurses on duty on May 24 (both dayshift and nightshift), reviewing the assignments given to

Plaintiffs, reviewing the nursing notes for each ICU patient, and reviewing Human Resources

notes of its interviews with Plaintiffs.  Based on this investigation, Iserman concluded that

Plaintiffs refused their patient assignments on May 24, 2007, without reasonably analyzing the acuity levels of the assigned patients.   Iserman Dep. 79:4-21/App. 0214.   Iserman further concluded that Sepeda and Friesen clocked out merely in anticipation of receiving a "triple" assignment without giving the Charge Nurse an opportunity to make the assignments.   Iserman Dep. 43:2-7/App. 0200.

Iserman further concluded that Plaintiffs likely would likely reject future three-patient assignments on the ICU.   Iserman Dep. 149:5 to 150:10/App. 0219-20.   In reaching this conclusion, Iserman noted that Plaintiffs had all refused assignments without even beginning the report process on a single patient.   Iserman Decl. ¶ 13/App. 0308.   Rather, Iserman noted that Taylor and Friesen clocked out without knowing their patients' medical conditions, and Sepeda clocked out without beginning report on a single patient and without receiving an actual three-patient assignment.   Iserman Decl. ¶¶ 11, 12/App. 0307-08.   Iserman further believed that Plaintiffs' comments to Human Resources supported her belief that Plaintiffs were making it clear that they would not take three patients regardless of underlying acuity levels.   Iserman Decl. ¶ 17/App. 0309.

Iserman believed the above constituted gross misconduct.   Iserman Dep. 79:19 to 80:14/App. 0214-15.   Further, Iserman believed the conduct was untenable because Iserman expected ICU nurses to have the skills and ability to handle triple assignments when the patients have the appropriate acuity levels.   Iserman Dep. 189:2-17/App. 0222.   Iserman thought that it would be detrimental to the ICU if Plaintiffs received special treatment — allowing them to refuse any triple regardless of acuity levels — which would increase the workload of the other ICU nurses.   Iserman Decl. ¶ 19/App. 0310.   As a result of the above, Iserman terminated their employment.   *Id.*

To survive summary judgment, Plaintiffs must establish pretext and put forth evidence rebutting each of Defendant's articulated, non-discriminatory reasons for terminating them. *See Lassetter v. Strategic Materials, Inc.*, 192 F. Supp. 2d 698, 706 (N.D. Tex. 2002) (Lynn, J.) (setting forth standard in ADEA retaliation case), *aff'd*, 72 F. App'x 106 (5th Cir. 2003). Plaintiffs cannot meet these burdens, and summary judgment is appropriate.

**B.      Plaintiffs Cannot Maintain an Action Under TOC § 301.413.**

TOC § 301.413(b) (Vernon 2005) provides, "A person may not suspend or terminate the employment of . . . a person who reports, without malice, under this subchapter."[6]  The relevant subchapter is entitled "Duty to Report Violation" and generally concerns the grounds for reporting a nurse to the BNE.  *See, e.g.*, TEX. OCC. CODE ANN. § 301.401(a) (Vernon 2004) (setting forth the grounds for reporting a nurse under the subchapter).  By way of example, a nurse may be reported to the BNE for unnecessary exposure of a patient to a risk of harm or failure to conform to the minimum standards of nursing.  *Id*. § 301.401(a)(1) & (4). Accordingly, to maintain a retaliatory termination claim under TOC § 301.413(b), each Plaintiff must show at least the following:  (1) she made a report under the subchapter;[7] (2) the report was made without malice; and (3) she was terminated as a result of the report.  Defendant moves for summary judgment because Plaintiffs cannot establish the first or third elements.

**1.      Plaintiffs Did Not Make A Report Under The Subchapter.**

Plaintiffs contend that their refusal to accept allegedly unsafe patient assignments constitutes a report under the subchapter.  Yet, as indicated above, a refusal to act is not the same as making a report under the subchapter.  Further, an examination of what was said on the

---

[6] TOC § 301.413 was amended effective September 1, 2007.  TEX. OCC. CODE ANN. § 301.413 (Vernon Supp. 2008).  Plaintiffs were terminated on June 4, 2007.  Accordingly, the 1999 version of TOC § 301.413 is applicable to the present case.  *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002).

