**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SANDRA TAYLOR, | § | |
| DIANA SEPEDA, AND | § | |
| NANCY FRIESEN, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No.: 3:07-cv-1931-M |
| | § | |
| v. | § | |
| | § | |
| LONE STAR HMA, L.P. | § | |
| d/b/a DALLAS REGIONAL MEDICAL | § | |
| CENTER, | § | |
| | § | |
| Defendant. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court is Defendant Lone Star HMA, L.P.'s Motion for Summary Judgment

[Docket Entry #36]. The Motion is **GRANTED IN PART** and **DENIED IN PART**.

*Factual Background*

This case involves a dispute between three nurses and the hospital where they worked.

Plaintiffs Sandra Taylor, Diana Sepeda, and Nancy Friesen worked as registered nurses in the

Dallas Regional Medical Center in Mesquite Texas, which is operated by Defendant Lone Star

HMA, L.P. ("the Hospital"). On May 24, 2007, Plaintiffs were scheduled to work the night shift

in the intensive care unit ("ICU"), which started at 7:00 p.m. and would end at 7:00 a.m. on May

25. The dispute centers on how nurses are assigned patients.

A charge nurse who works on the ICU floor assigns patients to nurses, making particular

assignments based on the charge nurse's assessment of the severity of a patient's condition,

which is referred to as the patient's "acuity level." The charge nurse also takes into account the

number of nurses available to work the particular shift. A severely ill patient is cared for by a

nurse assigned only to that patient, which is referred to as a "1:1 ratio." The typical patient assignment for ICU nurses at the Hospital is two patients to one nurse. On occasion, the Hospital assigns three patients to one nurse, which is known as "tripling." If the Hospital assigns a nurse three patients, the charge nurse is supposed to assign less ill patients to that nurse in order to maintain an acceptable level of care. When a nurse is assigned three patients, it is recorded in a "triple log," so that three patient assignments are rotated among the staff. Patient assignments are communicated to the nursing staff on a whiteboard near the ICU desk. After learning of an assignment, a nurse is to review with the nurse who cared for those patients during the previous shift the medical condition of the assigned patients. This process is known as "taking report," and is designed to facilitate the transition between nursing shifts.

On May 24, 2007, Rick Lijauco was the charge nurse for the day shift ending at 7:00 p.m., and he had the responsibility of assigning nurses to patients for the night shift. Seven ICU nurses were scheduled to work the night shift, and fourteen ICU patients were in the ICU. Lijauco believed that one patient required a 1:1 ratio, which left six nurses for thirteen patients. As a result, one nurse would have to care for three patients. Lijauco checked the triple log and, finding it was Sandra Taylor's turn to be tripled, assigned Taylor three patients.

Sandra Taylor clocked into the ICU at 6:38 p.m. on May 24. After she checked in, Taylor talked to Jeannette Wright, one of the day shift ICU nurses, about the condition of Wright's patients. Wright told Taylor she had been "very busy" during the day shift because one of her two patients was "sick" and had to get multiple medical scans, requiring Wright to accompany the patient for the various scans. This was all the information Taylor had about Wright's patients, and all parties acknowledge that this conversation did not amount to Taylor "taking report" on Wright's patients. At that time, Taylor did not know which patients had been

2

assigned to her.  Taylor then went to the whiteboard, finding that she had been assigned Wright's two patients, and one other patient.  Taylor says she believed the assignment of three patients to her was unsafe, and she told Lijauco that while she was "not refusing an assignment," she also "could not take" the assignment given her.  Lijauco asked Taylor whether she would invoke "Safe Harbor," a provision of the Nurse Practices Act that allows a nurse to discuss with hospital management a situation she deems unsafe.  If such a discussion does not resolve the dispute, the nurse reports the situation to the hospital's Peer Review Committee, which reviews the situation and, if necessary, takes corrective action.  According to Taylor, Lijauco told her that if she were to invoke Safe Harbor, she would still have to take the three patient assignment, and thus she refused to invoke Safe Harbor.  Taylor then asked Barbara Welpton, the incoming ICU charge nurse, to help resolve the dispute.  Welpton told Taylor that the director of the ICU, Linda Iserman, had given charge nurses the authority to send home any nurse who refused an assignment.  Taylor then called Iserman, who she claims told her to either invoke Safe Harbor or go home.  Taylor then left the ICU and went home.

