**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **SANDRA TAYLOR, R.N.** | § |
| **DIANA SEPEDA, RN** | § |
| **NANCY FRIESEN, RN** | § |
| | § |
| **V.** | § |
| | §   **CIVIL ACTION NO.3:07-CV-1931-M** |
| | § |
| **LONE STAR HMA, LP, D/B/A** | § |
| **DALLAS REGIONAL MEDICAL CENTER** | § |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

TO THE HONORABLE BARBARA LYNN:

COME NOW, PLAINTIFFS SANDRA TAYLOR AND DIANA SEPEDA, in the above-styled and numbered cause and files this, their Proposed Findings of Fact and Conclusions of Law.

**PROPOSED FINDINGS OF FACT**

1. Diana Sepeda is a Registered Nurse licensed since 2001 who was employed by Defendant in the ICU from September 13, 2001 until June 4, 2007.

2. Sandra Taylor is a Registered Nurse licensed since 1995 who was employed by Defendant in the ICU from December 14, 2004 until June 4, 2007.

3. Linda Iserman RN was the ICU/PCU Director for Defendant hospital and was the decision maker with regard to disciplinary action taken against Plaintiffs.

4. Rick Lijuacorn RN and Barbara Welpton RN were charge nurses in the Defendant Hospital ICU responsible for making patient care assignments.

5. Paulette Murphy was the House Supervisor on May 24, 2007 from 7 am to 7 pm.  PJ Kersey RN was the House Supervisor on May 24, 2007 from 7pm to 7 am.

6. Linda Iserman the ICU/PCU Director was aware of chronic understaffing in the ICU and raised her concern with management in 2006 and 2007.  She discussed the

chronic understaffing with her superiors Chief Nursing Officers Ken McGee and Tom Mars.

7.     The proposed solution to the problem was to increase the number of available staff by virtue of a merger with another hospital campus in May 2007.  The problem was not solved because the full complement of expected staff was not realized.

8.     Prior to May 24, 2007 Linda Iserman requested permission to use agency staff to fill vacancies in the ICU and the request was denied by Tom Mars.

9.     Prior to May 24, 2007, Iserman asked Administration to close ICU beds in the past due to lack of staffing and the request was denied.

10.    Prior to May 24, 2007, Iserman asked Administration to transfer ER patients to other facilities with available ICU beds in the past due to lack of staffing and the request was denied.

11.    The accepted ratio of nurses to patients in the ICU was generally 1 nurse to care for 2 patients (1:2 ratio), depending on the acuity (illness) of the patients, available staff and ICU environment of care.  A nurse would be assigned to care for only one patient if the patient was unstable, was within eight hours after open heart surgery or if the patient had an Intra Aortic Balloon Pump (IABP).  Once the ICU census reached thirteen (13) patients, seven (7) nurses and a Unit Secretary were needed according to the Staffing Grid for ICU.

12.    The ideal staffing pattern for ICU on the night shift when it was full (14 patients) was to have seven (7) nurses to do patient care, a charge nurse and a Unit Secretary.

13.    With ICU patients, prevailing professional nursing practice standards for ICU staffing in nursing publications citing evidenced based practice reveals that a 1:2 nurse patient ratio has been correlated with better patient outcomes.

14.    The staffing grid for the ICU at Dallas Regional Medical Center was based on prevailing standards of professional practice and specifically on evidence based practice correlating better patient outcomes with a 1:2 nurse patient ratio.

15.    The Staffing Plan Policy for Dallas Regional Medical Center required staffing levels be based at a minimum on the following factors:

    1.   Patient Characteristics and number of patients for whom care is being provided, including:

      a.   number of admissions

      b.   number of discharges

      c.   number of transfers

2.   Intensity of care provided as well as the variability of care on the Nursing Unit.

3.   Scope of services provided

4.   Consideration of :

      a.   Architecture and geography of unit

      b.   Availability of technology

      c.   Availability of supplies and equipment

      d.   Other appropriate factors that affect patient care

5.   Staff Characteristics including:

      a.   Tenure

      b.   Preparation and Experience'

      c.   Number and competencies of clinical and non-clinical support staff the Nurse must collaborate with or supervise.

16.    The Staffing Plan Policy for Dallas Regional Medical Center required that patient care assignments take into consideration:

1.   The training experience and capability of the person to whom the task is delegated

2.   The degree and availability of supervision required for the staff member including student nurses and orientees

3.   The condition of the patient, identified needs, complexity of assessment and care required by each patient

4.   Patient safety and infection control issues

5.   Breaks, meals, inservice education and Hospital Committee involvement.

17.    Although not written in hospital policy or on the ICU staffing grid, a nurse could be assigned more than two patients in the ICU if sufficient staff was not available.  The practice of assignment of three patients was termed "tripling".

18.    If the Charge Nurse made a "triple" assignment to a nurse, patients with lower acuity were supposed to be assigned to that nurse to maintain an acceptable level of care.

19. Hospitals are required by law to have a written staffing plan that incorporates a process for timely identification of staffing concerns that prohibits retaliation for reporting staffing concerns as of March 24, 2002.

20. The Staffing Plan Policy for Dallas Regional Medical Center did not contain any procedure for a nurse to report a staffing concern.

21. Linda Iserman, PJ Kersey and Barbara Welpton were aware of the legal requirement but did not know how a nurse would make a complaint of unsafe staffing at Dallas Regional Medical Center.

22. The Staffing Plan for Dallas Regional Medical Center is silent on the mechanism for protection from retaliation for reporting a staffing concern.

23. Hospitals are legally required to have a written staffing plan that incorporates a process for use of Safe Harbor Peer Review as of March 24, 2002.

24. Dallas Regional Medical Center's Peer Review Committee Guidelines in effect on May 24, 2007 contained no provision for a nurse to invoke Safe Harbor Peer Review.

25. No policy or procedure for nurses at Dallas Regional Medical Center related to Safe Harbor Peer Review has ever been produced by Defendant Hospital.

26. On or around 2006, the Chief Nursing Officer Gaylon Maddox implemented a policy change whereby charge nurses would not take patients.

