UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SANDRA TAYLOR RN, §<br>DIANA SEPEDA RN §<br>§<br>     Plaintiffs §<br>§<br>v. §<br>§<br>LONE STAR HMA, LP §<br>d/b/a DALLAS REGIONAL MEDICAL §<br>CENTER, §<br>§<br>     Defendant. § | Case No. 3:07-cv-1931-M |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court makes these Findings of Fact and Conclusions of Law as to a bench trial which occurred from November 30 to December 2, 2010.

### FINDINGS OF FACT

1.  Defendant Dallas Regional Medical Center (the "Hospital") is located in Mesquite, Texas. There are a number of different medical units in the Hospital, including the Intensive Care Unit ("ICU"), which is the critical care unit.

2.  Sandra Taylor and Diana Sepeda (collectively, "Plaintiffs") were nurses employed by the Hospital who worked on the night shift in the ICU. They and Nancy Friesen were on the schedule for May 24, 2007. All three refused to accept their patient assignments that evening. After a suspension and an investigation, on or about June 4, 2007, their employment by the Hospital was terminated.

3.  During the relevant periods, Linda Iserman was the Nurse Manager of the ICU at the Hospital, and as such, had direct supervisory responsibility over Plaintiffs.

4. Iserman investigated the events of May 24, 2007, and made the decision to terminate Plaintiffs' employment.

5. On May 24, 2007, Rick Lijauco was the ICU Charge Nurse on the day shift. As Charge Nurse, he was responsible for making patient–nurse assignments for the oncoming night shift, based in significant part on an assessment of the severity of each patient's medical condition, which is referred to as the patient's "acuity level." The Charge Nurse also takes into account the number and skill of the nurses available to work the particular shift.

6. Barbara Welpton was the night shift ICU Charge Nurse on duty on May 24, 2007. Welpton's Charge Nurse duties were the same as Lijauco's, except she would make the initial assignments for the oncoming ICU day shift.

7. P.J. Kersey was the House Supervisor for the night shift on May 24, 2007. As House Supervisor, Kersey was responsible for nurse staffing throughout the Hospital during her shift. If one unit required additional staffing, Kersey's job duties required that she assist in finding additional staffing, which might include transferring a nurse from one unit to another, calling in overtime nurses, and other similar activities.

8. Chris Loyd was the Director of Human Resources for the Hospital. Loyd assisted in conducting the investigation into the events of May 24, 2007, including conducting individual interviews with each Plaintiff and Nancy Friesen on June 1, 2007.

9. Plaintiffs were involved, as they had every right to be, with a nurse advocacy group that actively supported a proposed state law that would have prohibited any ICU from assigning more than two patients to one nurse, regardless of the patients' acuity levels. However, the proposed legislation did not pass.

10. There is no Texas law that prohibits the Hospital from assigning three ICU patients to one ICU nurse.

11.     After learning of an assignment, an oncoming nurse is to review the medical condition of each assigned patient with the outgoing nurse who cared for those patients during the previous shift. This process is known as taking "report." Report is designed to facilitate the transition between nursing shifts. It is through the report process that an oncoming nurse discovers the acuity level of her patients.

12.     When making patient−nurse assignments for the night shift on May 24, 2007, Lijauco first determined that nurse Lisa Berry would care for the patient in Bed 5, in a one-to-one assignment. There remained six ICU nurses to be assigned to thirteen patients. This meant one ICU staff nurse would have a triple. The Charge Nurse is not expected to triple.

13.     Lijauco consulted the triple log, which reflected prior triple assignments, in order to determine who would triple, and it was Taylor's turn. Lijauco reviewed the existing patients to determine if there was an acceptable three-patient assignment for Taylor.

14.     Lijauco assigned Beds 11, 14, and 15 to Taylor. These patients were near each other, and Lijauco believed all three patients were stable, with relatively lower acuity than other patients.

15.     The patient located in Bed 8, along with one other patient, was initially assigned to Diana Sepeda.

16.     Taylor clocked into the ICU at 6:38 p.m. Before Taylor looked at her assignment, she gave a message to Jeannette Wright, a day shift ICU nurse. Taylor claims Wright told Taylor she had been very busy with one of her two patients, taking the patient for several scans. That was the totality of the information Taylor knew regarding the patients who had been assigned to Wright. Taylor never observed Wright's patients, did not know their medical conditions, and did not know if the one patient mentioned by Wright had any additional scans scheduled.

17. Leaving Wright, Taylor went to the whiteboard. Taylor had been assigned Wright's two patients, and one additional patient.

18. Taylor refused the triple assignment without knowing the underlying conditions of the patients assigned to her.

19. Taylor did not know the acuity level of the patient as to whom she says Wright said she was "very busy," nor did Taylor know the acuity levels of the other two patients assigned to her.

20. Taylor told Lijauco she would not triple. Lijauco suggested to Taylor that she invoke "Safe Harbor," or speak with the ICU Nurse Manager, if she would not triple.