[7] Under the subchapter, a report to the BNE must be written and signed and include the identity of the nurse being reported and any additional information required by the Board.  TEX. OCC. CODE ANN. § 301.402(d) (Vernon 2004).

evening of May 24 shows that Plaintiffs did not make a report that anyone had violated any identifiable section of the subchapter.

**Sepeda** – Sepeda claims that she told the charge nurse, "Barbara, I cannot take three patients safely.  I had a very sick open heart who is having V-Tac, V-Fib all day.  And now I'm going to have to pick up somebody's other patient, and that's going to be my third patient." *See* Sepeda Dep. 40:9-14/App. 0072.  When the charge nurse allegedly responded that nurses who would not accept three patients could go home, Sepeda responded, "Well, why don't I take the charge nurse position and you take my patients." *See* Sepeda Dep. 42:1-6/App. 0073.  Sepeda then spoke to Iserman, and allegedly repeated that she could not safely take three patients and again mentioned the patient with V-Tac/V-Fib.  *See* Sepeda Dep. 51:13-20/App. 0080.  Sepeda admits she never told anyone she would take three patients, but it needed to be a different mix of patients.[8]  Sepeda Dep. 52:2-19/App. 0081.  Sepeda then notified the House Supervisor that she was leaving, and she clocked out.

**Taylor** – Taylor claims, on May 24, she told Rick Lijauco (Dayshift Charge Nurse), "Rick, I'm not refusing an assignment, but I cannot take this assignment." Taylor Dep. 75:23 to 76:2/App. 0146-47.  Taylor claims Lijauco told her to discuss the matter with Linda Iserman (ICU Nurse Manager) and asked her to invoke Safe Harbor.   Taylor Dep. 76:1-15/App. 0147.  Taylor refused to invoke Safe Harbor, but agreed to speak with Iserman.  *Id.*  Taylor claims she told Iserman, "Linda, this is an unsafe assignment.  I cannot take this assignment.  I'm not refusing to take this assignment.  It needs to be adjusted."[9]  *See* Taylor Dep. 80:18-24/App. 0150.

---

[8] In addition to admitting she was never offered a specific three patient assignment, Sepeda admits that she did not have sufficient information to determine the safety level of the two-patient assignment that was actually written on the assignment board.

[9] Despite Taylor's claim that she said the assignment was unsafe, as Iserman's investigation revealed and as Taylor now admits, she knew nothing about two of her patients, and virtually nothing about the third patient at the time she refused the assignment.

Taylor claims that Iserman responded she had two options:   (1) invoke Safe Harbor, or (2) go home.   Taylor Dep. 80:25 to 81:7/App. 0151-51.   Taylor opted to go home.   *Id.*   After notifying the House Supervisor, Taylor clocked out and went home.

**Friesen** –   Friesen claims that when she arrived on May 24, Sepeda told her that they were going to receive triple assignments.   Friesen Dep. 77:4-5/App. 0024.   Friesen responded, "No, we can't do that.   We've been there, done that.   And I don't want to -- we're not going to do that again."   Friesen Dep. 77:20-22/App. 0024.   Friesen claims that she then called Iserman who said she could take the triple or go home.   Friesen Dep. 77:23 to 78:4/App. 0024-25.   Friesen alleges that she responded, "You're not giving me a choice because it's not safe."   Friesen Dep. 78:10-11/App. 0025.   Friesen then told Charge Nurse Welpton, "Why don't you take the third patient if they're going to transfer out tonight anyway?"[10]   Friesen Dep. 78:4-6/App. 0025. Friesen claims Welpton yelled at her that she was not taking three patients.   Friesen Dep. 78:6-7/App. 0025.   Friesen clocked out and went home.

There is no evidence that any Plaintiff made any report that identified someone who had violated any provision of the subchapter (TOC § 301.401 *et seq.*).   Plaintiffs at most were claiming that they were refusing to take the assignments because, if they accepted the assignments, some unidentified person might report *them*.   That is not the equivalent to making a report under the subchapter.   Further, Plaintiffs admit that they did not actually file any report with the BNE or any governmental agency regarding the events in question.   Accordingly, they cannot meet an essential element of TOC § 301.413(b).

---

[10] This apparently is a reference to the fact that Friesen knew that one of the three patients assigned to Taylor had orders permitting transfer of the patient out of ICU.