Diana Sepeda clocked into the ICU at 6:43 p.m. and went to the whiteboard to check her assignments.  She found she had been assigned two patients, one of whom had been assigned to Jessie Wallace during the day shift.  Sepeda spoke with Wallace, who told her that on the day shift this patient had gone into V-Tach and V-Fib, which Ms. Sepeda describes as lethal arrhythmias.  Again, it is undisputed that the conversation between Wallace and Sepeda did not amount to "taking report" on the patient's condition.  During her conversation with Wallace, Sepeda heard a commotion and approached the ICU desk, where she says she saw Welpton in front of the whiteboard with a magic marker, and heard Welpton say that every nurse was going to have to take three patients.  In response, Sepeda says she told Welpton she could not take three

3

patients.  Sepeda says Welpton told her that any nurse who would not accept three patients could clock out and go home.  Sepeda admits that Welpton did not actually make a triple assignment to her.  Sepeda noticed that Taylor was speaking with Iserman and asked Taylor to let her speak with Iserman after Taylor finished talking to her.  Sepeda claims she told Welpton that she could not safely accept her assignment because of the high acuity level of the patient who had suffered V-Tach and V-Fib.[1]

Nancy Friesen clocked into the ICU late, at 7:04 p.m on May 24.  Before receiving an assignment, she encountered Sepeda, who told Friesen that Friesen was going to be required to take three patients.  Friesen called Iserman and told her that she would not take a three-patient assignment because if it was unsafe for the other two nurses, it was also unsafe for her.  Friesen claims Sepeda told her about the V-Tach / V-Fib patient and that Taylor told her about the "very busy" patient, but Friesen admits she did not know anything about the specific patients to whom she would be assigned.  Friesen followed Taylor and Sepeda out of the ICU and went home.

After the events of May 24, Iserman conducted an investigation.  She first reviewed the files of the patients assigned to Taylor, to determine whether Taylor had been given an unsafe assignment.  She then spoke with the Hospital's Human Resources Director, Chris Lloyd, and the Chief Nursing Officer, Tom Mars, about the incident.  Lloyd provided Iserman with copies of notes taken during interviews with the nurses.  The notes reflect that Friesen repeatedly stated that a 3:1 ratio is unsafe, and that she said "[i]t was not my idea to walk out.  I had to do it.  To prove our point."[2]  Iserman concluded that all three nurses' assignments in the ICU on May 24 were reasonable, and within each nurse's ability to handle safely.  She also concluded that the nurses' behavior constituted gross misconduct and that each would likely refuse any future three-

---

[1] Sepeda Deposition at p. 46-47.
[2] Defendant's Appendix at p. 228.

patient assignments.  In early June 2007, as a result of the events of May 24, Iserman fired the three nurses.

On August 24, 2007, Plaintiffs filed a suit alleging that the Hospital fired them in violation of Texas Health and Safety Code § 161.134(a) and Texas Occupations Code § 301.413. Plaintiffs also made a common law defamation claim which they have since withdrawn.[3] Defendant removed to this Court on diversity grounds, and after conducting discovery, now moves for summary judgment on all the claims.