27. On August 21, 2006, Sandra Taylor put her concerns in writing about nurses being asked to take three (3) patients in the ICU.

28. There is no written policy that states that a nurse could be "tripled" in ICU.

29. Assignment of 3 patients to one nurse is not contained on the ICU staffing grid.

30. Unit Directors, including Linda Iserman were given financial incentives to decrease staffing in the form of productivity bonuses.

31. Between January 2007 and May 24, 2007 Registered Nurses Sandra Taylor and Diana Sepeda and other nurses from the night shift met with Linda Iserman RN, the ICU/PCU Director and reported concerns about safe staffing in the Intensive Care Unit. The main concern reported was the unsafe practice of assignment of three patients to one nurse, a practice known as "tripling".

32. The ICU staff was not only responsible for caring for the patients in the Unit, ICU staff were also responsible for covering all patient arrests "Codes" in the hospital.

33. If no Unit secretary was assigned to ICU, the nursing staff was responsible for transcription of orders, obtaining and ordering medications, supplies and equipment.

34. In the afternoon of May 24, 2007, the ICU was full (14) patients, with seven nurses scheduled to work, including the charge nurse. One of the patients required 1:1 care. That left six nurses to care for 13 patients. There was no Unit Secretary scheduled to work after 11 p.m.

35. The ICU should have been staffed with eight nurses for the 7p-7a shift on May 24, 2007 and a Unit Secretary.

36. Linda Iserman was aware of the fact that the ICU was two nurses short at some point during the day on May 24, 2007 and remained at least one nurse short according to the census and ICU staffing grid when she left the hospital on May 24, 2007 after her day shift. She contacted Joe O'Neel RN who agreed to work from 7pm to 11 pm.

37. Throughout the 7a to 7p shift on May 24, 2007 the ICU was at maximum capacity of 14 patients with a patient waiting to be transferred into the ICU.

38. By 4 a.m. on May 25, 2007 (the 7a-7p shift) there were two (2) patients holding for admission to the ICU.

39. Iserman did not ask Administration to block admissions to the ICU for the 7p-7a shift on May 24, 2007.

40. Assignments are written on the "white board" in the ICU by the Charge Nurse. Rick Lijuacorn RN was the charge nurse on the day shift responsible for making the assignments on the white board for the oncoming 7p to 7a shift.

41. Rick Lijuacorn was aware that the Unit was short staffed before he made the assignments and tried to call a nurse to come in without success.

42. Jesse Wallace RN advised Rick Lijuacorn that he did not agree with how the patients were matched up for the oncoming 7p-7a shift on May 24, 2007.

43. Chidi Onyi RN advised Rick Lijuacorn not to make the assignments the way they were written on the whiteboard for the oncoming 7p-7a shift on May 24, 2007.

44. Mr. Lijuacorn assigned three patients (Beds 11, 14, and 15) to Sandra Taylor on the whiteboard and assigned two patients (Beds 7 and 8) to Diana Sepeda.

45. Jesse Wallace and Chidi Onyi advised Mr. Lijuacorn not to make the assignments that were made based on their knowledge of the acuity of the patients.

46.     Mr. Wallace disagreed with how the patients were matched up or combined.

47.     On May 24, 2007, Registered Nurses Sandra Taylor, Diana Sepeda and Nancy Friesen were scheduled to work a twelve (12) hour night shift beginning at 7 p.m. and ending at 7 a.m.

48.     Ms. Taylor clocked in at 18:38 and saw her assignment on the white board.  She had spoken to Jeanette Wright about two of the patients (Rooms 14 and 15) and had gained the knowledge that one of the patients was unstable and had required several diagnostic tests during the day.  She saw that in addition to the patients in Room 14 and 15 that she was assigned a third patient.

49.     She had also talked with Chidi Onyi briefly about the third patient in Room 11 assigned to her.

50.     Diana Sepeda clocked in at 18:43 and learned that she was assigned to patients in Rooms 7 and 8.  She spoke with the nurse caring for the patient in Bed 8, Jesse Wallace who advised that the patient was unstable, was one to two days after open heart surgery and was having runs of V-Tach.

51.     Diana Sepeda received information about the patient in Bed 8 that led her to reasonably believe that the patient may require 1:1 care.

52.     In Texas, all licensed nurses are legally required to make and take assignments that are safe for them to carry out based on the patient condition and the nurse's education, training, experience and ability to perform the required duties.  Licensed nurses are also required to provide a safe environment of care for their patients.

53.     In accordance with the Rules promulgated by the Texas Board of Nursing at 22 TAC 217.12 (1) (E) Unprofessional Conduct includes but is not limited to: "accepting the assignment of a prescribed nursing function when the acceptance of an assignment could be reasonably expected to result in unsafe or ineffective client care".

54.     The Board of Nursing publishes a "six step decision making model" whereby a nurse can determine whether or not a task or assignment is within his or her scope of practice.  According to the model, the nurse must ultimately determine if they are willing to accept responsibility for the consequences of their actions.

55.     When nurses leave their shift and officially transfer care of patients to oncoming nurses, the process is known as "report".  Taylor and Sepeda had not officially

assumed the care of the patients yet because of concerns about the safety of their assignments.

56.    Sandra Taylor called the 7a-7p House supervisor Paulette Murphy about her assignment and was told by Murphy to talk to the charge nurse who made the assignment (Lijuacorn).

57.    Sandra Taylor told Mr. Lijuacorn that she was not refusing an assignment but was refusing the assignment that he had made because it was not a safe assignment.  He did not ask her why she thought the assignment was unacceptable.

58.    Barbara Welpton, the oncoming charge nurse heard Ms. Taylor's discussion with Mr. Lijuacorn and announced that anyone who refused a triple would be sent home but that they needed to talk to Linda and the supervisor (PJ Kersey) first.

59.    Within six weeks prior to May 24, 2007 Barbara Welpton had approached the HR manager Chris Lloyd and Linda Iserman and Iserman gave Welpton the authority to send any ICU nurse home who refused a triple.  The plan was to send home any nurse who refused a triple with no other attempt to alleviate the situation such as discussing the nurse's concerns or otherwise changing the assignment.