21. "Safe Harbor" is provided for under the Nursing Practice Act ("NPA"). *See* 79th Leg., R.S., ch. 113 § 116, 2005 Tex. Gen. Laws 213 (amended 2007) (current version at Tex. Occ. Code Ann. § 303.005(b) (West, Westlaw through 2009 Sess.)). If a nurse believes she is being asked to perform an action that would be reportable to the Board of Nurse Examiners ("BNE" or "Board"), she can invoke Safe Harbor. *Id.* Under the Safe Harbor process, a nurse and management initially discuss the situation, and if a resolution cannot be reached, the nurse completes a form invoking Safe Harbor, and an independent peer review committee reviews the issue.

22. Taylor declined to invoke Safe Harbor. She spoke with Linda Iserman, Barbara Welpton, and P. J. Kersey, and stated she would not accept the triple assignment.

23. Kersey, Iserman, and Welpton told Taylor she should go home if she would not accept her assignment.

24. On May 24, 2007, Diana Sepeda clocked in at 6:43 p.m. Sepeda went to the whiteboard and saw she had a two-patient assignment.

25. Sepeda became aware that Taylor was declining a triple, before Sepeda took report on the patients assigned to her. Sepeda saw Welpton in front of the whiteboard with a magic marker in her hand, in the process of trying to re-determine assignments in light of Taylor's imminent departure.

26. Sepeda told Welpton she could not take three patients. On May 24, 2007, no one ever made an actual three-patient assignment to Sepeda.

27. Sepeda spoke to Iserman on the phone. At that time, Sepeda did not know if, or which, three patients might be assigned to her.

28. At 7:13 p.m., Taylor and Sepeda, along with Nancy Friesen, clocked out without taking patient assignments.

29. Taylor and Sepeda unreasonably refused their patient assignments on May 24, 2007. Taylor could not have been motivated by the safety of the three patients assigned to her, because she did not know the acuity level of any of those patients. Sepeda could not have been motivated by the safety of any three patients, because she never received a three-patient assignment and thus could not know the acuity levels of the patients for an assignment not given her.

30. Based on Plaintiffs' lack of information, they did not have a reasonable cause to report that a situation existed that exposed a patient to substantial risk of harm, nor did they have a good faith basis to make a report of any such risk.

31. Iserman concluded that only Taylor was actually given a three-patient assignment, and that Taylor did not know the acuity levels of any of those three patients.

32. Iserman also concluded that Sepeda was never actually assigned three specific patients. Sepeda refused to wait for a prospective triple assignment. Iserman also concluded that Sepeda had not taken report on a single patient. With regard to Sepeda's initial two-patient

Page **5** of **10**

assignment, Iserman concluded that Sepeda knew nothing about one of her two patients, and had only heard that one patient had an episode of V-Tach, a serious heart malfunction, on the prior shift.

33. Iserman concluded the initial May 24 assignments were appropriate, and that Taylor's refusal to accept her assignment, and Sepeda's refusal to accept an unknown potential assignment, was not reasonable. Iserman reasonably believed Plaintiffs' conduct of refusing an assignment without knowing more about the acuity levels of their patients was misconduct. The Hospital's ICU nurses were expected to take triple assignments on occasion, if the patients' conditions were such that a nurse could reasonably care for them. Iserman concluded that Plaintiffs were likely to refuse triples in the future, and she concluded it would be detrimental to the ICU if these nurses received special treatment—allowing them to refuse a triple without analyzing the acuity levels of their patients.

34. Iserman's conclusions constitute a legitimate, non-retaliatory reason for Plaintiffs' termination. Plaintiffs have not presented sufficient persuasive evidence to show that each of Iserman's reasons for termination constitute a pretext for unlawful retaliation against Plaintiffs for any conduct authorized by the law and that her true reason was retaliatory.

35. Any Finding of Fact that should instead be a Conclusion of Law is hereby incorporated into the Conclusions of Law as if stated in full.

## CONCLUSIONS OF LAW

1. Section 161.134 of the Texas Health and Safety Code ("THSC") provides in pertinent part, "A hospital . . . may not . . . terminate . . . an employee for reporting to the employee's supervisor . . . a violation of law . . . ." Tex. Health & Safety Code Ann. § 161.134(a) (West, Westlaw through 2009 Sess.). To prove retaliatory discharge under THSC § 161.134(a), each Plaintiff must establish the following elements: (1) she was an employee of the hospital; (2)

she reported a violation of law; (3) the report was made to her supervisor; (4) her report was made in good faith; and (5) she was terminated as a result of the report.

2. With regard to THSC § 161.134(a), the Texas Administrative Code explains, "A report is not made in good faith if there is not a reasonable factual or legal basis for making the report." 22 Tex. Admin. Code § 133.43(b) (West, Westlaw through Jan. 31, 2011) (Dep't of State Health Servs., Discrimination or Retaliation Standards). Further, the Texas Administrative Code defines *bad faith* as "knowingly or recklessly taking action not supported by a reasonable factual or legal basis." 22 Tex. Admin. Code § 217.19(a)(2) (West, Westlaw through Jan. 31, 2011) (Tex. Bd. of Nursing, Incident-Based Nursing Peer Review and Whistleblower Protections).