**2.     Plaintiffs cannot show Defendant's legitimate reason for termination is pretextual.**

As in THSC § 161.134, TOC § 301.413(e) (Vernon 2004) creates a rebuttable presumption of retaliation "for reporting under this subchapter" if the person was terminated within sixty days of making the report and the Board or a court determines that the underlying report was authorized or required under the subchapter and made without malice.   As with other employment actions, the presumption would not shift the burden of proof to Defendant. *Tomhave*, 82 S.W.3d at 385 (interpreting analogous provision in THSC § 161.134)).   Instead, once Defendant produces evidence indicating a legitimate, non-retaliatory reason, the presumption disappears, and Plaintiffs must establish that their terminations would not have occurred when it did but for their reports.   *Id.*

As set forth above, Section III(A)(3), Linda Iserman made the decision to terminate Plaintiffs' employment based on legitimate, non-retaliatory reasons.   Plaintiffs cannot show that these reasons are false or pretext for retaliating against Plaintiffs for making reports under the applicable subchapter.   Thus, for yet another reason, Plaintiffs cannot maintain a claim under TOC § 301.413(b).

**C.     TOC § 301.352 Precludes Plaintiffs' Claims Under TOC § 301.413 and THSC § 161.134.**

TOC § 301.352(a) is the statute that governs a nurse's refusal to engage in alleged reportable conduct.   As set forth below, the applicable version of TOC § 301.352(a) does not provide for a private cause of action, which is why Plaintiffs did not plead a cause of action under that statute.   Further, under Texas Supreme Court precedent, the specific provisions of TOC § 301.352(a) trump the general whistleblower provisions of TOC § 301.413 and THSC § 161.134, which requires dismissal of the whistleblower causes of action.

1.      **The Remedial Structure of TOC § 301.352(a) Does Not Provide a Cause of Action.**

Plaintiffs contend they were "terminated for invoking their statutory rights/duty to refuse assignments that were unsafe for their patients and would jeopardize their nursing licenses." Joint Report and Scheduling Proposal, filed January 4, 2008, p. 1 ("Plaintiffs' Contentions").  As indicated above, although Plaintiffs' Petition attempts to assert this constitutes an alleged violation of the whistleblower provisions set forth in THSC § 161.134(a) and TOC § 301.413(b), it patently does not.  Refusal to engage in an unlawful act and whistleblowing simply are not the same.  *See Ed Rachal*, 207 S.W.2d at 332 (under Texas common law, an employee cannot be terminated for refusal to engage in criminal conduct; however, reporting criminal conduct is not the same as refusal to engage in criminal conduct and will not support a common law wrongful termination claim).

Rather than address this quandary, Plaintiffs' Contentions ignore the whistleblower statutes actually pleaded in the Original Petition and contend Plaintiffs "refused the assignment in accordance with Texas Occupations Code 301.352 and 22 Texas Administrative Code 217.11(a)(T)."[11]  *See* Joint Report and Scheduling Proposal, filed January 4, 2008, p. 1 ("Plaintiffs' Contentions").  Accordingly, Defendant will address these unpleaded statutory and administrative code provisions.

Under TOC § 301.352(a), a person may not "terminate . . . a nurse who refuses to engage in an act or omission relating to patient care that would constitute grounds for reporting the nurse to the [B]oard."  Act Effective May 20, 2005, 79th Leg., R.S., ch. 113, § 7, 2005 Tex. Gen. Laws 210 (amended 2007) (current version at TEX. OCC. CODE ANN. § 301.352 (Vernon Supp. 2008)).  Under TAC § 217.11(1)(T), a nurse shall "[a]ccept only those assignments that take into

---

[11]  Although Plaintiffs cite to TAC § 217.11(a)(T), it appears they meant to cite to TAC § 217.11(1)(T).

consideration client safety and that are commensurate with the nurse's . . . ability." Plaintiffs conclude that, if they had accepted their alleged unsafe patient assignments, they would have violated TAC § 217.11(1)(T), which would constitute grounds for reporting them to the Board. *See* TEX. OCC. CODE ANN. § 301.401(a)(4) (Vernon 2004) (a nurse may be reported for failure to conform to minimum nursing standards). Accordingly, the gravamen of Plaintiffs' Petition is that Defendant could not terminate them for refusing their patient assignments. This begs the question: Why does Plaintiffs' Petition ignore TOC § 301.352 and instead plead whistleblower claims? An analysis of TOC § 301.352 provides the answer.

As an initial matter, it is necessary to determine the version of TOC § 301.352 that applies to the present case. Both TOC § 301.352 and TOC § 301.413 were recently amended with an effective date of September 1, 2007. Because Plaintiffs were terminated on June 4, 2007 (prior to the effective date), the earlier versions of TOC § 301.352 ("2005 Version") and TOC § 301.413 are applicable to the present case. *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002) ("Courts generally presume that the Legislature intends a statute or amendment to operate prospectively and not retroactively"); *Austin v. Healthtrust, Inc.*, 967 S.W.2d 400, 402 (Tex. 1998) (recognizing that because THSC § 161.134(a) was not in effect at the time plaintiff was terminated, she could not avail herself of its provisions).

Under the 2005 Version of TOC § 301.352, there are two ways a nurse may challenge an alleged termination for refusing to engage in a reportable act. First, a nurse may raise an alleged violation with an appropriate licensing agency. *See* Act Effective May 20, 2005, 79th Leg. R.S., ch. 113, § 7, 2005 Tex. Gen. Laws 210 (amended 2007) ("An appropriate licensing agency may take action against a person who violates this section."). Second, a nurse may request that the

hospital's peer review committee determine whether the requested conduct was reportable and, if the peer review committee agrees with the nurse, the nurse is entitled to reinstatement with backpay.  *Id.* § 301.352(b) (permitting Chapter 303 peer review committee to review an alleged violation); *see also* Act Effective May 20, 2005, 79th Leg., R.S. ch. 113 § 116, 2005 Tex. Gen. Laws 213 (amended 2007) (current version at TEX. OCC. CODE ANN. § 303.005(b) (Vernon Supp. 2008)) (nurse may request peer review).  But unlike other sections of the Texas Occupations Code — *e.g.*, TOC § 301.413 (Vernon 2004) — the 2005 Version of Section 301.352 does *not* provide for recourse to the courts through a private cause of action.  This Court, accordingly, should reject any invitation to read such a right into the statute.  *See Brown v. De la Cruz*, 156 S.W.3d 560, 568 (Tex. 2004) ("[W]hen the Legislature includes a right or remedy in one part of a code and omits it in another, that may be precisely what the Legislature intended."); *see also Transam. Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) ("[W]here a statute expressly provides a particular remedy or remedies, a court must be leery of reading others into it").

The fact that the 2005 Version of TOC § 301.352 does not create a private right of action is highlighted by the statutory amendments which became effective on September 1, 2007. Specifically, a new subsection was added to TOC § 301.352 and provides, "A violation of this section is subject to Section 301.413."  *See* TEX. OCC. CODE ANN. § 301.352(f) (Vernon Supp. 2008).  Under the amended TOC § 301.413(c) — also effective on September 1, 2007 — a nurse who "refuses to engage in conduct as authorized by Section 301.352 . . . has a cause of action . . . ."  TEX. OCC. CODE ANN. § 301.413(b) (Vernon Supp. 2008).  None of that statutory text existed prior to September 1, 2007.  Accordingly, a nurse who wanted to raise a violation of TOC § 301.352, prior to September 1, 2007, was directed to appropriate licensing agencies or

peer review committees, not the courts.  Therefore, Plaintiffs cannot maintain a cause of action based on TOC § 301.352 (even if they had pleaded/asserted such a claim).

> **2.     Plaintiffs Cannot Plead Whistleblower Claims to Circumvent TOC § 301.352.**

A recent Texas Supreme Court decision shows that Plaintiffs cannot circumvent the procedural and remedial restrictions of TOC § 301.352 by pleading their claims under the whistleblower provisions of TOC § 301.413 or THSC § 161.134.   In *City of Waco v. Lopez*, No. 06-0089, 2008 WL 2702182 (Tex. July 11, 2008), a former city employee brought suit against the City of Waco alleging that his employment was terminated for reporting alleged racial discrimination in violation of the City's EEO policy.  *Lopez*, 2008 WL 2702182, at \*1. Lopez did not bring his claim under the Texas Commission on Human Rights Act ("TCHRA"), which prohibits retaliation for opposing racial discrimination, but under the more general Whistleblower Act which prohibits retaliation against public employees who report violations of law.  *Id.* at \*2.  The Court noted the TCHRA was more specific to the conduct in question and noted the TCHRA created procedural and remedial limitations not present in the general whistleblower statute.  *Id.* at \*5.  The Court recognized that, if a plaintiff could proceed under the more general statute, the TCHRA's special structure effectively would be stripped away.  *Id.* The Court refused to permit this result and dismissed the cause of action under the Whistleblower Act.  *Id.* at \*4 (rejecting whistleblower claim and noting "[t]he issue here is not exclusivity in the strictest sense of the word, but whether the Legislature intended to allow a claimant to elect between two remedial schemes addressing essentially the same conduct but providing different procedures and remedies").

In the present case, the 2005 Version of TOC § 301.352 governs the specific conduct that Plaintiffs allege resulted in termination.  If Plaintiffs want this conduct addressed, they must seek

review by either an appropriate licensing board or a peer review committee.  As *Lopez* teaches, Plaintiffs cannot circumvent these limitations by attempting to shoe-horn their claims into whistleblower statutes such as THSC § 161.134 or TOC § 301.413.  Thus, Plaintiffs' claims under THSC § 161.134 and TOC § 301.413 should be dismissed.

**D.      Plaintiff Cannot Establish Defamation.**

Under Texas law, each Plaintiff must plead and prove the following essential elements to establish defamation:  (1) Defendant made a statement of fact that injured Plaintiff's reputation and exposed Plaintiff to public hatred, ridicule, or impeached Plaintiff's honesty, integrity or virtue; (2) Defendant's statement was false; and (3) Defendant's statement was published to a third party without legal excuse.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (Vernon 2005); *Brown v. Petrolite Corp.*, 965 F.2d 38, 43-44 (5th Cir. 1992) (holding plaintiff must prove the "allegedly defamatory language is false"); *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex. 1995) (defamatory statements must be published to a third person); *Cain v. Hearst Corp.*, 878 S.W.2d 577, 580 (Tex. 1994) ("Recovery for defamation requires the communication of a false statement");  *Wal-Mart Stores, Inc. v. Lane*, 31 S.W.3d 282, 290 (Tex. App.—Corpus Christi 2000, pet. denied) ("[T]he essence of defamation is a statement that is false.").  In addition, unless each Plaintiff can establish defamation *per se*, Plaintiff must also show that any alleged defamatory statement resulted in special damages.  *See Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 91 (Tex. App.—Corpus Christi 1992, writ dism'd w.o.j.).

Even assuming each Plaintiff could establish these essential elements (which she cannot), the affirmative defense of qualified privilege routinely shields former employers from defamation claims brought by disgruntled former employees.  *See Randall's*, 891 S.W.2d at 646 (protecting statements of employees made during investigation of employee misconduct); *Leatherman v. Rangel*, 986 S.W.2d 759, 763 (Tex. App.—Texarkana 1999, pet. denied)

(protecting statements made and conclusions drawn during investigation of employee misconduct).

    1.    **Plaintiffs Cannot Establish Any Actionable Defamatory Statements (Elements 1 and 2).**

**Taylor** — Taylor testified that she does not know of any false or defamatory statements that Defendant made to Group One. Taylor Dep. 39:18 to 40:1; 182:24 to 183:4/App. 0126-27; 0166-67. Thus, she cannot establish an essential element of defamation.

**Sepeda —** Sepeda testified that she does not know of any false or defamatory statements that Defendant made to Group One. Sepeda Dep. 94:7-18; 106:10 to 108:12/App. 0098; 0099-101. Thus, she cannot establish an essential element of defamation.

**Friesen** — Friesen testified that her Group One report was inaccurate inasmuch as the salary information provided by Defendant failed to include her last annual wage increase, which was eighty cents per hour. Friesen Dep. 32: 16-25; Exh. 1/App. 0005; App. 0176. Friesen testified, however, that she corrected this mistake. Friesen Dep. 32:10-12/App. 0005. A statement is defamatory only "if the words tend to injure a person's reputation, exposing the person to public hatred, ridicule, or financial injury." *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (Vernon 1996)). Under that definition, Defendant's statement regarding Friesen's hourly wage is not actionable defamation.

Because Plaintiffs have failed to identify any statements Defendant provided to Group One that are false and defamatory, their defamation claims fail as a matter of law. *See Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987) (recognizing that whether an unambiguous statement is capable of defamatory meaning is a dispositive question of law).

2.      **Plaintiffs Cannot Establish Special Damages.**

To the extent Plaintiffs can establish an actionable defamatory statement, Plaintiffs'

defamation claim still fails because Plaintiffs have not pleaded and shown special damages.

*Kelly*, 832 S.W.2d at 91.   "Special damages" are those damages which are foreseeable to the

defendant but are not the necessary and usual result of the wrong.   *Fox v. Parker*, 98 S.W.3d 713,

726 (Tex. App.—Waco 2003, pet. denied).   Plaintiffs are not seeking recovery of special

damages.   Pet. ¶ 18.[12]   Thus, Defendant is entitled to summary judgment on Plaintiffs'

defamation claim.

3.      **The Qualified Privilege Covers Any Information Defendant Provided To Group One.**

a.      *Any Statements by Defendant Were Made to Persons Having a Common Interest in the Subject Matter to Which the Communications Related.*

It is well-established under Texas law that a qualified privilege extends to any

communications made in good faith on a subject in which the speaker and the person receiving

the statement both have an interest.   *Leatherman*, 986 S.W.2d at 762 (citing *Dixon v. Sw. Bell*

*Tel. Co.*, 607 S.W.2d 240 (Tex. 1980)).

Plaintiffs' defamation claim is based solely on the information contained in their Group

One reports.   Pet. ¶ 14.   But the only false information Plaintiffs allege Defendant provided to

Group One is Friesen's wage information at the time of her termination.   Even if this oversight

were defamatory (which, as noted above, it clearly is not), Defendant would still be protected

from liability by the qualified privilege.

As Plaintiffs recognize, "Group One is a credentialing organization relied upon by

healthcare providers to obtain nurse reference information."   Pet. ¶ 14; *see also* Loyd Decl. ¶ 4.

---

[12] Plaintiffs allege that Defendant's conduct has resulted in injury to Plaintiffs' reputations. Pet. ¶¶ 14, 18. These are not special damages. *See Peshak v. Greer*, 13 S.W.3d 421, 427 (Tex. App.—Corpus Christi 2000, no pet.) (recognizing that "[g]eneral damages are mental anguish, injury to the reputation and the like . . .").

Clients of Group One all share the same interest:  verifying the employment histories of nurses being considered for employment.   Thus, these communications are subject to qualified privilege. *See Patrick v. McGowan*, 104 S.W.3d 219, 223 (Tex. App.—Texarkana 2003, no pet.) ("A former employer's statements about a former employee made to a prospective employer fall within the qualified privilege that protects communications made in good faith on a subject matter in which the author has a common interest with the other person.").

       *b.*    *Any Statements by Defendant Were Made With a Lack of Actual Malice.*

Plaintiffs cannot show that Defendant acted with actual malice in providing information to Group One.  While qualified privilege is an affirmative defense, it is conclusively established once Defendant has presented evidence that statements were made in the absence of actual malice. *Leatherman*, 986 S.W.2d at 762-63.  "Actual malice" cannot be established through ill will; rather, actual malice is established only through a showing that a statement was made with knowledge of its falsity or with reckless disregard of whether the statement was true. *Id.* at 763.

Defendant has shown that the eighty cent per hour mistake in Friesen's wage was unintentional and not a reckless disregard of the truth. *See* Loyd Decl. ¶ 5/App. 0317.  Because Plaintiffs have failed to produce any evidence to overcome Defendant's qualified privilege, summary judgment is appropriate. *See Austin*, 118 S.W.3d at 499 (affirming summary judgment for employer on defamation claim where employee failed to present any controverting evidence to indicate the employer's statements were false or made with reckless disregard as to their truth).

WHEREFORE, Defendant respectfully requests that the Court grant summary judgment, award costs to Defendant, and grant such other and further relief to which Defendant may be entitled.

Respectfully submitted,

/s/ Mike Birrer
Mike Birrer
  State Bar No. 00783662
  mbirrer@ccsb.com
Rachel E. Mascorro
  State Bar No. 24060233
  rmascorro@ccsb.com
CARRINGTON, COLEMAN, SLOMAN
  & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Telephone:  (214) 855-3000
Facsimile:  (214) 855-1333

**Attorneys for Defendant Lone Star HMA L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of September, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for Plaintiffs Sandra Taylor and Diana Sepeda, R.N., Elizabeth L. Higginbotham, Esq., 106 E. 6th Street, Suite 900, Austin, Texas  78701, and counsel for Plaintiff Nancy Friesen, Maria Wormington, Wormington Law Group, 207 East Lamar Street, McKinney, Texas 75069.

**/s/ Mike Birrer**