*Summary Judgment Standard*

Summary judgment is warranted when the facts and law, as reflected in the pleadings, affidavits, and other summary judgment evidence, show that no reasonable trier of fact could find for the nonmoving party as to any material fact.[4]  "The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case."[5]  Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate.[6]

The nonmovant is then required to go beyond the pleadings and designate specific facts that prove the existence of a genuine issue of material fact.[7]  In determining whether genuine issues of material fact exist, factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists.[8] A district court properly grants summary judgment if, when viewing the facts in the light most

---

[3] Plaintiff's Response to Defendant's Motion for Summary Judgment at p. 21.
[4] *See* Fed. R. Civ. P. 56; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).
[5] *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 322-25).
[6] *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).
[7] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[8] *Lynch Props.*, 140 F.3d at 625; *see also Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 338 (5th Cir. 2005).

favorable to the nonmovant, the movant shows that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law.[9]

*Analysis*

## Texas Occupations Code § 301.413(b) Claim[10]

The Plaintiffs claim their termination was in violation of Texas Occupations Code Section 301.413, entitled "Retaliatory Action," which provides, in pertinent part:

> (b) A person may not suspend or terminate the employment of, or otherwise discipline or discriminate against, a person who reports, without malice, under this subchapter,
>
> (c) A person who reports under this subchapter has a cause of action against a person who violates Subsection (b) . . .

These provisions are contained within Subchapter I of Chapter 301 of the Code, and another part of the Subchapter, Section 301.402, defines the "report":

> (f) A nurse may report to the nurse's employer or another entity at which the nurse is authorized to practice any situation that the nurse has reasonable cause to believe exposes a patient to substantial risk of harm as a result of a failure to provide patient care that conforms to minimum standards of acceptable and prevailing professional practice or to statutory, regulatory, or accreditation standards.  For purposes of this subsection, the employer or entity includes an employee or agent of the employer or entity.

Section 301.402(f) applies to a situation where a nurse makes (1) a report, (2) to her employer, (3) of a situation the nurse has reasonable cause to believe exposes a patient to substantial risk of harm as a result of a failure to provide patient care that conforms to minimum standards of acceptable and prevailing professional practice or to statutory, regulatory, or accreditation standards.  Defendant argues that none of the Plaintiffs made a report under Section

---

[9] Fed. R. Civ. P. 56(c).

[10] Tex. Occ. Code Ann. § 301.413 (Vernon 2005).  The Texas Occupations Code was amended in 2007.  There is no indication that the legislature intended for the 2007 amendments, which were adopted after the Plaintiffs were terminated, to be retroactive, and so the Court applies the 2005 version of the statute.  *See Subaru of America, Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002) ("Courts generally presume that the Legislature intends a statute or amendment to operate prospectively and not retroactively.").

301.402, and even if they did, as a matter of law they did not have reasonable cause to believe that the situation exposed a patient to substantial risk of harm as a result of a failure to provide patient care that conforms to minimum standards of acceptable and prevailing professional practice.  Defendant then argues that because Section 301.402 is not implicated, no claim can arise under Section 301.413.

Defendant first argues that Plaintiffs did not make a "report," but simply refused patient assignments.  For summary judgment purposes, the Court disagrees.  The nurses' statements to their supervisors were sufficient to put the Hospital on notice of a claim that their assignments were unsafe, subjecting patients to a substantial risk of harm.  Taylor testified she told Iserman, "Linda, this is an unsafe assignment."[11]  Sepeda claims she told Welpton, "I cannot take three patients safely."[12]  Friesen claims she told Iserman "it's a safety issue . . . and if it wasn't safe for the others, it wasn't safe for me."[13]  This testimony is sufficient at the summary judgment stage to show that Plaintiffs all made a "report" under Section 301.402(f).

Defendant next argues that the Plaintiffs did not have a reasonable factual basis for believing that their patients were exposed to substantial risk of harm as a result of a failure to provide adequate patient care as defined by Section 301.402.  The Court declines to hold that Taylor's or Sepeda's conduct was unreasonable as a matter of law.  Taylor learned from her conversation with Jeannette Wright that one of Wright's patients had had multiple scans during the day and that her patient was especially sick.[14]  Taylor also knew at the time of her confrontation with Welpton and Iserman that she had been assigned this patient plus two others. Defendant argues that Iserman's later investigation revealed that the patient Wright discussed

---

[11] Defendant's App. at p. 150.
[12] *Id*. at p. 72.
[13] *Id*. at p. 29.
[14] *Id*. at p. 142.

with Taylor had completed all the scans the patient was scheduled to have, and that Taylor therefore did not have a reasonable basis for concluding that a three-patient assignment including this patient was unsafe.  While Taylor may have incorrectly assumed her patient would continue to require particularly close attention during the night shift, the proper inquiry is whether Taylor had a reasonable factual basis at the time of her report.  While it would have been better for Taylor to discover the details of her assignment before concluding it was unsafe, the Court cannot now conclude that a jury considering the evidence could not find reasonable Taylor's conclusion that the assignment exposed her patient(s) to a substantial risk of harm.

Defendant argues that Sepeda did not have a reasonable factual basis for believing that the patients assigned to her were exposed to a substantial risk of harm as a result of a failure to provide adequate patient care.  For summary judgment purposes, the Court disagrees.  The basis for Sepeda's "report" was more concrete than Taylor's, as Sepeda knew that one of the patients assigned to her had suffered multiple potentially lethal arrhythmias during the day shift.  While it is true that Sepeda had not been assigned three specific patients at the time she walked out, a jury could find it reasonable for her to assume that she would keep the two patients she had (including the V-Tach / V-Fib patient), and also be asked to care for a third.  The Court cannot find that Sepeda's basis for making the report was unreasonable as a matter of law.

Conversely, the Court holds as a matter of law that Friesen did not have a reasonable basis for concluding that any of her patients were exposed to a substantial risk of harm as a result of a failure to provide adequate patient care.  Friesen admits when she refused her assignment and walked out of the Hospital, she knew nothing about any of the patients to be assigned to her. Plaintiffs' position is that a nurse's subjective assessment of her own abilities – in this case an inability to handle any three ICU patients at one time – is enough to constitute a reasonable basis

under Section 301.402.  In other words, if a nurse believes she is unqualified to take three

patients, no matter what the circumstances, then she has a reasonable basis for making a

protected report and cannot be terminated.  The Court rejects this argument.  If Plaintiffs'

position were adopted, it would mean that each nurse has an effective veto power over any

assignment based on her purely subjective assessment of her own abilities, devoid of

consideration of any patient's condition.[15]  Without any concrete basis for knowing the condition

of any of the patients to be assigned to her, as a matter of law Friesen could not reasonably

conclude that a patient would be subjected to a substantial risk of harm by the assignment.

Defendant is thus entitled to summary judgment on Friesen's claim.

Defendant argues that all of the Plaintiffs are precluded from bringing a Section

301.413(b) claim because under the Texas Supreme Court's decision in *City of Waco v. Lopez*,[16]

claims like the Plaintiffs' may be asserted under only Section 301.352.  In *Lopez*, the plaintiff

brought suit under the Texas Whistleblower Act, claiming that his employer, the City of Waco,

had transferred him to a less desirable position because of his race and age, in violation of the

City's equal employment opportunity policy.  The City argued that the Texas Commission on

Human Rights Act ("the TCHRA") provided the exclusive state statutory remedy for the

plaintiff's retaliation claim, because he was a covered employee under the TCHRA and his claim

fell directly under the TCHRA's ambit.  The Court agreed, holding that the Legislature intended

the TCHRA to be the exclusive remedy for the plaintiff's complaint, and that the plaintiff did not

satisfy the procedural requirements for a TCHRA claim.  The Court held that "the issue here is

not exclusivity in the strictest sense of the word, but whether the Legislature intended to allow a

claimant to elect between two remedial schemes addressing essentially the same conduct but

---

[15] Plaintiffs acknowledge there is no law or regulation against assigning more than two ICU patients to one nurse, and that attempts to pass such a law have been rejected by the Texas legislature.  *See* Defendant's App. at p.10, 165.
[16] 259 S.W.3d 147 (Tex. 2008).

providing different procedures and remedies."[17]  Finding irreconcilable tension between the

TCHRA and the Whistleblower Act, the Court held that the more-specific TCHRA applied and

barred plaintiff's claims under the Whistleblower Act.

Defendant contends that Section 301.352 specifically covers Plaintiffs' conduct, and that

the less specific statute, Section 301.413, thus cannot be asserted.[18]  The Court disagrees that

Sections 301.413 and 301.352 are mutually exclusive.  The relevant version of Section 301.352

is entitled "Protection for Refusal to Engage in Certain Conduct," and provides, in pertinent part:

> (a) A person may not suspend, terminate, or otherwise discipline or discriminate
> against a nurse who refuses to engage in an act or omission relating to patient care
> that would constitute grounds for reporting the nurse to the board under
> Subchapter I, . . . or that violates this chapter or a board rule if the nurse notifies
> the person at the time of the refusal that the reason for refusing is that the act or
> omission:
>
> > (1) constitutes grounds for reporting the nurse to the board; or
> >
> > (2) is a violation of this chapter or a rule of the board.[19]

Conversely, Section 301.413 protects nurses who report a violation of law, incorporating

all other sections in the same subchapter, as explained above.  The Court has concluded that all

three nurses made a "report" under Section 301.402, which is entitled "Duty of Nurse to Report,"

thus triggering Section 301.413, "Retaliatory Action."  Sections 301.352 and 301.413 protect

different conduct, the former protecting a refusal by a nurse to engage in unlawful conduct and

the latter protecting reports to a supervisor of certain conduct.  The situation here, unlike that in

*City of Waco v. Lopez*, is not one in which there is a general statute and a more specific statute –

the two statutes here protect different conduct.  Section 301.413 protects reporting, and Section

301.352 protects a refusal to act.  The statutes do not present the same type of irreconcilable

---

[17] *Id.* at 153.

[18] The same analysis, and same result, applies to Section 301.413 and Texas Health and Safety Code Section 161.134.

[19] Tex. Occ. Code Ann. § 301.352 (Vernon 2005).  As explained above, because there is no indication that amendments made in 2007, after the Plaintiffs were terminated, were intended to be retroactive, the Court applies the 2005 version of the statute.  *See* n.10, *supra*.

tension found in *City of Waco v. Lopez*.[20]  The Court rejects the argument that *Lopez* precludes the Plaintiffs from bringing claims under Section 301.413.

**Texas Occupations Code § 301.352 Claim**

In the Joint Report and Scheduling Proposal, Plaintiffs asserted that they were terminated in violation of Texas Occupations Code Section 301.352, although that Section is not referenced in the Plaintiffs' original pleading.[21]  The 2005 version of that statute, which was in effect in May, 2007, does not expressly provide for a private cause of action.  In 2007, the Legislature added subsection (f), which provides that "a violation of this section is subject to section 301.413," thus providing for a private cause of action.  Plaintiffs argue the amendment merely clarified that a private cause of action was always available for a violation of Section 301.352. In support of their argument, Plaintiffs submitted the affidavit of Stephanie Tabone, the Director of the Texas Nurses Association, who they claim has expertise regarding the purpose and progress of Senate Bill 993, which added 301.352(f).  Defendant moved to strike Tabone's affidavit as improper, and in the hearing of December 12, 2008, the Court granted that motion, finding it improper and irrelevant for Ms. Tabone to testify as to the intent of the legislature in passing the amendment.

Plaintiffs argue that the bill summary for Senate Bill 993, which amended Section 301.352, shows it permitted a private cause of action before it was amended.  The bill summary states that the "bill increases the minimum amount of damages a person is entitled to recover for wrongful suspension or termination . . . as a result of making a good-faith report or refusing to engage in certain conduct."[22]  Plaintiffs seize on the last part of this passage, urging that if the amendment *increased* the minimum amount a wrongfully terminated employee would recover

---

[20] *Accord Fitzgerald v. Barnstable School Committee*, No. 07-1125, 2009 WL 128173, (Jan. 21, 2009).
[21] For the purposes of this Motion, the Court assumes Plaintiffs properly pled a claim under Section 301.352.
[22] SB 993, Leg. Session 80(R) (Tex. 2007).

for refusing to engage in conduct, it follows that the pre-amendment version of Section 301.352 already provided a private cause of action, or there would be nothing to increase. However, there are several analytical defects in this argument. First, the Court cannot glean anything about the legislature's intent in passing an earlier version of Section 301.352 from a statement made years later. Second, the specific reference to a private cause of action is most logically construed to add something, rather than to reiterate what was already there. Additionally, the 2005 version of Section 301.352 provides for remedies, such as peer review, but does not mention a private cause of action, although other provisions, including Section 301.413, do so. The Court concludes that under the 2005 version of Section 301.352, no private cause of action was available, so that the Plaintiffs cannot sue for a Section 301.352 violation.

**Texas Health and Safety Code § 161.134 Claim**

Texas Health and Safety Code Section 161.134 provides, in pertinent part, that a "hospital . . . may not suspend or terminate the employment of or discipline . . . an employee for reporting to the employee's supervisor . . . a violation of law, including a violation of this chapter . . . ."[23]  In *Barron v. Cook Children's Health Care System*, the Fort Worth Court of Appeals held that to make a *prima facie* case under the statute, a plaintiff must prove that: (1) she was an employee of a hospital; (2) she reported a violation of law; (3) the report was made to a supervisor; (4) the report was made in good faith; and (5) she was suspended, terminated, disciplined, or otherwise discriminated against.[24]  The existence of the first and third elements is undisputed. This Court has held that Plaintiffs reported what they believed to be a violation of law, satisfying the second element. With regard to the good faith requirement, the Texas Administrative Code explains that a "report is not made in good faith if there is not a reasonable

---

[23] For these purposes, and without prejudice to further briefing, the Court assumes that an assignment that is unsafe to patients is a violation of the law.
[24] 218 S.W.3d 806, 810 (Tex. App.--Fort Worth 2007, no pet.).

factual or legal basis for making the report."[25]  As it did in interpreting a similar requirement in Texas Occupations Code Section 301.402(f), the Court reaches the same conclusion with regard to this element.  The Court cannot now hold, as a matter of law, that Taylor and Sepeda did not have a reasonable factual basis for making reports of what they considered to be unsafe situations.  However, as Friesen did not have any factual basis for her report other than that she knew she would be assigned three patients and that the two other nurses had walked out because of their assignments, Friesen could not have had a reasonable basis for making a report.  Therefore, Friesen has no claim under Section 161.134, and Defendant is entitled to summary judgment on this claim as well.

Finally, with regard to the last element of Section 161.134, Defendant claims that it is entitled to summary judgment because the Plaintiffs cannot show that their reports of a violation of law caused their terminations.  Defendant argues that Iserman fired them based on her opinion that Plaintiffs had refused patient assignments without reasonably analyzing the safety of those assignments, and because Plaintiffs would likely refuse to triple in the future.  However, under Section 161.134, there is a presumption of causation if the termination occurred within sixty days of the making of a report, which is the case here.[26]  Taylor and Sepeda's accounts must be taken as true at this stage of the case, and establish that Iserman knew about their reports of unsafe conduct when she fired Plaintiffs.  Iserman's testimony, as an interested witness, is insufficient to overcome the presumption and establish as a matter of law that she did not fire Taylor and Sepeda because of their reports.

---

[25] 25 Tex. Admin. Code § 133.43(b) (2007).
[26] Tex. Health & Safety Code § 161.134(f) (Vernon 2001).

*Conclusion*

For the reasons stated above, the Court **DENIES** Defendant's Motion for Summary Judgment based on Taylor and Sepeda's claims under both the Texas Occupations Code Section 301.413 and Texas Health and Safety Code Section 161.134.  The Court **GRANTS** the Defendant summary judgment on all of Friesen's claims and on all of the Plaintiffs' claims under Texas Occupations Code Section 301.352.  The Plaintiffs previously acknowledged that they were not pursuing defamation claims, so those are **DISMISSED** with prejudice.

       **SO ORDERED**.

       January 23, 2009.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**

14