60.    Sandra Taylor talked to Linda Iserman and PJ Kersey and advised that the assignment of three patients made to her was unsafe.

61.    Lijuacorn, Welpton, Iserman and Kersey all talked to Taylor and made no attempt to either determine what the reason was for Taylor's refusal, or to restructure or change the assignment.

62.    Welpton told Taylor to clock out and go home.

63.    Welpton announced from the white board that everyone would have to take three patients and that any nurse who would not take three could clock out and go home.

64.    Diana Sepeda voiced her concern about the safety of her assignment based on the high acuity of the patient in Bed 8 and the fact that she was next on the list to triple.

65.    Diana Sepeda talked to Linda Iserman and PJ Kersey and advised that her assignment of two patients was questionable because of the acuity of the patient in Bed 8 and that three patients would be unsafe.

66.    Diana Sepeda suggested that Welpton switch assignments with her, with Sepeda taking on the charge nurse position and Welpton taking three patients.

67. Welpton refused to exchange assignments with Sepeda and said that it wasn't her job as Charge Nurse to take three patients and told Sepeda to clock out and go home.

68. Lijuacorn, Welpton, Iserman and Kersey made no attempt to either determine what the reason was for Sepeda's refusal or to otherwise restructure an assignment for her.

69. Instead of discussing the reasons that Sepeda was concerned about conditions in the ICU, she was sent home by Welpton.

70. At the time that the discussions between Taylor, Sepeda and management were taking place Nancy Friesen RN, one of the remaining five nurses realized that she would be receiving a triple assignment, refused and was also told to go home by Welpton.

71. Taylor Sepeda and Friesen were sent home by Welpton and clocked out at 1913.

72. According to Iserman, Taylor did not use the word "unsafe".  If Taylor would have said that her assignment was unsafe, Taylor would have been protected from suspension and termination.

73. "Safe Harbor" is provided for under the Nurse Practice Act (Texas Occupations Code 303 et.seq.).  If a nurse believes that she is being asked to perform an action that would subject her to report to the Texas Board of Nursing, she may but is not required to invoke Safe Harbor.

74. The Nurse Practice Act does not require that a nurse invoke Safe Harbor when refusing an assignment.  The nurse has the option of performing the assignment or task she disputes while a Peer Review Committee considers the assignment.

75. The Nurse Practice Act allows a nurse who claims Safe Harbor to decline the assignment that he or she questions while a Peer Review Committee considers the assignment.

76. The Nurse Practice Act provides that a nurse may refuse an assignment that would expose her to a report to the Board of Nursing without invoking Safe Harbor.

77. The Nurse Practice Act provides that a nurse may refuse an assignment that would constitute grounds for reporting the nurse to the Board of Nursing.

78. The Nurse Practice Act provides that a refusal to engage in assignment or task will be sent to the Peer Review committee for a determination of whether the refusal to engage was appropriate.

79.   Iserman told Taylor and Sepeda that is they claimed Safe Harbor that they would still have to take the assignments.

80.   By sending home three of the seven nurses scheduled to work, four nurses were left to care for 14 patients, with one patient requiring 1:1 care.  Three nurses were left with 13 patients which meant that every nurse remaining would take three patients, with one nurse taking four patients.

81.   Nurses did not arrive to take the places of Taylor Sepeda and Friesen (who all clocked out at 1913 hours) until 2105 (Marion); 2215 (Sharon) and 2245 hours (Tita).

82.   The day after this event, the Taylor and Sepeda went back to the hospital and attempted to speak to the Chief Nursing Officer Tom Mars who refused to see them and sent them to Human Resources.

83.   The Human Resources Manager Chris Lloyd also refused to meet with them on May 25, 2007.

84.   All three nurses were suspended on May 25, 2007, within 60 days of their report of unsafe conditions in the ICU.

85.   Mars conducted an investigation of the May 24 2007 event on June 1, 2007 and received written statements from Iserman, Taylor and Sepeda.

86.   On June 1, 2007 Taylor and Sepeda advised the hospital again verbally and in writing that the assignments made on May 24 2007 were unsafe and compromised patient safety.

87.   In accordance with Texas Health & Safety Code 161.134 (j) Texas Hospitals are required to prominently and conspicuously post for display in a public area of the facility that is readily available to patients, residents, employees, and visitors that employees and staff are protected from discrimination or retaliation for reporting a violation of law.  The statement must be in English and in a second language.

88.   Defendant Hospital did not prominently and conspicuously post for display in a public area of the facility that is readily available to patients, residents, employees, and visitors that employees and staff are protected from discrimination or retaliation for reporting a violation of law.

89.   On June 4, 2007 Plaintiffs Taylor and Sepeda were terminated in a phone call from Iserman for violation of a hospital policy that Iserman would not identify.

90.     During the course of litigation, a Human Resources Employee Counseling and Corrective Disciplinary Action policy (with no number) bearing the "review" and "revised" date of June 2007 was identified as the reason for termination.

91.     Iserman stated that the reason for termination was "Gross Misconduct" and specifically "Job Abandonment" and identified the Human Resources Employee Counseling and Corrective Disciplinary Action policy (with no policy number) bearing the "review" and "revised" date of June 2007.

92.     In Interrogatory answers Defendant Hospital identified as the basis for termination that Plaintiffs would reject any three patient assignments without reviewing the acuity levels of the three patients being assigned as a general rule.

93.     There is no policy or procedure that states that a nurse may be disciplined, suspended or terminated if he or she refused a triple assignment in the ICU.

94.     Plaintiffs' first documented reports about the practice of tripling were made in writing on August 21, 2006 by Sandra Taylor.

95.     Additional reports were made in meetings with Linda Iserman within three to six months of May 24, 2007 with several other nurses present.

96.     Plaintiffs were terminated on June 4, 2007

97.     Plaintiffs were not terminated for violating the critical care Policy and Procedure entitled "Patient Assignments in Critical Care".

98.     Taylor and Sepeda's Personnel Action Requests identify that Separation was Involuntary and "Termination Warranted" was handwritten on each document.

99.     According to Iserman:  "I never heard the word 'unsafe'.  Alls (sic) I heard and my investigation determined 'I wasn't taking three patients".

100.    Iserman admits that "if she (Taylor) would have said in there that it was unsafe, that goes with the protection" in the Texas Occupations Code 301.413.

101.    Iserman did an investigation to evaluate the triple assignment(s) but never read Sepeda and Taylor's written statements delivered to Human Resources on June 1, 2007.

102.    The documentation of status of the fourteen (14) patients on the census filled out by Rick Lijuacorn and Barbara Welpton is misleading as it does not include key

information about patient acuity and mis-states true patient transfer status as of the time that the assignments were made.

103. The actual documents containing notes written by the day shift nurses on four pages about the 14 patients that Iserman reviewed have never been produced.

104. Taylor's and Sepeda's annual performance evaluations prior to May 24, 2007 were satisfactory and identified no concerns by management about fulfillment of job functions in the ICU.

105. After the August 21, 2006 letter from Taylor to the hospital CEO about staffing issues, both Sepeda and Taylor's essential job duties performance evaluation scores dropped from 60 points to 52 points.

106. The timing of Plaintiffs reports to Iserman about staffing and triple assignments span a 9 month period of time.  Plaintiffs' first documented reports about tripling were made in writing on August 21, 2006 by Sandra Taylor.  Additional reports were made in a meeting with Linda Iserman within three to six months of suspension and termination and again on May 24 and June 1, 2007.  Plaintiffs were terminated on June 4, 2007.

107. Iserman knew of the complaints that Plaintiffs made about the safety of their assignments on May 24, 2007 and she made the decision to suspend and later terminate employment of Plaintiffs.

108. Iserman knew that the Hospital was required to have in place a staffing committee whereby minimum staffing standards by Unit were established.  Likewise, Iserman knew that the hospital was required to have a procedure in place whereby nurses could make complaints about staffing without fear of reprisal, and did not have such a procedure.

109. The staffing Rules likewise provided that the Hospital was required to utilize Safe Harbor Peer Review; the Hospital's Peer Review Policy has no mention of Safe Harbor Peer Review.

110. Iserman Welpton and Lloyd had meetings before May 24, 2007 where Barbara Welpton got permission to send home anyone who refused a triple without taking any steps to determine why the nurse was refusing.  Lijuacorn admitted that he knew that the Plaintiffs had complained about triple assignments being unsafe.

111.   Iserman had a negative attitude towards the complaints about triple assignments being unsafe.  In response, there was premeditation of precisely what the recourse would be for nurses refusing to triple—Welpton Iserman and Lloyd had agreed on a plan to send nurses home who refused to triple.   Moreover Iserman was financially incentivized to decrease staffing and Welpton insisted that as a charge nurse she did not have to take three patients.

112.   There is no written company policy related to disciplinary action for triple assignments.

113.   There was disparate treatment of similarly situated employees.  Other nurses had refused triple assignments in the ICU and were not disciplined suspended or terminated.

114.   Other nurses who refused to take three patients in the ICU were not told to clock out and go home.

115.   Sandra Taylor had never been fired from a job before June 4, 2007.

116.   Diana Sepeda had never been fired from a job before June 4, 2007.

117.   Iserman did not report the termination of either Taylor or Sepeda to the Texas Board of Nursing in accordance with the mandatory reporting requirement of the Texas Occupations Code Subchapter I.

118.   In 2006 Sandra Taylor was a full time ICU RN at Defendant Hospital and earned $74,820.21.  She also worked a part time position at another facility and earned $30, 412.90.  Her total earnings for 2006 were $105, 233.11.

119.   In 2007 up to the time of her termination from Defendant hospital Sandra Taylor earned $33, 547.96 while in Defendant's employ.  She continued to work at her part time employment and worked at two staffing agencies.  Her total earnings for 2007 were $80, 357.44.  Her lost earnings for 2007 compared to her 2006 earnings were $24,875.67.

120.   Because of her whistleblower status, Taylor has been unable to gain full time employment in a hospital ICU setting and has been relegated to contract work and work outside of the ICU setting which is her field of expertise.

121.   In 2008 Sandra Taylor worked for 4 different employers and earned $ 79,250.12.  Her lost earnings compared to her 2006 earnings were $25, 972.95.

122.   In 2009 Sandra Taylor worked for 7 different employers and earned $ 76,718.64.  Her lost earnings compared to her 2006 earnings were $ 28,514.47.

123.   For 2010 Sandra Taylor worked for 2 different employers and earned $ 45,198.50.

124.   Using the year 2006 as a benchmark, Sandra Taylor's total lost earnings from 2007-2009 are $79,373.09.

125.   In 2006 Diana Sepeda was a full time ICU RN at Defendant Hospital and earned $75,328.53.  She also worked a part time position at two other facilities.  Her total earnings for 2006 were $93, 430.10.

126.   In 2007 up to the time of her termination from Defendant hospital Diana Sepeda earned $31, 195.99 while in Defendant's employ.  She continued to work at her part time employment and worked at two staffing agencies.  Her total earnings for 2007 were $75,534.51.  Her lost earnings for 2007 compared to her 2006 earnings were $17,805.59.

127.   Because of her whistleblower status, Sepeda has been unable to gain full time employment in a hospital ICU setting and has been relegated to contract work.

128.   In 2008 Diana Sepeda worked for 4 different employers and earned $ 70,152.69.  Her lost earnings compared to her 2006 earnings were $23, 277.41.

129.   In 2009 Diana Sepeda worked for 8 different employers and earned $ 76,806.43.  Her lost earnings compared to her 2006 earnings were $ 16,533.67.

130.   For 2010 Diana Sepeda worked for 2 different employers and earned $ 45,362.77.

131.   Using the year 2006 as a benchmark, Diana Sepeda's total lost earnings from 2007-2009 are $57,616.67.

132.   In order to prosecute their cause of action, Plaintiffs hired counsel to represent them.  Reasonable and necessary Attorneys fees and expenses through October 26, 2010 were $127,659.33.

133.   Reasonable and necessary attorneys' fees and costs for the preparation and trial of this matter range from $25-45,000.00.

134.   Sandra Taylor has suffered mental anguish as a result of the Defendant Hospital's unlawful conduct.

135.   Diana Sepeda has suffered mental anguish as a result of the Defendant Hospital's unlawful conduct.

136.    The hospital acted with malice in terminating Sandra Taylor's employment.

137.    The hospital acted with malice in terminating Diana Sepeda's employment.

## PROPOSED CONCLUSIONS OF LAW

1. On May 24, 2007 Sandra Taylor made a verbal protected report about unsafe conditions in the ICU that was authorized under Texas Occupations Code 301.402 without malice. **(Statements of Law 1-7; 11, 12)**

2. On June 1, 2007 Sandra Taylor made a written protected report about unsafe conditions in the ICU that was authorized under Texas Occupations Code 301.402 without malice. **(Statements of Law 1-7; 11, 12)**

3. On May 24, 2007 Diana Sepeda made a protected report about unsafe conditions in the ICU that was authorized under Texas Occupations Code 301.402 without malice. **(Statements of Law 1-7; 11, 12)**

4. On June 1, 2007 Diana Sepeda made a protected report about unsafe conditions in the ICU that was authorized under Texas Occupations Code 301.402 without malice. **(Statements of Law 1-7; 11, 12)**

5. On May 24, 2007 Sandra Taylor reported a violation of law to Defendant Hospital in good faith. **(Statements of Law 1- 12)**

6. On June 1, 2007 Sandra Taylor reported a violation of law to Defendant Hospital in good faith. **(Statements of Law 1- 12)**

7. On May 24, 2007 Diana Sepeda reported a violation of law to Defendant Hospital in good faith. **(Statements of Law 1- 12)**

8. On June 1, 2007 Diana Sepeda reported in good faith a violation of law to Defendant Hospital in good faith. **(Statements of Law 1- 12)**

9. Taylor's suspension on May 15, 2007 and termination of June 4, 2007 are presumed to be retaliatory as the suspension and termination occurred within 60 days of making protected reports under Texas Occupations Code 301.413. **(Statements of Law 7, 8, 10a)**

10. Taylor's suspension on May 15, 2007 and termination of June 4, 2007 are presumed to be retaliatory as the suspension and termination occurred within 60 days of making protected reports under Texas Health & Safety Code 161.134. **(Statements of Law 9, 10, 10a)**

11. Sepeda's suspension on May 15, 2007 and termination of June 4, 2007 are presumed to be retaliatory as the suspension and termination occurred within 60 days of making protected reports under Texas Occupations Code 301.413.  **(Statements of Law 7, 8, 10a)**

12. Sepeda's suspension on May 15, 2007 and termination of June 4, 2007 are presumed to be retaliatory as the suspension and termination occurred within 60 days of making protected reports under Texas Health & Safety Code 161.134.  **(Statements of Law 9, 10, 10a)**

13. The Defendant Hospital's stated reasons of employee misconduct being the reason for suspension and termination of Sandra Taylor is overcome by a preponderance of evidence that the reasons are pretextual or false. **(Statements of Law 8- 10, 10a)**

14. The Defendant Hospital's stated reasons of employee misconduct being the reason for suspension and termination of Diana Sepeda is overcome by a preponderance of evidence that the reasons are pretextual or false. **(Statements of Law 8- 10, 10a)**

15. Defendant Hospital violated Texas Occupations Code 301.413 by suspending and terminating the employment of Sandra Taylor.  **(Statements of Law 1-7; 10a; 11; 12)**

16. Defendant Hospital violated The Texas Health & Safety Code 161.134 by suspending and terminating the employment of Sandra Taylor.  **(Statements of Law 1-12)**

17. Defendant Hospital violated Texas Occupations Code 301.413 by suspending and terminating the employment of Diana Sepeda. **(Statements of Law 1-7; 10a; 11; 12)**

18. Defendant Hospital violated The Texas Health & Safety Code 161.134 by suspending and terminating the employment of Diana Sepeda. **(Statements of Law 1-12)**

19. Defendant Hospital is liable to Sandra Taylor for actual damages in the form of lost wages in an amount of $79, 373.09. **(Statements of Law 7; 9; 14; 15)**

20. Defendant Hospital is liable to Diana Sepeda for actual damages in the form of lost wages in an amount of $ 57, 616.67. **(Statements of Law 7; 9; 14; 15)**

21. Defendant Hospital is liable to Plaintiffs for attorneys' fees and court costs in an amount of _____. **(Statements of Law 7; 9)**

22. Defendant Hospital is liable to Sandra Taylor for front pay in lieu of reinstatement in an amount of _____. **(Statements of Law 7; 9; 16)**

23. Defendant Hospital is liable to Diana Sepeda for front pay in lieu of reinstatement in an amount of _____. **(Statements of Law 7; 9; 16)**

24. Defendant Hospital is liable to Sandra Taylor for mental anguish damages in an amount of ___

_____. **(Statements of Law 7; 9; 18)**

25.  Defendant Hospital is liable to Diana Sepeda for mental anguish damages in an amount of __
_____. **(Statements of Law 7; 9; 18)**

26.  Defendant Hospital is liable to Sandra Taylor for punitive damages in an amount of _____
_____. **(Statements of Law 7; 9; 13; 17)**

27. Defendant Hospital is liable to Diana Sepeda for punitive damages in an amount of _____
_____. **(Statements of Law 7; 9; 13; 17)**

## STATEMENTS OF THE LAW

**STATEMENT OF THE LAW 1:**  In accordance with the Board of Nursing's official position statement 15.14 "Duty of a Nurse in Any Setting" nurses in Texas are obligated to put the safety of their patients first without regard to physician orders or facility policy.  (Source Position Statement 15.14 Texas Board of Nursing Adopted 1/2005; revision date 01/2007 http://www.bon.state.tx.us/practice/position.html)

**STATEMENT OF THE LAW 2:**  The Texas Board of Nursing has codified the nurse's duty to her patients in the Texas Occupations Code Chapter 301; the duty has been interpreted by the Court in the seminal case, *Lunsford v. The Board of Nurse Examiners*, 648 S.W. 2d 391 (Tex. App. -- Austin 1983) (holding that nurse's duty to patient supersedes hospital policy and physician orders).

**STATEMENT OF THE LAW 3:**  A nurse may report to the nurse's employer or another entity at which the nurse is authorized to practice any situation that the nurse has reasonable cause to believe exposes a patient to substantial risk of harm as a result of a failure to provide patient care that conforms to minimum standards of acceptable and prevailing professional practice or to statutory, regulatory, or accreditation standards. For purposes of this subsection, the employer or entity includes an employee or agent of the employer or entity.  (Source TOC 301.402 (f)).

**STATEMENT OF THE LAW 4:**  The Rules and Regulations promulgated by the Texas Board of

Nursing  entitled Standards of Nursing Practice effective on May 24, 2007 at 22 TAC 217.11 (a)

require that :

 All vocational nurses, registered nurses and registered nurses with advanced practice

authorization shall:

   (B) Implement measures to promote a safe environment for clients and others

(Source 22 TAC 217.11 (a) (B))

   (S) Make assignments to others that take into consideration client safety and that are

commensurate with the educational preparation, experience, knowledge, and physical and

emotional ability of the person to whom the assignments are made. (Source 22 TAC 217.11 (a)

(S))

    (T) Accept only those nursing assignments that take into consideration client safety and that

are commensurate with the nurse's educational preparation, experience, knowledge, and physical

and emotional ability.  (Source 22 TAC 217.11 (a) (T))

**STATEMENT OF THE LAW 5:**  The Unprofessional Conduct Rules and Regulations

promulgated by the Texas Board of Nursing and effective on May 24, 2007 at 22 TAC 217.12

(1) (E) provide that it is unprofessional conduct for a nurse to engage in:

(1) Unsafe Practice –actions or conduct including but not limited to:

       (E)  Accepting the assignment of nursing functions or a prescribed health function when

             the acceptance could reasonably be expected to result in unsafe or ineffective client

             care  (Source 22 TAC 217.12 (E)).

**STATEMENT OF THE LAW 6:**  The Texas Hospital Licensing Rules require hospitals to have a

mechanism in place for nurses to report unsafe staffing that also protects the nurse from

retaliation for making a report.  (Source: Texas Hospital Licensing Regulations 22 TAC

§133.41(o)(2)(I)(i)(III))

**STATEMENT OF THE LAW 7:** Texas Occupations Code 301.413[1] provides a

[1] § 301.413. RETALIATORY ACTION.  (a) A person named as a defendant in a civil action or subjected to other retaliatory action as a result of filing a report required, authorized, or reasonably believed to be required or authorized under this subchapter may file a counterclaim in the pending action or prove a cause of action in a subsequent suit to recover defense costs, including reasonable attorney's fees and actual and punitive damages, if the suit or retaliatory action is determined to be frivolous, unreasonable, or taken in bad faith.

(b)  A person may not suspend or terminate the employment of, or otherwise discipline or discriminate against, a person who reports, without malice, under this subchapter.

(c)  A person who reports under this subchapter has a cause of action against a person who violates Subsection (b), and may recover:

(1)  the greater of:

(A)  actual damages, including damages for mental anguish even if no other injury is shown;  or

(B)  $1,000;

(2)  exemplary damages;

(3)  court costs;  and

(4)  reasonable attorney's fees.

(d)  In addition to the amount recovered under Subsection (c), a person whose employment is suspended or terminated in violation of this section is entitled to:

(1)  reinstatement in the employee's former position or severance pay in an amount equal to three months of the employee's most recent salary;  and

(2)  compensation for wages lost during the period of suspension or termination.

(e)  A person who brings an action under this section has the burden of proof.  It is a rebuttable presumption that the person's employment was suspended or terminated for reporting under this subchapter if:

(1)  the person was suspended or terminated within 60 days after the date the report was made;  and

(2)  the board or a court determines that the report that is the subject of the cause of action was:

(A)  authorized or required under Section 301.402, 301.403, 301.405, 301.406, 301.407, 301.408, 301.409, or 301.410;  and

(B)  made without malice.

(f)  An action under this section may be brought in a district court of the county in which:

(1)  the plaintiff resides;

(2)  the plaintiff was employed by the defendant;  or

(3)  the defendant conducts business.

Acts 1999, 76th Leg., ch. 388, § 1, eff. Sept. 1, 1999.

retaliation cause of action for a nurse against his or her employer for making a "report" without malice, that is authorized or required under 301.402 (f).

**STATEMENT OF THE LAW 8:**  Plaintiffs have the burden of proof of proof; however there is a rebuttable presumption that the Plaintiffs' employment was suspended or terminated for reporting under Chapter 301 of the Occupations Code if the suspension or termination happened within 60 days after the report was made, *and* the court determines that the report was authorized or required under 301.402 *and* was made without malice. (Source 301.413 (e)).

**STATEMENT OF THE LAW 9:**  The Texas Health & Safety Code 161.134[2] prohibits

---

[2] § 161.134. RETALIATION AGAINST EMPLOYEES PROHIBITED.  (a) A hospital, mental health facility, or treatment facility may not suspend or terminate the employment of or discipline or otherwise discriminate against an employee for reporting to the employee's supervisor, an administrator of the facility, a state regulatory agency, or a law enforcement agency a violation of law, including a violation of this chapter, a rule adopted under this chapter, or a rule adopted by the Texas Board of Mental Health and Mental Retardation, the Texas Board of Health, or the Texas Commission on Alcohol and Drug Abuse.

(b)  A hospital, mental health facility, or treatment facility that violates Subsection (a) is liable to the person discriminated against.  A person who has been discriminated against in violation of Subsection (a) may sue for injunctive relief, damages, or both.

(c)  A plaintiff who prevails in a suit under this section may recover actual damages, including damages for mental anguish even if an injury other than mental anguish is not shown.

(d)  In addition to an award under Subsection (c), a plaintiff who prevails in a suit under this section may recover exemplary damages and reasonable attorney fees.

(e)  In addition to amounts recovered under Subsections (c) and (d), a plaintiff is entitled to, if applicable:

(1)  reinstatement in the plaintiff's former position;
(2)  compensation for lost wages;  and
(3)  reinstatement of lost fringe benefits or seniority rights.

(f)  A plaintiff suing under this section has the burden of proof, except that it is a rebuttable presumption that the plaintiff's employment was suspended or terminated, or that the employee was disciplined or discriminated against, for making a report related to a violation if the suspension, termination, discipline, or discrimination occurs before the 60th day after the date on which the plaintiff made a report in good faith.

(g)  A suit under this section may be brought in the district

retaliation against an employee of a health care facility who reports a violation of law to a supervisor in good faith. (Source: Texas Health & Safety Code 161.134).

**STATEMENT OF THE LAW 10: Texas Health & Safety Code 161.134 elements**

The elements of a cause of action under 161.134 are (1) an employee of a hospital, mental health facility or treatment facility; (2) report a violation of law; (3) to a supervisor administrator, state regulatory agency or a law enforcement agency; (4) in good faith; and (5) as a result, the employee was suspended, terminated, disciplined or otherwise discriminated against. *Barron v. Cook Childrens Health Care Sys.*, 218 S.W. 3d 806, 810 (Tex. App.—Ft. Worth 2007 no pet.). In a retaliation case under 161.134, "but for" causation is the standard for causation. *Tomhave v. Oaks Psychiatric Hosp.*, 82 S.W.3d 381,385 (Tex.App.—Austin 2002, pet.denied), *overruled on other grounds by Binur v. Jacobo,* 135 S.W. 3d 646 (Tex.2004). If an employer submits evidence that it would have taken adverse action in the absence of the report, the presumption disappears and the Plaintiff must submit evidence that the Defendant would not have terminated her employment but for the report. *See Tomhave*, 82 S.W. 3d at 385.

**Pretext**

Factors including timing such as adverse employment action taken soon after the protected activity; knowledge of the protected activity by employees making the decision to suspend or terminate employment; a negative attitude towards the protected activity; deviation from

---

court of the county in which:
   (1) the plaintiff was employed by the defendant; or
   (2) the defendant conducts business.
  (h) A person who alleges a violation of Subsection (a) must sue under this section before the 180th day after the date the alleged violation occurred or was discovered by the employee through the use of reasonable diligence.
  (i) This section does not abrogate any other right to sue or interfere with any other cause of action.
  (j) Each hospital, mental health facility, and treatment facility shall prominently and conspicuously post for display in a public area of the facility that is readily available to patients, residents, employees, and visitors a statement that employees and staff are protected from discrimination or retaliation for reporting a violation of law. The statement must be in English and in a second language.

Added by Acts 1993, 73rd Leg., ch. 573, § 1.01, eff. Sept. 1, 1993.

company policy or disparate treatment of similarly situated employees; and whether the stated reason for employment termination is false or only a pretext all can be considered circumstantial evidence that a report of unlawful activity caused or led to termination of employment. *Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450  (Tex.1996).

**STATEMENT OF THE LAW 10a : Retaliation and Pretext under Title VII Retaliation**

To prove unlawful retaliation, Plaintiff must prove by a preponderance of the evidence that Defendant suspended and then terminated Plaintiffs because they made protected reports about unsafe conditions in the ICU.  Source:  5th Circuit Pattern Jury Charge 11.6.1 Retaliation 2009 changes

Plaintiffs do not have to prove that the unlawful retaliation was the sole reason that Defendant Hospital suspended and then terminated their employment.   Source: 5th Circuit Pattern Jury Charge 11.6.1 Retaliation 2009 change*; Price Waterhouse v. Hopkins,*  490 U.S. 228, 241 & n. 7 (1989).

If Defendant's reasons for the suspension and termination of Plaintiffs is not believable, it may be inferred that Defendant's took such actions because Plaintiffs made protected reports about unsafe conditions in the ICU.  Source: 5th Circuit Pattern Jury Charge 11.6.1 Retaliation*; Ratliff v. City of Gainesville*, 256 F.3d 355, 359-362 (5th Cir. 2001).

**STATEMENT OF THE LAW 11:  25 TAC 133.41 as a Basis for a 301.402 (f)**
**and/ or 161.134 Reports**

In 2002, the Texas Hospital Licensing Laws regarding adequate staffing were passed.  The staffing rules required that hospitals have adequate numbers of RNs, licensed vocational nurses (LVNs), and other personnel to provide nursing care to all patients as needed and provided specific protection from discrimination or retaliation for employees reporting inadequate staffing.  The staffing plan required the hospital to have a procedure in place for nurses to make complaints about inadequate staffing without fear of reprisal.  (Source:  Title 25 Texas

Administrative Code, Chapter 133, Hospital Licensing, Section 133.41 Hospital Functions and

Services (o), Nursing services   http://texinfo.library.unt.edu/texasregister/html/2002/apr-

2/adopted/25.HEALTH%20SERVICES.html  effective date 9/1/2002

**STATEMENT OF THE LAW 12: 25 TAC Section 133.43, Discrimination or Retaliation Standards, Subsection (b) Good Faith definition**

> (b)  Discrimination relating to employee reporting a violation of law. In accordance with Health & Safety Code, §161.134(a), and §133.41(o)(2)(I)(i)(III) of this title (relating to Hospital Functions and Services), a hospital may not suspend or terminate the employment of, discipline, or otherwise discriminate against an employee for reporting in good faith to the employee's supervisor, an administrator of the hospital, a state or federal regulatory agency, a national accrediting organization or a law enforcement agency a violation of law, including a violation of the Act or this chapter.  For purposes of this subsection, a report is not made in good faith if there is not a reasonable factual or legal basis for making the report.  *Id.*

The Texas Supreme Court has developed a two-pronged test to determine whether the employee was acting in good faith for purposes of a whistleblower cause of action. See *Wichita County v. Hart*, 917 S.W.2d 779 (Tex.1996). The first prong is subjective; that is, the employee believed the conduct reported was a violation of the law, regardless of whether the belief is correct. *Id.* at 784-85. The second prong is objective; that is, the employee's belief is reasonable in light of their training and experience. *Wichita County*, 917 S.W.2d at 784-85.

**STATEMENT OF THE LAW 13:  MALICE**

In other retaliation contexts, knowledge by the employer of laws prohibiting retaliation and that the employer is violating the employee's legal rights has been found to be some evidence of malice of the employer. *Ancira Enter's., Inc. v. Fischer*, 178 S.W.3d 82, 94-95 (Tex. App.—Austin 2005, no pet.).

Plaintiff must prove by clear and convincing evidence that Defendant acted with malice defined as follows:

 (a) a specific intent by defendant to cause substantial injury to plaintiff.

(Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (Vernon Supp. 2010); Texas PJC 115.36B.

**STATEMENT OF THE LAW 14:  LOST WAGES AND MOONLIGHTING EARNINGS:**

If one can hold his supplemental job and desired full time job simultaneously and there is reason to believe that he will do so, the supplemental job assumes a permanent rather than interim nature.  *Bing v. Roadway Express, Inc.* 485 F.2d 441, 454 (5th Cir 1973).

**STATEMENT OF THE LAW 15:  BACK PAY**

If Plaintiffs have satisfied their burden under The Texas Occupations Code or the Health & Safety Code they may be awarded back pay and employment benefits as actual damages. (Source: comment to Texas PJC 115.27 re: Texas Whistleblower Act does not provide a definition of actual damages).

"Back pay" is that amount of wages and employment benefits that Plaintiffs would have earned if they had not been subjected to Defendant employer's unlawful conduct less any wages, unemployment compensation benefits or worker's compensation benefits she received in the interim.  Source:  Texas PJC 115.30

"Employment benefits" include sick-leave pay, vacation pay, profit-sharing benefits, stock options, pension fund benefits, housing or transportation subsidies, bonuses, monetary losses incurred as a result of the loss of health, life, dental, or similar insurance coverage.

Source:  Texas PJC 115.30

**STATEMENT OF THE LAW 16:  FRONT PAY in LIEU of REINSTATEMENT**

A plaintiff may recover front pay when a plaintiff shows that reinstatement is not feasible. TEX. PATTERN JURY INSTRUCTIONS 115.30, Comment, Front Pay (2008 ed.) (citing similar federal law). This includes situations in which a hostile relationship exists between the employer and the plaintiff and reinstatement is not feasible. *Pollard v. E.I. DuPont de Nemours & Co.,* 532 U.S. 843, 846 (2001); *Julian v City of Houston,* 314 F. 3d 721, 728 (5th Cir 2002); *Mota v. Univ. of Tex. Houston Health Sci. Ctr.,* 261 F.3d 512, 526 (5th Cir.2001).

**STATEMENT OF THE LAW 17:  PUNTIVE DAMAGES**

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.  The harm to Plaintiffs must be caused by clear and convincing evidence that the harm caused to Plaintiffs resulted from Defendant's malice.

Source: Texas PJC 115.36B

Factors to consider in awarding exemplary damages, are—

  a.  The nature of the wrong.

  b.  The character of the conduct involved.

  c.  The degree of culpability of Defendant.

  d.  The situation and sensibilities of the parties concerned.

  e.  The extent to which such conduct offends a public sense of justice and propriety.

  f.  The net worth of Defendant.

Source Texas PJC 115.37.

A punitive damage award need not be accompanied by compensatory damages under Title VII

and § 1981, based on the plain language of the statute and the purpose of punitive damages.
*Abner v. Kansas City Southern Railroad Co.,* 513 F.3d 154 (5th Cir. 2008).

## STATEMENT OF THE LAW 18:  MENTAL ANGUISH DAMAGES

The following elements of damages to the extent proved by a preponderance of the evidence
should be considered:

> Pain and suffering, mental anguish, loss of capacity to enjoy life: You may award
> damages for any pain and suffering, mental anguish and/or loss of capacity for enjoyment
> of life that the Plaintiff experienced in the past or will experience in the future as a result
> of the Defendant's conduct.  No evidence of the value of intangible things, such as
> mental or physical pain and suffering has been or need be introduced.  You are not trying
> to determine value, but an amount that will fairly compensate the Plaintiff for the
> damages she has suffered. There is no exact standard for fixing the compensation to be
> awarded for these elements of damage. Any award you make should be fair in the light of
> the evidence.

Source:        Fifth Judicial Circuit Pattern Jury Charges (Civil) 15.1, 15.4 (2006)
               (modified).

*Patterson v PHP Healthcare* 90 F. 3d 927 (5th Cir. 1996) cited by Defendant is distinguished as

it was based upon the Court's narrow reliance on EEOC Policy Guidance No. 915.002 (II)(A)(2).

There are numerous ways in which emotional harm may manifest itself, including physical

manifestations as well as other types of manifestations, such as stress and humiliation.  In Texas

cases where retaliatory discharge has been found, proof of physical injury was not required for

the jury to award compensatory damages under ant-retaliation statute.  *See Town Hall Estates v.*

*Winters*, 220 S.W. 3d 71 (Tex. App—Waco 2007, no pet.) (sufficient evidence to uphold award

of compensatory damages.

Respectfully submitted,

HIGGINBOTHAM & ASSOCIATES LLC

By:

    Elizabeth L. Higginbotham, RN, JD
    State Bar No. 00787694

    One Castle Hills
    1100 N.W. LOOP 410, Suite 500
    San Antonio, Texas  78213-2256
    Tel. (210)377-3706
    Fax. (210)377-3757

IHFE AND ASSOCIATES, P.C.

    Richard H. Ihfe
    Texas Bar No. 10384500
    One Castle Hills
    1100 N.W. LOOP 410, Suite 500
    San Antonio, Texas  78213-2256
    Tel. (210)377-3706
    Fax. (210)377-3757

ATTORNEYS FOR PLAINTIFF

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing instrument has been forwarded via electronic transmission and filed through the Court's Electronic Filing System on this 22nd day of November 2010 to Defendant's counsel of record:

Ms. Jennifer Wang
Mr. Mike Birrer
Carrington, Coleman, Sloman & Blumenthal, LLP
901 Main Street, Suite 5500
Dallas, Texas  75202


_____
Elizabeth L. Higginbotham, RN, JD