3. There is no Texas law that prohibits a hospital from assigning three ICU patients to one ICU nurse. Thus, the "reporting" of triple assignments does not constitute "reporting . . . a violation of law" under THSC § 161.134(a).

4. Furthermore, because Taylor rejected her triple assignment without knowing her patients' acuity levels and Sepeda rejected a potential triple assignment before anyone had actually determined the assignment that might be given to her, neither had a reasonable factual or legal basis for making a THSC § 161.134(a) report, and, therefore, neither have established that any report they made was made in good faith.

5. Even if Plaintiffs had met their burdens of proof to show their actions were reasonable and in good faith, Defendant has met its burden of production by establishing legitimate, non-retaliatory reasons for Plaintiffs' terminations. Specifically, Linda Iserman concluded termination was warranted because she reasonably believed that (1) each Plaintiff engaged in misconduct by rejecting patient assignments before reasonably analyzing their acuity levels, (2) Plaintiffs likely would, as a matter of course, refuse future three-patient assignments without review of patients' acuity levels, which would be disruptive to the ICU, and (3) it would

be detrimental to the ICU if Plaintiffs received special treatment by being allowed to refuse a triple without analyzing the acuity levels of their patients.

6. Because Defendant presented evidence of legitimate, non-retaliatory reasons for Plaintiffs' terminations, the Plaintiffs had to prove that each reason is false and that the actual reason each Plaintiff was terminated was that the Hospital intended to retaliate against such Plaintiff for making a report that meets the elements of THSC § 161.134(a).

7. It is not sufficient for the Court to conclude it would have made a different decision about Plaintiffs, nor that the Hospital's decision was arbitrary or ill-informed. Rather, the Court is required to determine that the Hospital did not actually reach the conclusions described in paragraph 33 of the Findings of Fact, and that it made the decision to terminate each Plaintiff with the intent to retaliate against her for making reports that meet all of the elements of THSC § 161.134(a).

8. Although Plaintiffs claim they were retaliated against, their subjective beliefs that retaliation occurred is not sufficient to support a finding of unlawful retaliation.

9. Because Plaintiffs have not presented sufficient persuasive evidence to show that each of Iserman's reasons for termination was pretextual and that her true reason was retaliatory, Plaintiffs have failed to establish their THSC claims.

10. The applicable version of § 301.413(b) of the Texas Occupations Code ("TOC") provides, "A person may not suspend or terminate the employment of . . . a person who reports, without malice, under this subchapter." Act of May 28, 1999, 76th Leg., R.S., ch. 388, § 1 (amended 2007) (current version at Tex. Occ. Code § 301.413(b) (West, Westlaw through 2009 Sess.)). The relevant subchapter is entitled "Duty to Report Violation" and generally concerns the grounds for reporting a nurse to the Board of Nurse Examiners. Accordingly, to maintain a retaliatory termination claim under TOC § 301.413(b), each Plaintiff must show at least the

following: (1) she made a report under the subchapter; (2) the report was made without malice; and (3) she was terminated as a result of the report.

11. Under the applicable version of TOC § 301.402(f), which is within the same subchapter as § 301.413(b), one may make a report to a hospital if she has *reasonable cause* to believe a situation existed that exposed patients to a substantial risk of harm as a result of a failure to provide patient care that conforms to minimum standards of professional practice or to statutory, regulatory, or accreditation standards.

12. Each Plaintiff failed to show by a preponderance of the evidence that she had reasonable cause to believe such a situation existed. Because Taylor rejected her triple assignment without knowing her patients' acuity levels and Sepeda rejected a potential triple assignment before anyone had actually determined the assignment that might be given to her, neither had reasonable cause to believe their patients were exposed to a substantial risk of harm. Thus, neither Taylor nor Sepeda "made a report" within the meaning of TOC § 301.402(f), and they have therefore failed to establish the first element of a retaliation claim under TOC § 301.413(b).

13. Furthermore, Plaintiffs' failures to determine acuity levels of their assigned patients were not reasonable, and making a report under such circumstances rises to the level of malice under applicable law. Thus, Plaintiffs have also failed to establish the second element of a retaliation claim under TOC § 301.413(b).

14. Even if the Court found that either Plaintiff's conduct was reasonable, then Defendant had the right to submit its legitimate, non-retaliatory reason(s) for its termination decisions. Defendant met this burden of production.

15. Accordingly, each Plaintiff was obligated to prove pretext; that is, that each reason provided by Defendant is false, and that the actual reason each Plaintiff was terminated

was that the Hospital intended to retaliate against such Plaintiff for making a report that meets the elements set forth above.

16. Both Plaintiffs have failed to meet their burdens to establish pretext.

17. Because Plaintiffs have failed to establish their claims, they are not entitled to damages.

18. Any Conclusion of Law that should instead be a Finding of Fact is hereby incorporated into the Findings of Fact as if stated in full.

**SO ORDERED**.

February 11, 2011.

_____
BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS